## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

IN-N-OUT BURGERS,
a California corporation,

        Plaintiff,

v.

DOLL N BURGERS LLC,
DOLL N BURGERS TECUMSEH LLC,
and JUSTIN DALENBERG,

        Defendant.

Civil Action No. 5:20-cv-11911

Hon. _____

Magistrate Judge _____

---

Brian D. Wassom (P60381)
WARNER NORCROSS + JUDD LLP
45000 River Ridge Drive, Suite 300
Clinton Township, Michigan 48038
(248) 784-5039
Attorneys for Plaintiffs
bwassom@wnj.com

---

## COMPLAINT

Plaintiff In-N-Out Burgers, a California corporation ("INO"), through its attorneys, for its Complaint against Defendants Doll N Burgers LLC, Doll N Burgers Tecumseh LLC (collectively, "DNB") and Justin Dalenberg, alleges the following:

## PARTIES

1.      INO is a California corporation with its principal place of business in Irvine, California.

2.      Doll N Burgers LLC is a Michigan limited liability company with its registered address at 399 Old Creek Rd., Saline, MI 48176.

3.      Doll N Burgers Tecumseh LLC is a Michigan limited liability company with its registered address at 117 W Louis Glick Hwy., Jackson, MI 49201.

4.      Justin Dalenberg is a founder and self-described "Chief Burger Flipper" of DNB. At all material times and in all material ways, he has been responsible for and a driving force behind the decisions and actions of DNB alleged herein, such that he bears individual liability for them. He resides and does business in this judicial district.

5.      Upon information and belief, Defendants are each responsible for and actively involved in, in whole or in part, operating a quick-service restaurant named "Doll N' Burgers" located at 411 E Chicago Blvd, Tecumseh, MI 49286 (the "DNB Restaurant").

## JURISDICTION AND VENUE

6.      Count I arises under the laws of the United States prohibiting infringement of federally registered trademarks, specifically the Lanham Act, 15 U.S.C. § 1114. Count II alleges unfair competition and common law trade dress infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Count III is for unfair competition under Michigan common law. Count IV is for violation of the Michigan Consumer Protection Act, M.C.L. § 445.903. Count V is for unjust enrichment under Michigan common law.

7.      This Court has subject matter jurisdiction over the claims arising under the Lanham Act based on 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and § 1338(a), because the

2

claims arise under federal law. This Court has subject matter jurisdiction over all of the claims based on 28 U.S.C. § 1332 because INO and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. This Court also has supplemental jurisdiction over the state law claims based on 28 U.S.C. § 1367 because the state law claims are so related to the federal claims that they form part of the same case and controversy.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 as Defendants are located and do business in this judicial district, and the actions alleged herein took place in this judicial district.

## INO'S STRONG, NATIONWIDE GOODWILL

9.      For more than 50 years, INO has operated a successful and popular chain of quick service restaurants offering made-to-order burger sandwiches and other products and services.

10.     INO has more than 225 locations in California, and over 350 locations in total throughout California, Arizona, Nevada, Utah, Texas, and Oregon, and it is continuing to expand to other states.

11.     INO serves and has served thousands of out-of-state customers who regularly travel to INO's locations, such that INO's customers are located throughout the United States, including in Michigan.

12.    INO is also well-known through its locations in tourist and other popular areas that are extensively visited by customers from all over the United States (including Michigan), such as Hollywood, California; Fisherman's Wharf in San Francisco, California; Las Vegas, Nevada; and the University of Texas, Austin.

13.    INO has developed a highly loyal customer base and has been consistently rated as one of the top quick-service restaurants in several customer satisfaction surveys. The opening of a new restaurant often becomes an event. For example, when INO opened its location in Scottsdale, Arizona, there was a four-hour wait for food, and news helicopters covered the event from overhead. A number of renowned chefs have publicly identified as fans of INO, including Gordon Ramsay, Thomas Keller, Julia Child, Anthony Bourdain, Ina Garten, and Mario Batali.

14.    INO's business practices also contribute to the strong goodwill it enjoys. One of the keys to INO's success is its decision not to franchise its operations or go public, in order to prioritize quality over excessively rapid business growth. INO is also well-known for employee-centered personnel policies. For example, INO is one of the few quick-service restaurant chains in the United States to pay its employees more than state and federally mandated minimum wage guidelines.

15.    INO was one of the very few restaurant chains given a positive mention in the book *Fast Food Nation*. The book commended the chain for using natural and fresh ingredients and for looking after the interests of employees regarding pay and benefits.

## <u>INO'S WELL-KNOWN TRADE DRESS</u>

16.    Since at least 1960, INO has consistently and exclusively used a combination of specific design elements in its restaurants and product packaging to indicate INO as the source of its goods and services. These elements include, among others:

  a.  A color scheme consisting of red and white with accents of yellow or gold;

  b.  A primarily white exterior with a low red stripe and red awnings;

  c.  Red and white interior décor, including a white counter featuring a stripe in red with a grey countertop, red cushioned chairs and red table tops, and grey floor tiles;

  d.  A menu with a red and white color scheme and layout including a horizontal line of boxes at the top featuring combo meals with no sizing options;

  e.  White cups with red graphics featuring a line of palm trees near the top of the cup;

  f.  Employee uniforms featuring white collared shirts, red aprons, and red and white hats (both baseball caps and paper hats);

  g.  Using open-ended burger wrappers;

  h.  The use of the single letter "N" in the name;

  i.  Décor and photos emphasizing a classic car theme.

These elements will be referred to collectively herein as the "INO Common Law Trade Dress."

17.     In recognition of the consumer recognition and goodwill associated with INO's trade dress, the US Patent and Trademark Office has issued U.S. Registration No. 4839216 for a subset of this trade dress (the "INO Registered Trade Dress"). The INO Registered Trade Dress consists of a three-dimensional trade dress depicting the interior of a restaurant. The interior includes white sectional dividing walls having horizontal rows of red stripes. The interior also includes clear glass panels positioned above parts of the dividing walls. The interior also includes a customer seating area with booths, barstools and chairs, wherein the chairs are red, the barstools are white, and the booths have red upholstery, and white countertops and tabletops. The interior further includes a customer ordering area with sections of red tile walls and white tile walls around the customer ordering area and a silver counter. The INO Registered Trade Dress is depicted below; the matter shown in broken lines is not part of the mark and serves only to show the position of the mark.



18.     The distinctive design of INO's Common Law Trade Dress and INO's Registered Trade Dress (together, the "INO Trade Dress") was adopted several decades ago

to distinguish INO's goods and services from that sold by others and to create a very strong market and reputational presence as a source indicator of high-quality quick-service food products.

19.     As a consequence of the long, extensive, continuous, and exclusive use of the INO Trade Dress in association with hamburgers, fries, and other quick-service restaurant food items, the INO Trade Dress has become an exceedingly strong and distinctive trademark.

20.     The distinctive INO Trade Dress has long symbolized and been readily identified with premium-quality food emanating from a single source, namely INO.

21.     The INO Trade Dress is inherently distinctive.

22.     The INO Trade Dress has, for many years, enjoyed strong secondary meaning in the marketplace across the United States, including in Michigan.

23.     INO has carefully monitored and policed use of the INO Trade Dress and maintains tight control over its use—including, when necessary, by obtaining judicial relief. For example, in the case *In-N-Out Burgers v. Chadder's Restaurant*, No. 07-394-TS (filed June 14, 2007), the United States District Court for the District of Utah not only recognized INO's longstanding rights in a materially identical articulation of the INO Common Law Trade Dress in a state to which INO had not yet physically expanded, but also issued a temporary restraining order against a restaurant that had materially copied it.

## DNB'S INFRINGEMENT OF THE INO TRADE DRESS

24.     DNB opened the DNB Restaurant in 2020, and advertised its grand opening as being July 11, 2020. Although its Tecumseh location is DNB's first restaurant, DNB has publicly made known its intention to expand its business into a nationwide chain.

25.     The DNB Restaurant features hamburgers, milkshakes, French-fried potatoes, and poutine.

26.     In its DNB Restaurant, product packaging, and related marketing materials, DNB has extensively copied and/or closely imitated the INO Trade Dress. Below are several non-exclusive examples:

a.  DNB has copied INO's color scheme, including the use and placement of red and white and even using a splash of yellow or gold in its logo, just like INO:



| DNB | INO |
|---|---|



b. The layout and colors of the DNB Restaurant include a primarily white exterior with a low red stripe and red awnings, red and white interior décor including white counter featuring a stripe in red with a black countertop similar to the In-N-Out grey countertop, red cushioned chairs and red table tops, and grey floor tiles similar to INO's white-and-gray tiles:

| DNB | INO |
| --- | --- |



9



c.  The red and white theme and layout of DNB's menu includes a horizontal line

of boxes featuring single-size, single-price combo meals at the top:



d. DNB's cups are white with red graphics featuring horizontal lines and a horizontal series of cow heads, in the same way that INO's cups display a line of palm trees.



e.  DNB employee uniforms feature white collared shirts, red aprons, and red and white baseball caps or paper hats.



f.   DNB uses open ended burger wrappers in the same manner as INO.

| DNB | INO |
|---|---|



g.   DNB uses the single letter "N" in the center of its three-part name.

| DNB | INO |
|---|---|



13

h.  DNB promotes its products using a classic cars theme.





Collectively, INO refers to DNB's trade dress as the "Infringing Dress."

27.     Upon viewing the Infringing Dress, purchasers and consumers are likely to believe that Defendants' goods and services originate with, or are sponsored or approved by, INO.

28.     This is not a hypothetical concern. A number of consumers have already expressed actual confusion between the INO Trade Dress and the Infringing Dress, as demonstrated by these excerpts from DNB's own Facebook page:



29.     The INO Trade Dress has priority over the Infringing Dress. Defendants' use of the Infringing Dress began long after INO had been utilizing in interstate commerce, and had gained nationwide secondary meaning in, the INO Trade Dress.

30.     Each of the *Frisch* factors for determining likelihood of confusion favor a finding that the Infringing Dress is likely to cause confusion with the INO Trade Dress:

   a.   The INO Trade Dress is strong, and commands a great deal of goodwill and secondary meaning with consumers nationwide.

   b.   The parties' products are highly related. Both feature specialty hamburgers, fries, soft drinks, and milk shakes.

   c.   The INO Trade Dress and the Infringing Dress are highly similar in appearance, as shown above.

   d.   As demonstrated above, there is ample evidence of actual confusion between the parties' trade dress.

   e.   The parties use similar marketing channels, including road signs, social media, and websites.

   f.   Because the products at issue are relatively low-cost items, consumers are not likely to exercise a high degree of care in distinguishing between the parties' goods.

   g.   Defendants could not have helped but be motivated by a desire to trade off of INO's goodwill when selecting the Infringing Dress. Dalenber even sent

correspondence to INO revealing his pre-existing familiarity with the INO Trade Dress (see Paragraph 34, Exhibit C).

h. The parties' product lines are likely to expand in such a way as to increase confusion going forward. INO's locations have steadily expanded eastward from California over the years, and are sufficiently popular that travelers from all parts of the country, including Michigan, are familiar with INO's branding. Defendants have also revealed plans to expand their brand nationwide.

## INO'S ATTEMPT TO RESOLVE THE DISPUTE

31.    On July, 3, 2020, counsel for INO delivered a letter to Defendants expressing INO's concerns and requesting that Defendants take voluntary action to avoid confusion with the INO Trade Dress. *See* **Ex A**.

32.    On July 4, 2020, Dalenberg responded to INO correspondence by email. His message revealed personal familiarity with INO and the INO Trade Dress, but entirely rejected INO's concerns and refused (on behalf of all Defendants) to take any corrective action. *See* **Ex B**.

33.    Defendants were aware of, and should have been aware that, their use of a confusingly similar trade dress in connection with the marketing and distribution of quick-service restaurant food was likely to confuse, mislead, and otherwise deceive consumers as to the source, sponsorship, or affiliation of their products. Despite this, Defendants decided

to manufacture, market, distribute, promote and sell their goods, on information and belief, in an attempt to capitalize and trade on the goodwill of the INO Trade Dress.

34.     Defendants' use of the identical or nearly identical trade dress in connection with the marketing, distribution, promotion and sale of quick-service restaurant food is likely to cause confusion with the INO Trade Dress that has long been used with its own quick-service restaurant food products. Defendants' use is also likely to cause confusion and mislead and deceive consumers as to the source, sponsorship or affiliation of Defendants' goods and services.

35.     If Defendants are permitted to continue to manufacture, market, distribute, promote and sell their products by infringing INO's distinctive INO Trade Dress, INO will continue to suffer irreparable harm for which there is no adequate remedy at law.

### COUNT I
### TRADEMARK INFRINGEMENT
### LANHAM ACT – 15 U.S.C. § 1114(1)

36.     INO incorporates all prior paragraphs as if they have been stated here.

37.     INO exclusively owns the INO Registered Trade Dress.

38.     INO has used the INO Registered Trade Dress in interstate commerce in connection with the advertising and promotion of its restaurant products and services.

39.     The Infringing Dress is a colorable imitation of the INO Registered Trade Dress which Defendants have used, and continue to use, in commerce in connection with the operating of a food service establishment.

40.     Upon information and belief, Defendants' unauthorized use of colorable imitations of the INO Registered Trade Dress has caused, and likely will cause, confusion, mistake, or deception in the relevant consumer market.

41.     Defendants' unauthorized use of colorable imitations of the INO Registered Trade Dress constitutes trademark infringement in violation of 15 U.S.C. §§ 1114 and 1117.

42.     Defendant has acted in bad faith and willfully in adopting colorable imitations of the INO Registered Trade Dress in connection with the operating of a restaurant in an effort to reap the benefits of the goodwill associated with the INO Registered Trade Dress.

43.     Defendants' infringing acts have caused and will continue to cause INO to suffer irreparable injuries to its reputation and goodwill. INO does not have an adequate remedy at law to recover for this harm, and therefore, INO is entitled to injunctive relief.

44.     This is an exceptional case pursuant to 15 U.S.C. § 1117.

45.     By reason of the above, INO is entitled to injunctive relief against Defendants that permanently restrains Defendants from further acts of trademark infringement and to any damages that have been caused by Defendants' aforementioned acts, including but not limited to, treble damages, costs, and attorneys' fees pursuant to 15 U.S.C. § 1117.

### COUNT II
### FEDERAL UNFAIR COMPETITION
### LANHAM ACT – 15 U.S.C. § 1125(A)

46.     INO incorporates all prior paragraphs as if they have been stated here.

47.     Defendants' intentional commercial use of the Infringing Dress constitutes a false designation of origin, a false or misleading description of fact, and a false or misleading representation of fact, and has, upon information and belief, caused and is likely to cause confusion, mistake, and deception as to the following:

(a)     the affiliation, connection, or association of DNB with INO and the INO Common Law Trade Dress;

(b)     the origin, sponsorship, or approval of DNB by INO; and

(c)     the nature, characteristics, or qualities of Defendants' goods and services that bear or sold in connection with the Infringing Dress.

48.     Defendants knew or should have known of INO's rights in the INO Common Law Trade Dress, and their infringement has been knowing, willful, and deliberate.

49.     Defendants' conduct as alleged herein constitutes unfair competition in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

50.     Defendants' conduct as alleged herein has caused and will continue to cause immediate and irreparable injuries to INO's reputation and goodwill. INO has no adequate remedy at law to recover for this harm, and is therefore entitled to injunctive relief under 15 U.S.C. § 1116.

51.     By reason of the above, INO is entitled to injunctive relief against Defendants that permanently restrains Defendants from further acts of trademark infringement and to any

damages that have been caused by Defendants' aforementioned acts, including but not limited to, treble damages, costs, and attorneys' fees pursuant to 15 U.S.C. § 1117.

## COUNT III
## UNFAIR COMPETITION
## VIOLATION OF MICHIGAN COMMON LAW

52.     INO incorporates all prior paragraphs as if they have been stated here.

53.     By virtue of Defendants' acts hereinabove pleaded, Defendants have engaged in unfair competition in violation of Michigan common law. Defendants' use of the Infringing Dress is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with INO and as to the origin, sponsorship, endorsement, or approval by INO of Defendants' products and its other commercial activity. Confusion is likely to occur if Defendants' use in commerce of the Infringing Dress does not stop.

54.     Defendants' unauthorized use of the Infringing Dress in connection with goods and services that are identical or substantially similar and highly related to INO's goods jeopardizes the entire goodwill symbolized by the INO Trade Dress, causing immediate, serious, and irreparable injury to INO, for which INO has no adequate remedy at law.

## COUNT IV
## VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT
## M.C.L. § 445.903

55.     INO incorporates all prior paragraphs as if they have been stated here.

56.     By virtue of Defendants' acts hereinabove pleaded, Defendants are in violation of Michigan Consumer Protection Act.

57.     Defendants' use of the Infringing Dress is unfair, unconscionable, or deceptive and likely to cause confusion, or to cause mistake, or to deceive as to the source, sponsorship, approval, or certification of Defendants' goods.

58.     Defendants' unauthorized use of the Infringing Dress in connection with goods that are identical or substantially similar and highly related to INO's goods jeopardizes the entire goodwill symbolized by the INO Trade Dress, causing immediate, serious, and irreparable injury to INO, for which INO does not have an adequate remedy at law.

<u>COUNT V</u>
**UNJUST ENRICHMENT**

59.     INO incorporates all prior paragraphs as if they have been stated here.

60.     Through Defendants' unlawful, unfair and deceptive use of the Infringing Dress, Defendants have received the benefit of INO's significant efforts to market INO's unique products and INO's goodwill in the food service industry.

61.     Defendants' unlawful, unfair and deceptive use of the Infringing Dress was done without INO's permission or consent.

62.     Such acts were done willfully, knowingly, intentionally and in bad faith.

63.     As such, INO involuntarily conferred a benefit on Defendants.

64.     Under Michigan law, Defendants have been unjustly enriched by their unlawful, unfair and deceptive acts in the form of additional ill-gotten sales, revenue and goodwill.

65.     Defendants' actions have irreparably harmed INO.

66.     INO is entitled to Defendants' ill-gotten gains and/or revenues.

## PRAYER FOR RELIEF

WHEREFORE, INO respectfully prays that this Court enter an order and judgment in its favor and against Defendants as follows:

A.      That INO's Registered Trade Dress has been infringed by Defendants in violation of 15 U.S.C. § 1114(1).

B.      That Defendants' use of the Infringing Dress infringes INO's rights in the INO Common Law Trade Dress, and otherwise constitutes unfair competition in violation of 15 U.S.C. § 1125(a).

C.      That the INO Trade Dress is protectable, valid, enforceable, and has been infringed by Defendants.

D.      That Defendants' use of the Infringing Dress is unfair competition under Michigan common law.

E.      That Defendants' use of the Infringing Dress is a violation of the Michigan Consumer Protection Act, M.C.L. 445.903.

F.      That Defendants have been unjustly enriched by Defendants' use of the Infringing Dress in violation of Michigan common law.

G.      That Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, be permanently enjoined and restrained from:

24

1.      Using the Infringing Dress or any variation thereof;

2.      Using any mark that is confusingly similar to or a colorable imitation of the INO Trade Dress; and

3.      Otherwise infringing the INO Trade Dress.

H.      That Defendants have willfully infringed the INO Trade Dress.

I.      That Defendants be required to pay to INO such damages, statutory or otherwise, together with pre-judgment interest thereon, as INO has sustained as a consequence of Defendants' wrongful acts, and to account for and return to INO any monies, profits, and advantages wrongfully gained by Defendants.

J.      That Defendants pay treble damages to INO, pursuant to 15 U.S.C. § 1117.

K.      That Defendants pay to INO its reasonable attorney's fees, expenses and costs incurred in this action, pursuant to 15 U.S.C. § 1117.

L.      That Defendants deliver up for impoundment, and for destruction upon entry of judgment, all products, advertising, marketing materials, writings, signage, artwork, and other material, including media, which infringe INO's rights, falsely designate its source or origin or otherwise facilitate Defendants' infringement of the INO Trade Dress

M.      That Defendants be directed to file with this Court and serve on INO within thirty (30) days after the service of an injunction, a written report under oath setting forth in detail the manner and form in which Defendants have complied with this injunction.

N.      That INO be granted such further relief as the Court may deem appropriate.

Respectfully submitted,

Dated:    July 15, 2020

By:   /s/ Brian D. Wassom
          Brian D. Wassom (P60381)
          WARNER NORCROSS + JUDD LLP
          45000 River Ridge Drive, Suite 300
          Clinton Township, Michigan 48038
          (248) 784-5039
          Attorneys for Plaintiff
          bwassom@wnj.com