101



**Warner Norcross + Judd** LLP

August 9, 2021

**FEDERAL EXPRESS**

Clerk of the Court
U.S. District Court
Eastern District of Michigan
526 Water Street
Port Huron, MI 48060

      Re:    **In-N-Out Burgers v Doll N Burgers LLC, et al**
              **U.S. District Court Case No. 3:20-cv-11911**

Dear Clerk:

      Enclosed please find Exhibit 56 to the Plaintiff's Motion for Summary Judgment (DKT 32), together with the Index of Exhibit to be Filed in the Traditional Manner, Cover Sheet for Exhibit 56 and the Notice of Filing Exhibits in the Traditional Manner for filing with the Court in the traditional manner in the above-referenced matter.

      In addition, I have provided a duplicate copy of all to Judge Cleland, which I have forwarded directly to his chambers.

      Please do not hesitate to contact us with any questions.

                        Sincerely,

                        */s/ Brian D. Wassom*

                        Brian D. Wassom

BDW/dak
Enclosures
cc:    Bradley L. Smith, Esq.
        Hon. Robert H. Cleland

22095616

RECEIVED
AUG 19 2021
CLERK'S OFFICE
DETROIT

no envelope

**Brian D. Wassom | Partner**
D 586.303.4139
F 248.603.9700
E bwassom@wnj.com
45000 River Ridge, Suite 300
Clinton Township, MI 48038-5582

MIED (Rev. 6/05) Notice of Filing Exhibits in the Traditional Manner

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

IN-N-OUT BURGERS, a California corporation

               Plaintiff(s),                        Case No.  3:20-cv-11911

v.                                     Judge Robert H. Cleland

DOLL N BURGERS LLC, ET AL,

                                    Magistrate Judge  Anthony P. Patti

               Defendant(s).

_____/

## NOTICE OF FILING EXHIBITS IN THE TRADITIONAL MANNER

        Please take notice that the undersigned has filed exhibits to the following paper in the traditional manner.  Leave of Court was previously granted on _____ August 3, 2021 _____ by the above judicial officer.

Title of Paper:   Exhibit 56 to Plaintiff's Motion for Summary Judgment

        The exhibits have been served in hard copy on all parties pursuant to federal and local rules.

Date:  August 6, 2021                /s/Brian D. Wassom _____

                                  P60381
                                  Warner Norcross + Judd LLP
                                  45000 River Ridge Drive, Suite 300
                                  48038
                                  586-303-4139
                                  bwassom@wnj.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

IN-N-OUT BURGERS,
a California corporation,

      Plaintiff/Counter-Defendant,

v.

DOLL N BURGERS LLC, et al,

      Defendants/Counter-Plaintiffs.

Civil Action No. 3:20-cv-11911

Hon. Robert H. Cleland

Magistrate Judge Anthony P. Patti

---

Brian D. Wassom (P60381)
Regina M. Gilmour (P83117)
WARNER NORCROSS + JUDD LLP
45000 River Ridge Drive, Suite 300
Clinton Township, Michigan 48038
(586) 303-4039
Attorneys for Plaintiffs
bwassom@wnj.com
rgilmour@wnj.com

Bradley L. Smith (P48138)
ENDURANCE LAW GROUP PLC
133 W. Michigan Avenue, Suite 10
Jackson, Michigan 49201
(517) 879-0253
Attorneys for Defendants
bsmith@endurancelaw.com

---

## EXHIBIT 56 IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT 32]

Respectfully submitted,

Dated:    August 9, 2021

By: /s/ Brian D. Wassom
    Brian D. Wassom (P60381)
    WARNER NORCROSS + JUDD LLP
    45000 River Ridge Drive, Suite 300
    Clinton Township, Michigan 48038
    (586) 303-4139
    Attorneys for Plaintiff
    bwassom@wnj.com

22095204

**IN-N-OUT BURGERS**

v.                                        No. 3:20-cv-11911

**DOLL N BURGERS LLC, et al**

Exhibit 56 to
Plaintiff's Motion for Summary Judgment



Placed on shelf

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

IN-N-OUT BURGERS,
a California corporation,

        Plaintiff/Counter-Defendant,

v.

DOLL N BURGERS LLC, et al,

        Defendants/Counter-Plaintiffs.

Civil Action No. 3:20-cv-11911

Hon. Robert H. Cleland

Magistrate Judge Anthony P. Patti

---

Brian D. Wassom (P60381)
Regina M. Gilmour (P83117)
WARNER NORCROSS + JUDD LLP
45000 River Ridge Drive, Suite 300
Clinton Township, Michigan 48038
(586) 303-4039
Attorneys for Plaintiffs
bwassom@wnj.com
rgilmour@wnj.com

Bradley L. Smith (P48138)
ENDURANCE LAW GROUP PLC
133 W. Michigan Avenue, Suite 10
Jackson, Michigan 49201
(517) 879-0253
Attorneys for Defendants
bsmith@endurancelaw.com

---

## INDEX OF EXHIBIT TO BE FILED IN THE TRADITIONAL MANNER

Plaintiff, IN-N-OUT BURGERS, ("Plaintiff") submits the following as its Index of Exhibit to be Filed in the Traditional Manner:

### Index

Exhibit 56 to Plaintiff's Motion for Summary Judgment [DKT 32] submitted in the form of a flash drive which contains a Lewis/Fetters video of a pick-up window which cannot

authentically be converted to PDF as required in R19(a) of this Court's ECF Policy and Procedures.

Respectfully submitted,

Dated:        August 9, 2021

By: /s/ Brian D. Wassom
Brian D. Wassom (P60381)
WARNER NORCROSS + JUDD LLP
45000 River Ridge Drive, Suite 300
Clinton Township, Michigan 48038
(586) 303-4139
Attorneys for Plaintiff
bwassom@wnj.com

22095087

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

IN-N-OUT BURGERS,

      Plaintiff/Counter-Defendant,

                                    Civil Action No. 20-11911

v.

                                      Hon. Robert H. Cleland

DOLL N BURGERS LLC, et al,

                                      Magistrate Judge Anthony P. Patti

      Defendants/Counter-Plaintiffs.

---

Brian D. Wassom (P60381)
Regina M. Gilmour (P83117)
WARNER NORCROSS + JUDD LLP
45000 River Ridge Drive, Suite 300
Clinton Township, Michigan 48038
(586) 303-4139
Attorneys for Plaintiffs
bwassom@wnj.com
rgilmour@wnj.com

Bradley L. Smith (P48138)
ENDURANCE LAW GROUP PLC
133 W. Michigan Avenue, Suite 10
Jackson, Michigan 49201
(517) 879-0253
Attorneys for Defendants
bsmith@endurancelaw.com

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, WITH SUPPORTING BRIEF

Plaintiff In-N-Out Burgers, ("INO"), through its attorneys, respectfully moves pursuant to Fed. R. Civ. P. 56 for summary judgment in its favor on all of the claims and counterclaims alleged in this case (and also moves under Rules 12(c) & (f) as to Counterclaim Count II), or, alternatively, on as many issues as the Court deems warranted. On July 27, 2021, the undersigned spoke to Defendants' counsel by phone and sought consent, which was declined. In support of its motion, INO offers the following brief.

i

## STATEMENT OF ISSUES PRESENTED

1. Should Count II of DNB's Counterclaims (seeking a declaration of non-infringement) be dismissed under Rules 12(c) & (f) as redundant, or on the merits under Rule 56?

2. Should the Court grant INO summary judgment as to Count I of DNB's Counterclaims (seeking cancellation of INO's trade dress registration) where DNB's accusation of fraud in the application process is baseless, and the record more than amply supports the Examiner's conclusion that INO's trade dress is distinctive?

3. Should the Court grant INO summary judgment as to its trade dress infringement claims against DNB, because the record is so overwhelmingly in INO's favor that no reasonable jury could find otherwise?

4. In the alternative to granting INO complete summary judgment on its claims, should the Court narrow the issues for trial by granting INO partial summary judgment on one or more of the following issues:

   a. That INO's trade dress is inherently distinctive?

   b. That INO's trade dress has achieved secondary meaning?

   c. That DNB adopted its dress with full knowledge of INO's trade dress, and therefore cannot evade enforcement of INO's Trade Dress on the basis of geographic distance?

## <u>CONTROLLING / MOST RELEVANT AUTHORITY</u>

- On the redundancy of Counterclaim Count II:

    - *Malibu Media, LLC v. Ricupero*, 705 Fed. Appx. 402 (6th Cir. Aug. 28, 2017)

- On the insufficiency of Counterclaim Count I:

    - *Anheuser-Busch, Inc. v. Bavarian Brewing Co.*, 264 F.2d 88 (6th Cir. 1959)

    - *In re Bose Corp.*, 580 F.3d 1240 (Fed. Cir. 2009)

- As to INO's Trade Dress Infringement claim:

    - *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 US 763 (1992)

    - *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405 (6th Cir. 2006)

    - *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619 (6th Cir.2002)

    - *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.* , 270 F.3d 298 (6th Cir. 2001)

    - *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F. 3d 1047 (6th Cir. 1999)

    - *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275 (6th Cir. 1997)

    - *Homeowners Grp. v. Home Marketing Specialists*, 931 F. 2d 1100 (6th Cir. 1991)

    - *Tas-T-Nut Co. v. Variety Nut & Date Co.*, 245 F. 2d 3, 7 (6th Cir. 1957)

    - *White Tower Sys, Inc v White Castle Sys Corp*, 90 F2d 67 (6th Cir. 1937)

    - *Hershey Co. v. Art Van Furniture, Inc.*, No. 08-14463, 2008 U.S. Dist. LEXIS 87509 (E.D. Mich. Oct. 24, 2008)

iii

- o *Mexican Food Specialties, Inc. v. Festida Foods, Ltd.*, 953 F. Supp. 846 (E.D. Mich. 1997)

- o *McNeil-PPC, Inc. v. Guardian Drug Co.*, 984 F. Supp. 1066 (E.D. Mich. 1997)

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED .......................................................................... ii

CONTROLLING / MOST RELEVANT AUTHORITY .............................................................iii

TABLE OF CONTENTS........................................................................................................ v

Table of Authorities.........................................................................................................vii

STATEMENT OF MATERIAL FACTS.................................................................................. xi

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 1

I.    DNB's Counterclaims Fail As a Matter of Law ........................................................ 1

    A.   Count II for Declaratory Judgment of Non-Infringement Is Redundant.................... 1

    B.   The Record Cannot Support Cancellation of INO's Trade Dress Registration........ 1

        1.   DNB Cannot Demonstrate Fraud on the USPTO ................................................ 2

        2.   DNB Cannot Disprove That the Registered Dress Is Distinctive......................... 5

            i.    As the Examiner Held, the Registered Dress Has Secondary Meaning.......... 5

            ii.   Direct consumer testimony .............................................................................. 6

            iii.    Consumer surveys........................................................................................ 6

            iv.  Exclusivity, length, and manner of use .......................................................... 6

            v.   Amount and manner of advertising.................................................................. 7

            vi.  Amount of sales and number of customers...................................................... 7

            vii.    Established place in the market .................................................................... 7

            viii.    Proof of intentional copying......................................................................... 8

    C.   The Registered Trade Dress is Inherently Distinctive............................................ 9

II.   INO Is Entitled to Summary Judgment on Its Claims Against DNB ........................... 10

    A.   INO's Trade Dress Comprises the Total Look and Feel Created By the
Combination of the Specified Elements........................................................................ 10

    B.   Distinctiveness and Likelihood of Confusion Are Central to Each Claim .............. 11

    C.   Décor Trade Dress (Such as INO's) Is Non-Functional......................................... 12

    D.   INO's Common Law Trade Dress Is Distinctive of INO ......................................... 13

        1.   The Common Law Trade Dress Is Inherently Distinctive................................... 13

        2.   The Common Law Trade Dress Has Also Acquired Distinctiveness................. 15

            i.    Direct consumer testimony .......................................................................... 15

ii. Consumer surveys...................................................................... 15

iii. Exclusivity, length, and manner of use......................................... 16

iv. Amount and manner of advertising............................................... 16

v. Amount of sales and number of customers.................................... 16

vi. Established place in the market.................................................... 17

vii. Proof of intentional copying........................................................ 17

E. A Reasonable Jury Could Only Find That DNB's Infringing Dress Is Likely to Cause Confusion With INO's Trade Dress .................................................... 18

1. The Strength of INO's Trade Dress .................................................. 18

2. The Relatedness of the Parties' Goods and Services ....................... 18

3. The Similarity of the Parties' Trade Dresses .................................... 19

4. Evidence of Actual Confusion ......................................................... 20

5. Marketing Channels Used By the Parties.......................................... 21

6. Probable Degree of Purchaser Care and Sophistication ................... 21

7. Defendants' Intent in Selecting Their Infringing Dress...................... 22

8. The Parties Are Likely to Expand Further Into Each Others' Markets—Although Any Geographic Distance Between the Parties Is Immaterial................................... 22

i. There Is Already Overlap Between the Parties in Michigan ........................... 22

ii. The Overlap Will Increase as the Parties Expand.......................................... 24

iii. Geographic Separation Is Irrelevant to DNB's Liability.............................. 24

F. Alternatively, the Court Should Narrow the Issues For Trial.................................. 25

vi

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.,*
   280 F.3d 619 (6th Cir.2002) ............................................................ 8, 11, 12, 13

*AMD Southfield Mich. Ltd. P'ship v. Mich. Open MRI LLC,*
   337 F. Supp. 2d 978 (E.D. Mich. 2004) ............................................................ 9

*Anheuser-Busch, Inc. v. Bavarian Brewing Co.,*
   264 F.2d 88 (6th Cir. 1959) ............................................................ 2, 3

*Ass'd Hosts of Cal, Inc v. Moss,*
   207 USPQ 973 (WDNC 1979)............................................................ 25

*Atl. Recording Corp. v. Serrano,*
   No. 07-CV-1824WJMA, 2007 WL 4612921 (S.D. Cal. Dec. 28, 2007) ........................... 1

*In re Bose Corp.,*
   580 F.3d 1240 (Fed. Cir. 2009) ............................................................ 2

*Brookfield Communs v. West Coast Ent'mnt,*
   174 F. 3d 1036 (9th Cir. 1999) ............................................................ 19, 22

*Calamari Fisheries, Inc v Village Catch, Inc,*
   698 F Supp. 994 (D Mass, 1988) ............................................................ 25

*Circuit City Stores, Inc. v. CarMax, Inc.,*
   165 F. 3d 1047 (6th Cir. 1999) ............................................................ 24

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,*
   109 F.3d 275 (6th Cir. 1997) ............................................................*passim*

*Freddie Fuddruckers, Inc v Ridgeline, Inc,*
   589 F Supp 72 ............................................................ 25

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,*
   826 F.2d 837 (9th Cir.1987) ............................................................ 13

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,*
   No. 84-1115, 1984 U.S. Dist. LEXIS 22289 (D. Ariz. Oct. 31, 1984) ........................... 10

*Gen. Motors Corp. v. Lanard Toys, Inc.,*
   468 F.3d 405 (6th Cir. 2006) .............................................................. 5, 6, 15

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.,*
   730 F.3d 494 (6th Cir. 2013) ...................................................................... 5

*Happy Sumo Sushi, Inc v Yapona, Inc,*
   2008 WL 3539628 (D Utah 2008)............................................................... 25

*Hensley Mfg. v. ProPride, Inc.,*
   579 F.3d 603 (6th Cir. 2009) ..................................................................... 12

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.,*
   270 F.3d 298 (6th Cir. 2001) ................................................................... 6, 7

*Hershey Co. v. Art Van Furniture, Inc.,*
   No. 08-14463, 2008 U.S. Dist. LEXIS 87509 (E.D. Mich. Oct. 24, 2008)....................... 11

*Homeowners Grp. v. Home Marketing Specialists,*
   931 F. 2d 1100 (6th Cir. 1991) .......................................................... 19, 21, 22

*I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC,*
   No. 3:19-cv-00981, 2019 U.S. Dist. LEXIS 198487 (M.D. Tenn. Nov. 15,
   2019)...................................................................................... 14

*Leapers, Inc. v. SMTS, LLC,*
   879 F. 3d 731 (6th Cir. 2018) ..................................................................... 12

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,*
   502 F.3d 504 (6th Cir. 2007) ..................................................................... 12

*Maids to Order of Ohio Inc. v. Maid-to-Order Inc.,*
   78 USPQ2D 1899 (TTAB 2006) ..................................................................... 4

*Malibu Media. LLC v. Ricupero,*
   705 Fed. Appx. 402 (6th Cir. Aug. 28, 2017) ...................................................... 1

*McNeil-PPC, Inc. v. Guardian Drug Co.,*
   984 F. Supp. 1066 (E.D. Mich. 1997) (Rosen, J.)................................................. 14

*Mexican Food Specialties, Inc. v. Festida Foods, Ltd.,*
   953 F. Supp. 846 (E.D. Mich. 1997) ......................................................... 14, 15

*Paddington Corp. v. Attiki Imps. & Distribs.,*
   996 F.2d 577 (2d Cir. 1993) ................................................................. 9, 14

*Prufrock Ltd., Inc. v. Lasater,*
    781 F.2d 129 (8th Cir. 1986) ........................................................................ 10

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*
    813 F. Supp. 2d 489 (S.D.N.Y. 2011)............................................................ 11

*Qualitex Co. v. Jacobson Prods. Co.,*
    514 U.S. 159 (1995).................................................................................... 12

*Sherwin-Williams Co. v. JP Int'l Hardware, Inc.,*
    988 F. Supp.2d 815 (N.D. Ohio 2013) .......................................................... 14

*Stone Creek, Inc. v. Omnia Italian Design, Inc.,*
    875 F. 3d 426 (9th Cir. 2017) ...................................................................... 25

*Tas-T-Nut Co. v. Variety Nut & Date Co.,*
    245 F. 2d 3 (6th Cir. 1957) .................................................................... 11, 17

*Therma-Scan, Inc. v. Thermoscan, Inc.,*
    295 F.3d 623 (6th Cir. 2002) ...................................................................... 18

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
    505 US 763 (1992).......................................................................................... 9

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,*
    529 US 205 (2000)........................................................................................... 5

*White Tower Sys, Inc v White Castle Sys Corp,*
    90 F2d 67 (6th Cir. 1937) ....................................................................... 23, 25

**Statutes**

15 U.S.C. §1052 ................................................................................................... 5

15 U.S.C. §1057(b)............................................................................................... 5

15 U.S.C. §1125(a) ............................................................................................. 12

Lanham Act ................................................................................................... 3, 5

**Other Authorities**

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:68 (5th ed.)............................... 2

*New York Times* ............................................................................................... 16

Rule 12 ................................................................................................................. 1

Rules 12(b)(6) & (f) ............................................................................................... 1

Rules 12(c) & (f) .................................................................................................... 1

x

## STATEMENT OF MATERIAL FACTS

### A.   The Defendants and Their Participation In Decisions Relevant to This Case

1.     Each Defendant has a direct role in, and is at least partially responsible for, operating quick-service restaurants named "Doll N' Burgers" located at 411 E Chicago Blvd, Tecumseh, MI 49286 (the "Tecumseh Restaurant") and at 323 S Cooper St, Jackson, MI 49201 (the "Jackson Restaurant"), including with respect to the restaurants' use of what INO defines below as the Infringing Trade Dress. (Second Amended Complaint ("2AC"), DE 21, ¶37; Answer, DE 25, ¶37). INO will sometimes refer to Defendants collectively as "DNB," with both locations being the "DNB Restaurants."

2.     Doll N Burgers Tecumseh LLC is a Michigan limited liability company with its registered address at 117 W Louis Glick Hwy., Jackson, MI 49201. (2AC, DE 21, ¶3; Answer, DE 25, ¶3.) The members of this LLC are Veritas Vineyard, LLC, Ken Heers, Joel Dalenberg (beneficially through his membership in Veritas Vineyard, LLC), Justin Dalenberg, and (until January 2021) John Burtka. (Ex 17[1], DNB Resp. to 1st Interrog. ¶1; Ex 18, Burtka Dep. at 12; Ex 19, Justin D. Dep. at 37.) All of these members contribute to approving the actions taken by the business. *Id.* Heers and Justin Dalenberg chose the colors and decor in the restaurant shortly prior to and contemporaneously with construction. *Id.*

3.     Doll N Burgers Jackson, LLC is a Michigan limited liability company with its registered address at 323 S. Cooper St., Jackson, MI 49201. (2AC, DE 21, ¶4; Answer, DE

---

[1] Exhibit references are to the numbered tabs in INO's Fact Appendix, filed herewith.

25, ¶4.) Its members are Justin Dalenberg, Joel Dalenberg, Ken Heers, and Ryan Parshall. (Ex 19, Justin D. Dep. at 39.)

4.    Doll N Burgers Tecumseh LLC and Doll N Burgers Jackson, LLC are responsible for and actively involved in operating the Tecumseh Restaurant and the Jackson Restaurant, respectively.

5.    Veritas Vineyard, LLC ("Veritas") is a Michigan limited liability company with its registered address at 117 W Louis Glick Hwy., Jackson, MI 49201. (2AC, DE 21, ¶5; Answer, DE 25, ¶5.) It is directly involved in operating the DNB Restaurants. (2AC, DE 21, ¶38; Answer, DE 25, ¶38). For example, Veritas "do[es] the staff, payroll, accounting, marketing, ... make[s] burger buns... [and] burger meat" for DNB. (Ex 19, Justin D. Dep. at 40.) "[T]he people who work at the Doll n' Burgers Tecumseh restaurant are employees of Veritas·Vineyard." (*Id.*) "Griffin Zotter, [who] does marketing [for] Doll N' Burgers ... is a Veritas employee." (*Id.*; Ex 20, Zotter Dep. at 9.) Veritas has run advertisements soliciting potential employees to apply to Veritas for employment at the Tecumseh Restaurant. (Ex 21, DNB Resp. to 2d RFAs, ¶12.) Until January 2021, Veritas was 51% owned by John Burtka. (Ex 18, Burtka Dep. at 11-12) and 49% by Justin Dalenberg; Justin is now the sole member. (Ex 19, Justin D. Dep. at 11-12).

6.    Defendant Justin Dalenberg is a founder of DNB, admits that he has described himself as "Chief Burger Flipper" of DNB, and admits that he has been involved in the majority of business decisions at DNB involving defendants' restaurant décor, signage, packaging,

uniforms, and the like. (2AC, DE 21, ¶6; Answer, DE 25, ¶6.) At all times relevant to this lawsuit, he acted as an agent of the DNB companies. (2AC, DE 21, ¶7; Answer, DE 25, ¶7.)

7.      Doll N Burgers LLC is a Michigan limited liability company with its registered address at 399 Old Creek Rd., Saline, MI 48176. (2AC, DE 21, ¶2; Answer, DE 25, ¶2.) Its sole member is Justin Dalenberg, and it owns DNB's trademark applications. (Ex 17, DNB Resp. to 1st Interrog. ¶1.)

8.      In or around 2018, Mr. Dalenberg met with Mr. Ken Heers who had an interest in property located in Tecumseh, Michigan that he had leased to Taco Bell, which was terminating its lease. Ken mentioned the availability of the space to Mr. Dalenberg and floated the idea of turning it into a quick service hamburger restaurant. Dalenberg promptly showed Mr. Heers an early draft of a menu and an early draft of a pro forma income statement. Things coalesced quickly and around November 2018, Heers and Dalenberg agreed to move forward with a hamburger restaurant at the Taco Bell site. (Ex 17, DNB Resp. to 1st Interrog. ¶2; Ex 22, first draft of DNB menu ca. 2018). Justin began discussing plans for DNB with co-founder John Burtka in mid-2019. (Ex 18, Burtka Dep. at 35.) Taco Bell vacated the premises around August 2019. Construction and remodeling of the site began shortly thereafter. (Ex 17, DNB Resp. to 1st Interrog. ¶3.)

**B.      INO and Its Well-Known Common Law and Registered Trade Dresses**

9.      Since first opening in 1948 in California, where it is still headquartered, INO has operated a successful and popular chain of quick service restaurants offering made-to-order burger sandwiches and other products and services. (Ex 16, Warnick Dec. ¶4).

xiii

10.    Since at least 1960, INO has consistently and exclusively used various combinations of specific design elements in its restaurants and product packaging to indicate INO as the source of its goods and services. These elements include, among others:

a.  A color scheme consisting of red and white with accents of yellow or gold;

b.  A primarily white exterior with a low red stripe and red awnings;

c.  Red and white interior décor, including a white counter featuring a stripe in red with a gray countertop, red cushioned chairs and white table tops with one or two red stripes, walls colored red and/or white, and gray floor tiles;

d.  A menu with a red and white color scheme and layout including a horizontal line of boxes at the top featuring combo meals with no sizing options;

e.  White cups with red graphics, including a row of palm trees encircling the top of the cup;

f.  Employee uniforms featuring white collared shirts, red aprons, and red and white hats (both baseball caps and paper hats);

g.  Using open-ended burger wrappers;

h.  The use of the single letter "N" in the name;

i.  Décor and photos emphasizing a classic car theme.

(Ex 16, Warnick Dec. ¶5.) These elements will be referred to collectively herein as the "INO Common Law Trade Dress."

## C.    The Procedural History of INO's Trade Dress Registration

11.     The US Patent and Trademark Office has issued U.S. Registration No. 4839216 for a subset of the Common Law Trade Dress (the "INO Registered Trade Dress"). The INO Registered Trade Dress consists of a three-dimensional trade dress depicting the interior of a restaurant. The interior includes white sectional dividing walls having horizontal rows of red stripes. The interior also includes clear glass panels positioned above parts of the dividing walls. The interior also includes a customer seating area with booths, barstools and chairs, wherein the chairs are red, the barstools are white, and the booths have red upholstery, and white countertops and tabletops. The interior further includes a customer ordering area with sections of red tile walls and white tile walls around the customer ordering area and a silver counter. The INO Registered Trade Dress is depicted below; the matter shown in broken lines is not part of the mark and serves only to show the position of the mark.



(2AC, DE 21, ¶19; Answer, DE 25, ¶19; Ex 23 (Registration Certificate).

12.     The diagonal and curved orientation of the ordering counter depicted in the INO Registered Trade Dress is an uncommon design within the restaurant industry, and is distinctive of INO. The combination of this layout with the red and white color scheme, stripes

underneath the counter, tiled walls, and booths is even more uncommon and distinctive; indeed, no other company uses this combination of elements. (Ex 16, Warnick Dec. ¶7.)

13.     On December 18, 2014, the examining attorney ("Examiner") assigned by the U.S. Patent and Trademark Office ("USPTO") to review INO's application to register the INO Registered Trade Dress issued an Office Action denying the application, finding a lack of distinctiveness. (Ex 24, Office Action without attachments.)

14.     On June 8, 2015, INO filed a request for reconsideration of the Office Action, (Ex 25), supported by legal arguments as well as several pieces of evidence intended to persuade the Examiner that the INO Registered Trade Dress had, in fact, acquired distinctiveness in the marketplace. This evidence included:

> a.  "[A] declaration by Carl Van Fleet, [who was then] INO's Executive Vice President, attesting that INO between 2000 and 2012, INO had spent in excess of $100 million on a combination of radio, television, outdoor and print advertising." (DE 25, PgID 213 ¶8; Ex 26 (copy of declaration); Ex 27 (Van Fleet Dep. at 10, 19 (authenticating signature)). This figure reflected INO's overall promotional spend during that period, (DE 25, PgID 214 ¶11), all of which was designed to encourage customers to visit INO restaurants, where they would encounter the INO Trade Dress.
>
> b.  Sworn declarations from Michelle Todd, Mark Warshaw, Robert McLain, John Sizemore, Kevin Henrichson, Jathan Floren, and Mark Lamoureux—individuals

from various professions, geographies, and walks of life, affirming that they

perceived INO's trade dress as distinctive. (Ex 28.)

c. Online reviews and articles observing the consistency and distinctiveness of

INO's trade dress. (Ex 29.)

d. A collection of trademark registrations that the USPTO had previously granted

for other restaurant decors. (Ex 30.)

e. Articles from various media outlets reporting on otherwise demonstrating INO's

popularity. (Ex 31.)

15.    The Examiner was persuaded by INO's request for reconsideration. She

responded by publishing the application, which was ultimately registered on October 27,

2015. (Ex 32, docket.)

**D.    INO's Trade Dress Has Acquired Distinctiveness in the Minds of Consumers**

16.    The distinctive design of INO's Common Law Trade Dress and INO's

Registered Trade Dress (together, the "INO Trade Dress") was adopted several decades ago

to distinguish INO's goods and services from that sold by others and to create a very strong

market and reputational presence as a source indicator of high-quality quick-service food

products. (Ex 16, Warnick Dec. ¶¶5-9).

*(1)    Direct consumer testimony*

17.    In support of its trade dress application, INO provided several sworn

declarations from third parties attesting to the distinctiveness of the Registered Trade Dress.

Ex 28. INO has since obtained additional declarations to the same effect, some of which are from the same witnesses and some of which are from others. Ex 33.

18.     INO has also obtained sworn declarations from third parties attesting to the distinctiveness of the INO Common Law Trade Dress. Ex 34. Some of these declarants are Michigan residents.

### (2)  *Consumer surveys*

19.     INO hired Dr. Isabella Cunningham to survey consumers regarding the secondary meaning in INO's trade dress. Dr. Cunningham holds the Stan Richards Chair in Advertising and Public Relations in the Moody College of Communications at The University of Texas at Austin, in Austin, Texas. She is the past Chair of the Advertising and Public Relations Department in the Moody College of Communication, a position that she held for 20 years. She is the author and co-author of several books and numerous academic articles in marketing and advertising. She has also published several peer-reviewed papers in academic proceedings and has made numerous presentations to both academic and professional audiences. She is a member of several academic journals' review boards and also served on numerous academic and professional committees as both a member and in leadership positions. She has taught marketing and advertising courses at The University of Texas for the past 40 years and has served as Chair of the Department of Advertising from 1978 to 1985 and from 2001 to 2013. Before joining the faculty at The University of Texas, she was Assistant Professor of Marketing and the Acting Dean of the Business School at St. Edward's University. She has been a marketing and advertising consultant to several

businesses and has been retained as an expert witness in several lawsuits. (Ex 35, Cunningham SM report at 20-21.)

20.    Dr. Cunningham's survey was successfully completed by 404 subjects—201 test subjects and 203 control subjects—residing in one of the states in which INO has a restaurant. (Ex 35, Cunningham SM report at 17.)

21.    Dr. Cunningham concluded that INO's trade dress has strong secondary meaning:

> 92.5% of the subjects in the test group stated that restaurants with the overall appearance of IN-N-OUT were likely owned by one company, while 31.5% of the subjects in the control group stated that restaurants with the appearance of the control restaurant images, they had seen were likely owned by one company. Thus, the net percentage of subjects attributing the trade dress of the IN-N-OUT restaurants to one source is 61%. This is a clear indication that the IN-N-OUT trade dress has acquired secondary meaning.

(Ex 35, Cunningham SM report at 17.)

22.    She further concluded that this secondary meaning is attributable to both the Registered Trade Dress and the Common Law Trade Dress:

> It is important to note that an overwhelming number (46%) of the subjects who stated that the restaurant they saw in the test survey was owned by one company specifically mentioned IN-N-OUT as that company (verbatim answers to Q2 and Q2a) and many of them stated they recognized the restaurant overall appearance and design. Also, while a few respondents referred to some of the elements of the "INO Common Law Trade Dress" identified in the Plaintiff's Second Amended Complaint ( P.6) such as: the beverage cup, the restaurant exterior, the burger, the décor, over 45% of those subjects that attributed the IN-N-OUT trade dress to one source referred to the restaurant's distinctive design, the red and white colors, the interior layout and design and overall look (all elements of the IN-N-OUT registered trade dress).

(Ex 35, Cunningham SM report at 18.)

xix

### (3)    *Exclusivity, length, and manner of use*

23.    As indicated above, INO has used various combinations of décor and packaging elements identified as its Common Law Trade Dress since approximately 1960, and has used it in the specific combinations depicted by the photographs in the Second Amended Complaint for decades. (Ex 16, Warnick Dec. ¶¶5-10.)

24.    As indicated in INO's trade dress registration, INO has used its Registered Trade Dress in commerce since at least 1992. (Ex 16, Warnick Dec. ¶10.)

25.    The vast majority of INO's restaurants feature a materially identical trade dress, subject primarily to constraints imposed on specific locations by space, size, or municipal regulations. (Ex 16, Warnick Dec. ¶11.)

26.    "Defendants admit that they are not aware of a restaurant that uses all of the alleged INO Trade Dress Elements." (Ex 21, DNB Resp. to 1st RFAs, ¶24). Neither is INO. (Ex 16, Warnick Dep. at 50; Ex 16, Warnick Dec. ¶7)

### (4)    *Amount and manner of advertising*

#### i.    *Traditional Advertising*

27.    As indicated above, between 2000 and 2012, INO spent in excess of $100 million on a combination of radio, television, outdoor and print advertising. (DE 25, PgID 213 ¶8; Ex 26 (Van Fleet declaration); Ex 27 (Van Fleet Dep. at 10, 19 (authenticating signature)).

28.    INO spent a comparable amount in 2013-present. (Ex 1, advertising figures, SEALED), authenticated by Ex 16, Warnick Dec. ¶13.)

29.     The promotional activity reflected by these figures includes but is not limited to television, radio, billboards, social media, website, digital marketing, direct mail, gift cards, sports marketing, library reading programs, food giveaways, benevolent cookouts for the homeless and first responders, cookouts at celebrity events, "lunch tour" donations to schools, and other field marketing—all of which is designed to encourage customers to visit its restaurants. (Ex 36, Guzman Dep. 47-51, 60, 75-79; Ex 16, Warnick Dep. at 20-21, 55-56; Ex 27, Van Fleet Dep. at 19-23).

30.     INO's print advertising has frequently featured one or more of the elements that make up the INO Trade Dress. (Ex 2, example ads, authenticated by Ex 16, Warnick Dec. ¶15).

### ii.     Online Marketing and Engagement

31.     INO maintains social media accounts on Facebook and Instagram, and purchase advertising on these platforms and on Google. (Ex 36, Guzman Dep. at 19-22.) At present, INO has more than 2.7 million Facebook followers and more than 576,000 followers on Instagram. (Ex 16, Warnick Dec. ¶16). The images shared on these accounts frequently feature one or more of the elements that make up the INO Trade Dress. (Ex 37 (Facebook posts); Ex 38 (Instagram posts).)

32.     Facebook analytics demonstrate that, although many visitors to INO's Facebook page are located in California or in other areas where INO has a restaurant, the fifth most common residence for visitors to the page is New York City, (Ex 3, Facebook analytics, authenticated by Ex 16, Warnick Dec. ¶17)), which shows that INO is well-known by consumers even where it does not have brick-and-mortar restaurant locations.

33.    INO's website at <in-n-out.com> has frequently featured one or more of the elements that make up the INO Trade Dress, including but not limited to wide-angle photographs of the restaurants' interior. (Ex 4, website excerpts, authenticated by Ex 16, Warnick Dec. ¶18).

34.    Merchandise sold through INO company stores and its website promotes the trade dress because it replicates elements of the trade dress and reminds people of their experiences at INO. (Ex 36, Guzman Dep. at 88; Ex 16, Warnick Dep. at 67-68; Ex 5 (examples of INO merchandise that replicate some or all of the elements of the INO Trade Dress, authenticated by Ex 16, Warnick Dec. ¶19)).

35.    INO has sold substantial amounts of INO-themed merchandise to Michigan over the years. For example, INO's records show that Michigan residents have purchased INO-themed merchandise from INO's online store in every month of every year between 2014 and the present. (Ex 6 (SEALED), sales records, authenticated by Ex 16, Warnick Dec. ¶20.)

### *(5)    Amount of sales and number of customers*

36.    INO has more than 225 locations in California, with over 360 locations in total throughout California, Arizona, Nevada, Utah, Texas, Oregon, and Colorado, and it is continuing to expand to other states. (Ex 16, Warnick Dec. ¶21).

### *(6)    Established place in the market*

37.    INO has developed a highly loyal customer base and has been consistently rated as one of the top quick-service restaurants in several customer satisfaction surveys. (Ex 16, Warnick Dec. ¶22).

38.    For example, in a March 23, 1997 article entitled "Bonkers for Burgers,"[2] the

*San Francisco Examiner* (Exs 31, 39) reported on the customer devotion evident during the

company's expansion into the San Francisco Bay Area:

> A Southern California fixture for almost half a century, the family-owned chain opened its first Bay Area outlet in Rohnert Park last March, followed by Milpitas in September and San Ramon in February. The restaurant's menu hasn't changed since 1948 - but its fanatical following keeps mushrooming.
>
> And in Northern California, where cults and cultures of all sorts have found a home, the cult of In-N-Out has surfaced in less time than it takes to order a "Double Double," vanilla shake and fries...
>
> An instant conversation piece, the chain incites passions either way.
>
> Some fans drive hundreds of miles just to get a $2.30 Double Double, as double cheeseburgers are called; directory assistance has been bombarded with calls about the San Ramon outlet. Other In-N-Out devotees feed their obsession by snapping up T-shirts, baseball hats, jackets, logoed golf balls, key chains, watches and fanny packs....
>
> In its February issue, Restaurants & Institutions magazine announced a major upset in its 17th annual survey of chains, to which 2,800 U.S. households responded. In-N-Out won in the quick-service burger category, ending Wendy's eight-year run....

39.    The same article provides evidence that the INO Trade Dress was well-

recognized as distinctive even at that time:

> In an Internet posting, Glenn Mandelkern recalled how mystified he was by the "cult thing" until he visited his first In-N-Out. His conversion culminated in a pilgrimage to the company store in Irvine.
>
> "I must have tried on everything, including the aprons," he wrote....

---

[2] This document is non-hearsay under the Ancient Documents Rule. FRE 803(16).

The "associates" complement the red-and-white interior, a spiffed-up version of the '50s. Red palm trees are everywhere: on tiles, paper cups, soft-drink dispensers and awnings.

40.    INO serves and has served thousands of out-of-state customers who regularly travel to INO's locations, such that INO's customers are located throughout the United States, including in Michigan. (Ex 16, Warnick Dec. ¶23).

41.    INO is also well-known through its locations in tourist and other popular areas that are extensively visited by customers from all over the United States (including Michigan), such as Hollywood, California; Fisherman's Wharf in San Francisco, California; Las Vegas, Nevada; and the University of Texas at Austin. (Ex 16, Warnick Dec. ¶24; Ex 19, Justin D. Dep. at 18 (DNB principal agreeing that the INO at Fisherman's Wharf in San Francisco is "a pretty popular ... tourist attraction"); Ex 40, Johnson Dep. at 14 (testimony of third party Jim Johnson, a Michigan resident, recounting having visited INO while in Las Vegas); *id.* at 56 (agreeing that, in his experience, people in Michigan "generally at least have heard of the brand"); Ex 16, Warnick Dec. ¶23 (testifying "from personal experience interacting with INO customers over the years that they come from all over the country and the world.").)

42.    The opening of a new INO restaurant often becomes an event. For example, when INO opened its location in Scottsdale, Arizona, there was a four-hour wait for food, and news helicopters covered the event from overhead. Similar fanfare and wait times of up to 14 hours occurred in November 2020 when INO opened its two newest locations in Colorado, a state in which INO had never previously done business. The new Colorado INO restaurants are a 500-mile drive from the next-closest INO location, in Texas. (Ex 16, Warnick Dec. ¶25).

### iii.     _Media and Third-Party Recognition_

43.     A number of renowned chefs publicly identified as fans of INO, including Gordon Ramsay, Thomas Keller, Julia Child, Anthony Bourdain, and Ina Garten. (Ex 16, Warnick Dec. ¶26; Ex 7 (articles).)

44.     Speaking in her personal capacity, attorney Lynne Boisineau testified to the international fame of INO and its trade dress: "I think it's pretty obvious.· I mean I have In-N-Out Burger stickers from 1987 when moved back to California from where I was living.· It's just -- of course it's famous, people around the world know it.· I mean that's just my own personal -- this has nothing to do with being a lawyer.· This is just my friends in France know it, my friends in England know it.· My friends in, you know, Sri Lanka have heard of In-N-Out Burger. It's just famous to me." (Ex 41, Boisineau Dep. at 24.)

45.     INO's business practices also contribute to the strong goodwill it enjoys. One of the keys to INO's success is its decision not to franchise its operations or go public, in order to prioritize quality over excessively rapid business growth. INO is also well-known for employee-centered personnel policies. For example, INO has consistently had one of the highest pay structures for quick-service restaurant employees that well exceed state and federally mandated minimum wage guidelines. (Ex 16, Warnick Dec. ¶27).

46.     INO was one of the very few restaurant chains given a positive mention in the book _Fast Food Nation_. The book commended the chain for using natural and fresh ingredients and for looking after the interests of employees regarding pay and benefits. (Ex 16, Warnick Dec. ¶28).

47.     Due to its popularity, INO and its Trade Dress is frequently featured in third-party national news and entertainment reporting, including the following examples:

    a.  A 2002 *New York Times* article (Ex 65) reported on the brand's popularity and on the opening of INO's 166th store, and featured a photo of the restaurant's interior:



    b.  In an article subtitled "Taking America's best fast car to America's best fast food," (Ex 66), the September 2006 issue of *Automobile Magazine* included several photos of INO, including of its burger wrappers:



c.  This full-page photo of pop star Taylor Swift ran in the February 8, 2008 issue
    of *Entertainment Weekly* demonstrating her affinity for the brand by posing with
    some of the packaging that makes up INO's Common Law Trade Dress in this
    case (Ex 31):



48.    Third-party social media posts by celebrities and average consumers alike frequently feature the elements of INO's trade dress. Many users are particularly inclined to take "selfie" photos inside INO restaurants or with INO packaging as a way of expressing affection for the brand. A collection of examples over the past few years is attached as Ex 42.

### iv.    _Brand Protection Efforts By INO and Its Customers_

xxviii

49.     The distinctiveness of INO's trade dress has also been illustrated by the numerous instances in which consumers have notified INO that a third-party restaurant appears to be copying INO's appearance. (Ex 43, Warnick Dep. at 59.)

50.     INO has carefully monitored and policed use of the INO Trade Dress and maintains tight control over its use—including, when necessary, by seeking judicial relief. (Ex 43, Warnick Dep. at 79). Usually these efforts have resulted in a negotiated resolution, although an Australian court ruled in INO's favor in a case against a company called "Down N' Out Burger." (Ex 43, Warnick Dep. at 79-81.) Other examples include the following:

   d. *In-N-Out Burgers v. Chadder's Restaurant*, Case No. 07-394 (D. Utah, filed June 14, 2007). INO filed this action against a Utah-based knock-off after several customers expressed confusion and complained about its similarities to INO, including its color scheme, uniforms, and menus. (Ex 16, Warnick Dec. ¶30.a; Ex 8 (customer complaints). In response, Chadders voluntarily made changes to its décor. (Ex 9 (initial response from Chadders to demand letter agreeing to change some challenged trade dress elements); Ex 44 (Complaint); Ex 45 (TRO Opinion at INO599) (noting that Chadders had voluntarily "already changed some of the elements that In-N-Out alleges infringes its trade dress").) The parties ultimately reached a confidential settlement of all claims, including the trade dress claim. (Ex 16, Warnick Dec. ¶30.a).

e.  *In-N-Out Burgers v. Mr. Bill's In-N-Out Burgers*, Case No. 07-1249 (D.N.M., filed Dec. 11. 2007). This defendant that had copied various elements of INO's menu boards, color schemes, and trademarks. In response, the restaurant voluntarily agreed to change its red and white color scheme to blue and white and make other changes to its menu boards, among other things. (Ex 16, Warnick Dec. ¶30.b; Ex 46, Complaint; Ex 10, letters.)

f.  *In-N-Out Burgers v. Caliburger, LLC*, Case No. 11-1418 (C.D. Cal., filed Sept. 14, 2011). INO filed this suit against a China-based international INO clone, which took steps to open locations all around the Pacific Rim including Seattle, Europe, and Asia, after reports of the knock-off attempt were reported to INO by California natives living in China. (Ex 16, Warnick Dec. ¶30.c; Ex 11, customer report.) As reported in the February 11, 2012 issue of the *Los Angeles Times*, this defendant "agreed to tweak Caliburger's menu and décor after In-N-Out filed suit in U.S. District Court ... for trademark infringement and counterfeiting." (Ex 47, INO2725-2727). The same article reported that "Protecting its image is nothing new for In-N-Out, which has been quick to take legal action against U.S. copycats." *Id*. at INO2727.

g.  From 2012 through 2021, INO battled a knock-off restaurant chain in Ethiopia that was utilizing photos of genuine INO food and packaging, white-and-colored stripes underneath the ordering counter, INO menus, the "In-N-Out" name, and orange/red uniforms. INO received multiple reports about the infringers from

xxx

American and other international travelers who noted the clear references to INO in the U.S. INO obtained judgment in Ethiopian court against the restaurant chain, including monetary damages. (Ex 16, Warnick Dec. ¶30.d; Ex 13 (call sheet and photos)).

h. In February 2021, INO received notice that a new restaurant in California named Bixby Burger had copied the look and feel of the INO drive-thru menu design. INO legal counsel contacted Bixby Burger and persuaded it to remove the similarities to INO's design. (Ex 14, Bixby documents, authenticated by Ex 16, Warnick Dec. at ¶30.e.)

51. There is also an active market on sites like eBay for resales of collectible and rare INO merchandise and memorabilia—much of which contains portions of the INO Trade Dress. (Ex 67, eBay pages.)

### (7) *Proof of DNB's Intentional Copying*

#### i. *DNB's Knowledge of INO's Fame and Trade Dress*

52. DNB readily admits INO's goodwill and commercial strength.

a. DNB principal John Burtka described INO as "kind of legendary," (Ex 18, Burtka Dep. at 17, and remarked "it's pretty impressive that a company's been around that long." *Id.* at 16-17.

b. In conversations held during the creation of DNB, Burtka and co-founder Justin Dalenberg discussed "how people sought [INO] and there would be long lines

for people to get in there. And ... that their quality was great." (Ex 18, Burtka
Dep. at 18.

c. Before launching DNB, Justin Dalenberg identified INO as one "of America's
great burger chains [that] have been able to eek [sic] out a large portion of
market share in their respective markets." (Ex 48, Dep Ex C, DNB282-283.)

d. Justin Dalenberg also admitted that INO has "a loyal following ... in California,"
(Ex 19, Justin D. Dep. at 26) and are located "throughout the southwest region."
(*Id.* at 30).

e. DNB's co-founder Ken Heers acknowledged, "We know that In-N-Out is
popular in California [and] is in the news from time to time." (Ex 49, Heers Dep.
at 16.)

f. DNB marketing lead Griffin Zotter admitted that INO restaurants are "a
destination location, ... [that] when you go out west you need to try it," (Ex 20,
Zotter Dep. at 10-11), and that "everybody [he knew at Michigan State] roasted
me when I got back [from Las Vegas without visiting INO], because -- they said,
how did you go there and not go to In-N-Out Burgers?" (*Id.* at 10.)

g. Even before this lawsuit, teenaged DNB employee Gracie Fetters was already
familiar with the appearance of INO's menu and uniforms from having seen
them through social media "on Instagram and TikTok." (Ex 50, Fetters Dep. at
11-12, 14).

ii. **DNB's Use of Its INO Knowledge In Its Business and Trade Dress**

53.     Before launching DNB, "Defendants were aware generally of INO and its western USA restaurants, its goods and services, and its trademarks IN-N-OUT BURGERS [sic] (both word and design). Defendants were also generally familiar with INO's food packaging and color scheme of red, white and yellow." (Ex 21, DNB Resp. to 1st RFAs, ¶15).

54.     "[A]s a restaurant and food consultant Justin Dalenberg has visited hundreds of restaurants including INO. He was generally aware of the major quick service restaurants and their marketing approaches, menus, service styles, etc. including the quick service hamburger market segment and INO." (Ex 17, DNB Resp. to 1st Interrog. ¶6). Justin had "eaten there a handful of times ... in San Francisco and .. a couple [of INO restaurants] in the Sacramento region." (Ex 19 Justin D. Dep. at 15-16.) He ordered his food inside the restaurant. (Ex 19, Justin D. Dep. at 17-18).

55.     Justin and Ken Heers also ate at an INO restaurant in 2019 during a trip to California, which they did "for the purpose of ... scoping out the competition." (Ex 19, Justin D. at 16-17; Ex 49, Heers Dep. at 16-18 ("We went to the In-N-Out in Sacramento ... to take a look at it ... [and] check out what they were doing"). They ordered their food inside the restaurant. (Ex 19, Justin D. Dep. at 17-18; Ex 49, Heers Dep. at 17).

56.     In "2018 or 2019," Justin Dalenberg drafted "a vision statement" for DNB, a quick-service fast food restaurant he intended to create. (Ex 48, Dep. Ex. C; Ex 19, Justin D. Dep. at 13). He wrote it for the benefit of his partners in DNB, Ken Heers and John Burtka. (Ex 19, Justin D. Dep. at 14.) That document compared his vision for DNB to INO, among

other upscale burger chains. Describing the leading companies in the fast food industry, the

document identified

> "companies like In n' Out Burger in The Western Region of the USA, Culver's in the Midwest, and Five Guys Burger and Fries in the East Coast. The[se] burger places focus on quality rather than quantity and have thus joined the ranks of America's great burger chains and have been able to eek [sic] out a large portion of market share in their respective markets."

(Ex 48, Dep Ex C, DNB282-283; Ex 19, Justin D. Dep. at 14, 24-25.)

57.     Justin also contemporaneously created a document listing seven other burger

restaurant chains as "comparables" to DNB. INO was first on that list. (Ex 51, Dep Ex. D,

DNB093.) Justin, Burtka, and Heers used these "comparables" as "case studies ... when we

were developing our business plan." (Ex 19, Justin D. Dep. at 27; Ex 51, Dep Ex. D). From

these case studies, they drew information on INO's "[p]roducts, services, generalities in the

... quick service business world." (Ex 19, Justin D. Dep. at 27; Ex 18, Burtka Dep. at 16 (Justin

discussed INO and other chains as "benchmark[s]" with John Burtka when designing DNB.))

This involved visiting INO's website and gathering additional information about INO through

Google searches. (Ex 19, Justin D. Dep. at 27.)

58.     DNB co-founder and principal Ken Heers was born and raised in Las Vegas,

then lived in California and Arizona before moving to Michigan in 1998. (Ex 49, Heers Dep.

at 11-12). California has had INO restaurants since 1948 and Las Vegas, Nevada has had

INO restaurants since 1992, such that Heers was familiar with the INO brand (*id*. at 14) and

had eaten at INO restaurants on at least three occasions in Las Vegas and California. (*Id*. at

13-14; Ex 18, Burtka Dep. at 18 ("Ken Heers had been familiar with [INO] and he said they

were a really good burger joint. [H]e had been to [an INO restaurant[ before... [because] he used to live in California.")）

59.     The colors, interior design, and exterior design were chosen during a visit to the Tecumseh site by Dalenberg and Heers, in a brief conversation. For the interior, they determined to use the existing gray floor tile. The two agreed on a red and black color scheme. During construction, Joel Dalenberg was the primary day-to-day liaison for the building contractor, but Heers and Justin Dalenberg also contributed ideas. (Ex 17, DNB Resp. to 1st Interrog. ¶3; Ex 19, Justin D. Dep. at 77-78; Ex 49, Heers Dep. at 33-34.)

60.     "The red and white striping underneath the countertop ... [was] a branding [decision.]" (Ex 52, Joel D. Dep. at 48.) It is meant to be "the same stripe that's on the bottom of the cup ... [and] [t]o be consistent with the look of the cups and the packaging ... [and the] [o]verall branding of [the restaurant] ... [which] maintained the same kind of aesthetic consistency."(Ex 52, Joel D. Dep. at 49; Ex 20, Zotter Dep. at 62-63 ("that horizontal red stripe along the top [of the cup] ... matches the same kind of red striping underneath the countertop ... that kind of create[s] a visual consistency....·Kind of like a non-verbal branding element.")

61.     DNB consulted Griffin Zotter, the Marketing Manager at Veritas Vineyard, LLC, relating to the design of several aspects of the restaurant interior. Mr. Zotter did market research on all the major fast-food brands, including INO, during the DNB design process, "to know the state of the market and the branding around that type of service in the market , if nothing else just to know how [DNB] fit[s] into that and how [it] can compete." (Ex 20, Zotter

Dep. at 13-14, 18.) Specific to INO, Mr. Zotter recalls having performed internet research, including Google image searches. (*Id.* at 15-16.)

62.  Mr. Zotter suggested that DNB incorporate and apply a single- or double-line red border to certain elements of the restaurant interior, and replicate the red border with DNB's food packaging, menu board, and certain elements of the uniform. Joel Dalenberg conceived the idea of continuing the existing wainscoting through the store. Justin Dalenberg and Ken Heers chose the look of the booth seating. (Ex 17, DNB Resp. to 1st Interrog. ¶3.)

63.  DNB looked to INO's exterior and interior menu boards in designing DNB's menu boards. (Ex 40, Johnson Dep. 32, 43 (he "ended up using In-N-Out's menu board ... as inspiration" for the physical "cabinet" of the interior and exterior boards); Ex 53, Emails mentioning DNB's menu board being "in the style of" the INO menu board, DNB039-040). Justin Dalenberg chose INO's boards because they were "the simplest design form that we could find, like in terms of framing." (Ex 19, Justin D. Dep. at 62; *id.* at 65-66). DNB contracted with Jim Johnson, of Johnson Signs, to build the structural housing for the drive thru menu. Justin Dalenberg provided Mr. Johnson with a picture of an INO drive thru menu to illustrate DNB's requested menu board design. (Ex 17, DNB Resp. to 1st Interrog. ¶3.) Mr. Johnson's construction documents depict the "existing" INO interior and exterior menu board designs that were supplied by DNB and used by Mr. Johnson as references in constructing DNB's menu boards. (Ex 54, DNB046-085; Ex 40, Johnson Dep. at 47).

64.  DNB also reapplied the simplicity of INO's menu content and its general appeal. Ex 18, Burtka Dep. at 27-28 ("it was mentioned [in that design meeting] how simple [INO's]

menu was ... [and] the other in [that] conversation liked that idea of simplicity."; *id.* at 29-30 & (Ex 55) Dep. Ex. Y ("post from Doll N Burgers that [Burtka] shared [on Facebook] on April 17th, [2020,] ... say[ing] the menu is very simple.") Mr. Zotter designed the menu layout in consultation with DNB's principals, who approved the menu designs. (Ex 17, DNB Resp. to 1st Interrog. ¶3; Ex 20, Zotter Dep. at 48.)

65.    DNB also reapplied portions of the typeface in INO's menu. Specifically, Mr. Zotter and the DNB principals discussed how they liked INO's depiction of the menu prices' cents portion and copied that design element. (Ex 20, Zotter Dep. at 53-55).

66.    Mr. Zotter designed the cup with input and approval from Justin Dalenberg. (Ex 21, DNB Resp. to 1st Interrog. ¶3; Ex 19, Justin D. Dep at 78.) Mr. Zotter designed the pattern of red cow-head silhouette images "repeating along the whole circumference of the cup," (Ex 20, Zotter Dep. at 64). Mr. Zotter testified that he "can't say that in the back of my mind" that the decision to use the red cow-head pattern encircling the top of the cup was not influenced by the red vertical stripes and palm tree pattern encircling the top of INO's cup. (*Id.*)

67.    Justin Dalenberg, in consultation with his partners, selected the DNB uniforms and the open-ended wrappers used by DNB. (Ex 17, DNB Resp. to 1st Interrog. ¶3.)

68.    DNB opened the Tecumseh Restaurant in 2020, and advertised its grand opening for July 11, 2020. Its Tecumseh location is DNB's first restaurant. (2AC, DE 21, ¶26; Answer, DE 25, ¶26).

69.    DNB opened the Jackson Restaurant on November 20, 2020. (2AC, DE 21, ¶27; Answer, DE 25, ¶27). Although the Jackson Restaurant is located "in a brick building

[and thus] in the dining area of the Jackson location there's more of a brick facade rather than the tile and the wainscoting [inside the Tecumseh location], ... there [are] obviously some aesthetic choices that were kind of imported from the Tecumseh location to Jackson to create a consistent look and feel between the two locations." (Ex 52, Joel D. Dep at 67-68.) "[F]or example, the exterior facade of the entrance of the Jackson location has that same kind of white exterior, [and] red awnings[.] ... And when you walk into the Jackson location there's the white or gray tiling on the floor[.] ... [The] dining tables have the same red and black aesthetic as the dining tables in Tecumseh[.] And in the ordering center you have the same white tiling and the red striping under the counter; that aesthetic is the same as in Tecumseh[.] ... ·That part is intentional[.]" (*Id.* at 68-69.)

70.    Joel Dalenberg, in a former career, traveled to California "a lot," and spent "weeks" at a time working in California. (Ex 52, Joel D. Dep. at 11.) During those periods, which took place from the early 2000's to 2015, (id. at 12-13), Joel "ate [at INO restaurants] a number of times – just because they're a good place to eat at and people introduced me [to them] years ago." (Id. at 12.)

### E.    DNB's Infringement of the INO Trade Dress

71.    Each of the *Frisch* factors weigh in favor of finding a likelihood of confusion between the Infringing Dress and the INO Trade Dress.

#### 1.    *Strength of the Plaintiff's Mark*

72.    INO's Trade Dress is strong, both commercially and conceptually. *See supra* ¶¶14-51.

### 2.   *Relatedness of the Goods or Services*

73.    The goods and services sold in connection with INO's Trade Dress and DNB's Infringing Dress are materially identical. INO's menu is intentionally simple and consists almost entirely of hamburgers, milkshakes, and French-fried potatoes. (Ex 16, Warnick Dec. ¶31.) Similarly, the DNB Restaurants feature hamburgers, milkshakes, French-fried potatoes, and poutine. (2AC, DE 21, ¶28; Answer, DE 25, ¶28).

### 3.   *Similarity of the Marks/Actual Confusion*

74.    In its DNB Restaurants, product packaging, and related marketing materials, DNB has extensively copied and/or closely imitated the INO Trade Dress. Below are several non-exclusive examples of similarities between DNB's restaurants and branding, and those used by INO. The following DNB and INO images are accurate representations of DNB's and INO's respective restaurants, décor, and product packaging, and the INO images reflect its Common Law Trade Dress as it is used in commerce (Ex 21, DNB Resp. to 1st RFAs, ¶¶7, 25-32; Ex 16, Warnick Dec. ¶8.)

a. DNB has copied INO's color scheme, including the use and placement of red and white and even using a splash of yellow or gold in its logo:

| DNB | INO |
|-----|-----|

xxxix

 

 

b.  The layout and colors of the DNB Restaurant include a primarily white exterior with a low red stripe and red awnings, red and white interior décor including a white counter featuring a stripe in red with a black countertop similar to the In-N-Out gray countertop, red cushioned chairs and red tables, vertical red strips on interior walls or dividers, and gray floor tiles similar to INO's gray tiles:

| DNB | INO |
|-----|-----|
|     |     |





c. The red and white theme and layout of DNB's menu includes a horizontal line of boxes featuring single-size, single-price combo meals at the top:

| DNB | INO |
|-----|-----|



d. DNB's cups are white with red graphics featuring horizontal lines and a horizontal series of red cow head silhouettes encircling the top portion of the cup, in the same way that INO's cups display a line of red palm tree silhouettes encircling the top portion of the cup.



e. At the time INO initiated this lawsuit and for a period of time thereafter, DNB employee uniforms were comprised of white collared shirts, red aprons, and red and white baseball caps or paper hats, as shown below.



After the initiation of this lawsuit, DNB employees began wearing black aprons, but the rest of their uniform remains the same, as shown below:



f.   DNB uses open ended burger wrappers in the same manner as INO.



g. DNB uses the single letter "N" in the center of its three-part name.



h. DNB promotes its products using a classic cars theme.



Collectively, INO refers to DNB's depicted combination of color scheme, décor, and packaging as the "Infringing Trade Dress" or "Infringing Dress."

75. DNB has also adopted a number of additional business methods identical to those used by INO. These similarities further accentuate the similarity and the likelihood of confusion between itself and INO Trade Dress. For example:

a. DNB advertises that its meat is butchered every morning and delivered fresh each day. (2AC, DE 21 ¶30.a; Answer, DE 25, ¶30.a; Ex 19, Justin D. Dep. at 60.) A similar promise has been one of the foundational distinctions of INO's commitment to quality throughout its existence. (Ex 16, Warnick Dec. ¶34.) Examples of each party's freshness statements are shown below:



b.      DNB has recently begun handing out free hot cocoa, (2AC, DE 21 ¶30.b;

Answer, DE 25, ¶30.b; Ex 20, Zotter Dec. at 28-29 (explaining this was intended to

draw more children into the store), exactly as INO has done since 2018. (Ex 16,

Warnick Dec. ¶33.) Examples of each party's advertisement of this business method

are shown below:



76.     Griffin Zotter, who played a principal role in designing DNB's packaging and in

marketing the DNB brand, admits "there's some degree of similarity [between the INO and

DNB brands; for example,] they both use red and white color schemes." (Ex 20, Zotter Dep. at 20-21.)

77.    A number of consumers have already spontaneously and without external prompting expressed their own perception of similarity between the INO Trade Dress and the Infringing Dress. (*See infra* ¶¶79-81.) At a minimum, these expressions reinforce the similarity of the parties' respective dresses. In many cases, they also evidence actual confusion.

78.    Gracie Fetters is a customer service employee who has worked at DNB's Tecumseh Restaurant since it opened in May 2020. (Ex 50, Fetters Dep. at 6.) She testified that, on multiple occasions within the first month that the restaurant was open, "when [customers] came in and were ordering, they might have just said some things like 'oh, this reminds me of In-N-Out.'" (Ex 50, Fetters Dep. at 7-8.) Specifically, she remembers commenting on "the color. They might say 'oh, your colors look similar.'" (*Id.* at 10.) "[F]rom those conversations, [she understood] that these customers ... found the color scheme of Doll N' Burgers to remind them on In-N-Out Burger." (*Id.*; Ex 19, Justin D. Dep. at 73-74 (verifying his awareness of "the fact that numerous customers have shared with [Ms. Fetters] that In-N-Out looks similar to Doll n' Burgers.")

79.    On June 24, 2020, while working at the Tecumseh Restaurant, Fetters took a drive-through order from Scott Lewis, a private investigator hired by INO. While interacting with Fetters at the drive thru window, Lewis remarked, "You know, you guys remind me—I used to live in California, just reminds me of In-N-Out." Fetters reacted by nodding and saying, "Right. Yeah, a lot of people say that." Lewis responded, "They do?" Fetters again said "Yeah."

This interaction is recorded in the video submitted as Ex 56 (INO1744 & INO1756, at timecode 0:37-0:44), and was subsequently verified by Fetters under oath. (Ex 50, Fetters Dep. at 5-6; Ex 57, Lewis Dec. & Report.)

80.     A collection of social media posts and online articles expressing similarity and/or confusion, and authenticated by the Declaration of Wendy Gabriel, are contained in Ex 58. (See also Ex 59, Dep Ex. J, containing most of these examples; Ex 19, Justin D. Dep. at 67 (verifying having encountered the posts in Ex J); *id.* at 74-77 (verifying DNB's awareness of online customer reviews comparing DNB to INO during the time DNB first opened and up to several months later); Ex 52, Joel D. Dep. at 74-76, 84 (acknowledging discussion of posts like those in Ex J with DNB principals); Ex 20, Zotter Dep. at 30 (acknowledging having seen at least a couple of these posts online)). For example, consumers have posted the following on:

    i.   DNB's own Facebook page:



(Authenticity admitted: Ex 21, DNB Resp. to 2d RFAs, ¶2).



(Authenticity admitted: Ex 21, DNB Resp. to 2d RFAs, ¶4)



(Authenticity admitted: Ex 21, DNB Resp. to 2d RFAs, ¶6)



(Authenticity admitted: Ex 21, DNB Resp. to 2d RFAs, ¶13 (INO 1787))



(Ex 60, produced as DNB 350; Ex 20, Zotter Dep. at 37-39 (authenticating this post))

    j.   Third Party Facebook pages:





**Downtown Tecumseh** was live
May

https://www.facebook.com/downtowntecumseh/videos/d41d8cd9/239715000648772
link&   rv   =related_videos



**Mark James**     Looks like in and out burger 😋 ! Great food
20w

(Ex 58, INO 417)

   k.  Google Reviews (Ex 58):



# Doll n' Burgers - Tecumseh

411 E Chicago Blvd, Tecumseh, MI

**4.1** ★ ★ ★ ★   254 reviews

Sort by: Most relevant ▾

All    drive thru 5    to go 4    poutine 16    cheese curds 15    +6

Like

**Bryce Bingham**
Local Guide · 45 reviews · 59 photos

★ ★ ★ ★ ★  a month ago
Good burgers. Kind of like an off-brand 5 Guys or In-N-Out. Has that vibe about it. Service is a little slow but usually worth it.

Like

**Response from the owner** 4 weeks ago
Thank you, Bryce!

**austin zacharias**
Local Guide · 9 reviews

★ ★ ★ ★ ★  5 days ago
Great burger, they're going for an in n out feel and I think they totally nail it!

Like

**Response from the owner** 3 days ago
Thanks Austin!

**Scott Hoel**
Local Guide · 46 reviews · 121 photos

★ ★ ★ ★  3 months ago
Took the 45min drive to come see this new establishment. Although no place - not one- can top In-N-Out Burger out west, these guys do a pretty good job with their flattery. Simple menu of a few different versions of their burger which was done very nicely. The buns are incredible! Dogs, fries, shakes and malts, a couple salads and - I want to come back and try their poutine. That's something In-N-Out probably never even heard of! I hope they make a name for themselves. It had to be difficult launching amid the Covid pandemic.

Like



I.   Twitter (Ex 58):

 かいかい■@🍠
@Sloth_7DAHLI8                                        ...

旦那のホームタウンに出来たらしい新しいバーガーシ
ョップ、その名もDoll N' Burgers🍔
な...なんかみためがカリフォルニアのアレに似てませ
んかね...?
#InNOut

Translated from Japanese by Go gle

A new burger shop that seems to have opened in my
husband's hometown, the name is Doll N'Burgers 🍔
Hmm ... Isn't it similar to that of California ...?
#InNOut



12:32 PM · Jan 6, 2021 · Twitter for iPhone

**7** Likes

(Ex 19, Justin D. Dep. at 76 (verifying having seen this tweet))

m.  And Yelp! (Ex 58):

lviii



**Jesse D.**
Montebello, CA
🏠 261 📷 2

★★★★★ 1/19/2021

As someone who just moved from Los Angeles after being there 25 years, I know that in n out is one of the best chains in the west coast. After moving to Michigan last year my gf showed me this gem and it is literally as close to in n out as you can get out here! Delicious burgers fries and shakes for a good price, and slightly reminds me of in n out at home!

👍 Useful   😄 Funny   😎 Cool



**Kasey W.**
Chelsea MI
🏠 0 📷 2

★★★★★ 7/30/2020

Similar atmosphere to In n Out burger - very very good food but on top of that the staff were excellent ! Helpful , didn't stop working and made the experience that much better. Would recommend trying out . especially if you're someone whose tried In N Out and need to fulfill a craving !

👍 Useful   😄 Funny   😎 Cool

81.     DNB admits that "[a]n unknown number of people have posted comments on DNB's social media sites comparing DNB's food to other quick service burger outlets, including INO." (Ex 17, DNB Resp. to 1st Interrog. ¶5; Ex 18, Burtka Dep. at 20 (admitting he was "aware of ... others expressing the opinion that Doll N Burgers looked similar to an In-N-Out Burger....·I think I just saw a Facebook post or something.")

82.     "A few times customers have remarked that DNB hamburgers were similar to but better than INO hamburgers .... Ken Heers encountered two men in the Tecumseh restaurant parking lot who said words to the effect "you're ripping off In-N-Out, look at your sign. We know

lix

In-N-Out, we're from Arizona.'" (Ex 17, DNB Resp. to 1st Interrog. ¶5; Ex 49, Heers Dep. at 47-49; Ex 19, Justin D. Dep. at 69-70 (verifying his awareness of this conversation)). Likewise, upon visiting a DNB restaurant, a relative of John Burtka's visiting from Texas "said, 'Wow, this is like In-N-Out Burger, but better.'" (Ex 18, Burtka Dep. at 23.) Both Justin and Joel Dalenberg recounted stories of visitors from California who volunteered a comparison between INO and DNB. (Ex 19, Justin D. Dep. at 68-69; Ex 52, Joel D. Dep. at 30-31, 88; *id.* at 89 "your burgers - - just, she said, it remind me of being in California at In-N-Out. That's what she said.").

83.     Dr. Cunningham performed a survey of 15 subjects--207 test subjects and 208 control subjects—living in the Midwest. The test survey indicated that 56% of the test subjects, when shown the test stimuli thought that the INO restaurants and the DNB restaurants were owned by the same company, and an additional 10.6% of the test subjects thought that the INO restaurants and the DNB restaurants were affiliated, associated, or connected. The results of the test , therefore showed a gross confusion of 66.6%. The results of the control survey showed 8.2 % "noise" as to source and 9.1% "noise" as to affiliation, for a total 17.3% "noise". Subtracting the total; "noise" from the gross confusion (66.6% - 17.3%) results in a net confusion of 49.3%. This is a clear indication that there is a high likelihood of confusion between the Plaintiff's and Defendant's restaurants trade dress. (Ex 68, Cunningham LOC survey at 7, 34-36.)

84.     Among the subjects who stated the INO and the DNB restaurants were owned by the same company, 6 subjects spontaneously indicated that INO was that company. When asked to state why they thought the same company owned both restaurants, 52% of the subjects referred to the restaurant's distinctive design, the red and white colors, the interior layout and

design and overall look ( all elements of the INO registered trade dress), 44% referred to the

color scheme and the colors of both restaurants and 21% referred to some of the elements of

the "INO Common Law Trade Dress" identified in the Plaintiff's Second Amended Complaint (

P.6) such as: the beverage cup, the restaurant exterior, the burger, or the shirts of the employees

of the restaurant. Note that the red and white color scheme could be considered elements of

both the INO registered trade dress and of the "INO Common Law Trade Dress". Among the

subjects that thought the INO and the DNB restaurants were affiliated or connected, when asked

to state why they thought so, 50% referred to the restaurant's distinctive design, the red and

white colors, the interior layout and design and overall look (all elements of the INO registered

trade dress); 31% referred to the color scheme and the colors of both restaurants; and 13%

referred to some of the elements of the "INO Common Law Trade Dress." (Ex 68, Cunningham

LOC survey at 37.)

### 4. *Marketing Channels Used*

85.    "DNB markets the DNB goods and services and the DNB Restaurant via

Facebook." (Ex 21, DNB Resp. to 1st RFAs, ¶17)

86.    "DNB markets the DNB goods and services and the DNB Restaurant through its

internet website available at https://www.dollnburgers.com." (Ex 21, DNB Resp. to 1st RFAs,

¶18)

87.    "Doll n' Burgers uses its website dollnburgers.com, Facebook, Instagram, and

various other online places to advertise. John Burtka was somewhat involved in marketing

initially but has little involvement now. Griffin Zotter is currently primarily responsible for posting

and monitoring content relating to DNB, as well as responding to posts and inquiries when appropriate. The DNB management team, and Ken's wife Heather Heers, also monitor FB and social platforms." (Ex 17, DNB Resp. to 1st Interrog. ¶4).

88.     John Burtka supervised and coached Zotter's efforts to market DNB via social media. (Ex 18, Burtka Dep at 49-50).

89.     All of DNB's promotional activity, which was conducted primarily through social media but also involved charitable community involvement, was designed "to drive word of mouth" interest in DNB. (Ex 18, Burtka Dep. at 50-53; Ex 19, Justin D. Dep. at 106 ("word of mouth is one of the best forms of advertisement"). DNB advertises through "[y]ard signs, social media, email ," (Ex 19, Justin D. Dep. at 103), and very limited amounts of print mailers and radio ads. (*Id.* at 105-06). It further promotes itself through "outdoor cookout events ... [in] the community ... and [charitable] donat[ions]." (Ex 19, Justin D. Dep. at 104-05). Any promotional activity [DNB] do[es], whether it's giveaways ... or other things to get [its] name out in the community, the end goal is always to get people in [the] restaurant." (Ex 19, Justin D. Dep. at 84.)

### 5.    *Likely Degree of Purchaser Care*

90.     As of July 2021, the advertised prices of DNB's meal combinations were between $9.50 and $11.50. (Ex 61, DNB menu.)

91.     As of July 2021, the advertised prices of INO's meal combinations ranged on average from $6.65 to $8.30. (Ex 16, Warnick Dec. ¶32.)

### 6.    *The Defendants' Intent in Selecting Their Infringing Dress*

92.     For purposes of this litigation, DNB now denies any intent to trade on INO's

goodwill. Each of the DNB principals and other agents who participated in the design of DNB's

Infringing Trade Dress, however, had personal familiarity with INO, the INO Trade Dress, and

with the fame of the INO brand. DNB admits to having used INO's menus as a reference point

in designing DNB's menus, to having done market research on INO, and to having used INO

as a "comparable" during the DNB design process. *Supra*, SOF 52-70.

### 7.     *Likelihood of Expansion of the Product Lines*

93.     The parties' product lines are likely to expand in such a way as to increase

confusion going forward. INO's locations have steadily expanded eastward from California

over the years, and are sufficiently popular that travelers from all parts of the country, including

Michigan, are familiar with INO's branding. *See supra.*

94.     INO is continuing to expand into states and areas where it does not currently have

a restaurant. As one example, INO has publicly announced plans to open locations in Idaho.

INO does not have a formal or informal policy in place that dictates the states or regions into

which it will or will not expand. Rather, particularly in recent years, customer demand has played

a key role in guiding INO's decisions about where to expand. For example, customer feedback

led INO to open its locations in Colorado, a state in which it had not previously planned to

expand. (Ex 43, Warnick Dep. at 109-113.)

95.     There is no area of the country in which INO would categorically rule out

expanding, including Michigan and other portions of the Midwest—especially if customer

feedback asking for INO to open there was sufficiently strong. (Ex 16, Warnick Dec. ¶35.)

96.     INO's most fundamental rule for where it locates its restaurants is that they must be located within a day's drive of the nearest INO warehouse and processing facility, so that the meat and other ingredients do not need to be frozen. Currently, INO has such warehousing and processing facilities in California, Texas, and Colorado. Therefore, many cities and states within the Midwest are currently within a day's drive of an existing facility. (Ex 16, Warnick Dec. ¶34.)

97.     INO has received a substantial amount of customer feedback urging INO to open a location in Michigan. (Ex 15, call sheet, authenticated by Ex 16, Warnick Dec. ¶36.) The substance of these comments strongly suggest that nearly every one of these customers has been to, or is at least familiar with, INO restaurants.

98.     Several of DNB's customers have been previously familiar with INO, either because they were visiting from out of state, used to live out of state, or had encountered INO while traveling out of state. (Ex 18, Burtka Dep. at 23 (visitor from Texas); Ex 19, Justin D. Dep. at 68 (visitor from California)); Ex 52, Joel D. Dep. at 28-29 (visitor from California); *cf.* Ex 18 (Burtka Dep.) at 24 (visitors from Ohio).)

99.     "DNB intends to expand its goods and restaurants." (Ex 21, DNB Resp. to 1st RFAs, ¶22).

100.    Defendants admit that they have publicly expressed a hope and desire to expand their restaurant concept to other locations, including other states and conceivably even "nationwide." (2AC, DE 21, ¶26; Answer, DE 25, ¶26).

101.    In a May 2020 press release issued by Griffin Zotter (Ex 62, DNB 2367) and approved by John Burtka (Ex 18, Burtka Dep. at 39) that was quoted in a May 26, 2020 news

article published by JTV (Ex 63, JTV Article, Dep. Ex. K), DNB announced that its Tecumseh Restaurant would be "the flagship of a national chain" (*id.*), that DNB was "insane enough to launch a high-end national burger chain in the middle of a pandemic, awesome enough to pull it off" (*id.*), and that "[t]hese restaurants aim to bring the mid-western spirit and hospitality across the nation." (*Id.*; see Ex 52, Joel D. Dep. at 80, 85 (verifying that Burtka's statements were accurately reported in the JTV article)). The press release provided a timeframe of opening "several more [restaurants] over the next couple of years with plans to go national." (Ex 62.)

102.    After this litigation was filed, DNB principals admitted making these statements about national expansion, but characterized them as "hopeful," (Ex 18, Burtka Dep. at 38), "aspirational," (*id.*), or "marketer" (*id.*) language, although not "disingenuous." (*Id.*) Burtka said that these comments about national expansion were designed to make DNB seem more appealing and thus "increase[] [its] likelihood of success." (Ex 18, Burtka Dep. at 38; Ex 19, Justin D. Dep. at 57 ("John liked to say very grandiose things [s]uch as 'national chain'") All of DNB's founders "ran with that interesting news angle of a group of guys in Tecumseh launching a national burger chain in the middle of a pandemic."" (Ex 18, Burtka Dep. at 43.)

103.    Also in May 2020, Burtka repeated the message of national expansion in social media posts. For example, on May 25, 2020, Burtka shared the JTV article on Facebook, which he did "because I want people on my page to read it and go to the restaurant." (Ex 18, Burtka Dep. at 44-45.) When a regular customer of another of Burtka's restaurants commented on DNB being a "national chain," Burtka responded, "Why not?" (Ex 64, Dep. Ex Z; Ex 18 Burtka Dep. 43-44). Another person commented that DNB should open a location in Arizona. (Ex 64, Dep.

Ex Z; Ex 18 Burtka Dep. 44-45).Burtka clicked "like" on both of these comments, among others. He did so because, "with Facebook, ... if you like something, it actually gets more airplay," (Ex 18, Burtka Dep. at 44-45)—in other words, it would be seen by more users.

104.    At a minimum, DNB's principals have expressed, and continue to express, an intention to expand across the Midwest. (Ex 48, Dep Ex C, DNB 283 ("we plan to open more locations across the state and most certainly the Midwest"); Ex 19, Justin D. Dep. at 58 ("mostly we talked about rustbelt, so that's my interpretation of nationwide in the next coming years, like ... Michigan, Ohio, Indiana, Illinois, Tennessee, Kentucky, Missouri, Arkansas .... Basically what's defined as the Midwest."); Ex 52, Joel D. Dep. at 27 ("I think that sums it up right there, generally Midwest ... it's a big area I know"); Ex 49, Heers Dep. at 46-47 ("Justin and I -- Justin especially was pretty firm that we were going to grow this chain throughout the Midwest, the Rust Belt ... I'm not prepared to put, you know, specific definition on what ... that means. In general speaking, the Midwest."); Ex 18, Burtka Dep. at 35 ("expansion regionally across the Great Lakes"); *id.* at 37 (same).)

105.    But even now, DNB's principals "[w]ould not rule out going past the Midwest." (Ex 19, Justin D. Dep at 59.); *see also* Ex 49, Heers Dep. at 47 ("We really have no desire to go out to the west coast. We're not going to necessarily limit ourselves and say that we will never plan to do it if we get to that point, but our sights are really set on the Midwest.")

## F.    DNB's Counterclaims

106.    When asked in discovery to identify "each INO representation that was allegedly 'false or misleading'" in its trade dress application, the only specific argument DNB

identified was its argument that the $100 million figure was not specific to the applied-for trade dress. (Ex 17, DNB Resp. to 1st Interrog. ¶13).

107.     DNB deposed Lynne Boisineau, the attorney who at the time was with McDermott Will & Emory and represented INO with regard to its application to register the Registered Trade Dress. She verified her own belief in the accuracy and good-faith nature of INO's representations and arguments to the USPTO, and denied any intent to defraud. (Ex 41, Boisineau Dep. at 29 ("I understand trade dress law, and to the best of my ability, I read what the examiner asked for and I made what I thought were appropriate arguments."); *id.* at 31-32 (same).)

**G.     INO's Attempt to Resolve the Dispute**

108.     On July, 3, 2020, counsel for INO delivered a letter to Defendants expressing INO's concerns with DNB having multiple examples of similarities to the INO Trade Dress and requesting that Defendants take voluntary action to change certain items to avoid confusion with the INO Trade Dress. (Ex A to the 2AC, DE 21, PgID 191-192.)

109.     On July 4, 2020, Dalenberg responded to INO correspondence by email. His message revealed personal familiarity with INO and the INO Trade Dress, but entirely rejected INO's concerns and refused (on behalf of all Defendants) to take any corrective action by stating, "I'd like to point out a couple of facts so you understand how hilarious your claims are … I'm flattered that [INO] believes we are utilizing elements of their brand but I assure you that we are not and I'm happy to argue any point you send my way". (Ex B to the 2AC, DE 21, PgID 194-195.) In responding to INO, Justin Dalenberg also commented that "[DNB]'s menus are completely different," even though DNB later confirmed that DNB (and Justin

Dalenberg personally) did indeed model DNB's menu boards on INO's menu boards. *Supra*,

SOF 63-65.

## INTRODUCTION

The evidence is overwhelming: customers associate INO's Trade Dress with INO restaurants, and they perceive the look and feel of DNB's restaurants as confusingly similar to INO. DNB's own admissions, along with unrebutted testimony and a chorus of customer feedback compel these conclusions. DNB's counterclaims, which attempt to undermine portions of INO's Trade Dress, are baseless and fail as a matter of law. In fact, the evidence is so lopsided that summary judgment in INO's favor on its claims is the only reasonable outcome.

## ARGUMENT

### I.      DNB's Counterclaims Fail As a Matter of Law

DNB's First Amended Counterclaims (DE 25) allege two counts: (1) cancellation of INO's trade dress registration, and (2) a declaration of non-infringement. Both fail as a matter of law.

#### A.      Count II for Declaratory Judgment of Non-Infringement Is Redundant

Counterclaim Count II merely purports to negate the elements of INO's causes of action. Courts in this circuit and around the country routinely dismiss such counterclaims under Rule 12 as being redundant. *See Malibu Media. LLC v. Ricupero*, 705 Fed. Appx. 402, 405-07 (6th Cir. Aug. 28, 2017) (upholding dismissal of copyright non-infringement counterclaim as redundant and serving "no useful purpose" under Rules 12(b)(6) & (f)); *Atl. Recording Corp. v. Serrano*, No. 07-CV-1824WJMA, 2007 WL 4612921, at *4 (S.D. Cal. Dec. 28, 2007) ("Courts often dismiss 'mirror image' counterclaims where they merely restate issues already before the court as part of a plaintiff's affirmative case.") The Court should do the same here, under Rules 12(c) & (f).

#### B.      The Record Cannot Support Cancellation of INO's Trade Dress Registration

1

### 1. DNB Cannot Demonstrate Fraud on the USPTO

"Both the courts and the Trademark Board regard charges of fraud in procurement of a trademark registration as a disfavored defense." 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:68 (5th ed.) The Sixth Circuit has cautioned that "fraud [on the USPTO] is not lightly to be presumed." *Anheuser-Busch, Inc. v. Bavarian Brewing Co.*, 264 F.2d 88, 91–92 (6th Cir. 1959). One who alleges such fraud bears a "heavy burden of proof"; the standard is "clear and convincing evidence" and an allegation of fraud "should not be taken lightly." *In re Bose Corp.*, 580 F.3d 1240, 1243-45 (Fed. Cir. 2009).

DNB's *entire* basis for alleging fraud here is that the Examiner *may* have misunderstood the precise scope of *one* of many pieces of evidence INO submitted to demonstrate that its dress had acquired distinctiveness, including multiple declarations, news articles, magazine publications, and customer recognition surveys. The declarations included "a declaration by Carl Van Fleet, INO's then-Executive Vice President, attesting that INO between 2000 and 2012, INO had spent in excess of $100 million on a combination of radio, television, outdoor and print advertising." DE 25, PgID 213 ¶8. This figure reflects INO's overall promotional expenses during that period, not an amount specifically dedicated to promoting the trade dress as such. *Id.*, PgID 214 ¶11; SOF 14.a, 29. DNB alleges that, because the Examiner had previously instructed INO to provide "evidence ... relate[d] to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the services in general," *id.*, PgID 213 ¶6, that "the Examiner would believe that INO had spent over $100 million in 'promotion and recognition of the specific [applied-for trade dress] and not to the services in general.'" *Id.* ¶9; SOF 106.

2

This speculation on DNB's part falls far short of demonstrating fraud by clear and convincing evidence. It is comparable to the argument the Sixth Circuit rejected in *Anheuser-Busch*. There, the defendant alleged that affidavits submitted to prove secondary meaning were fraudulent because they incorrectly indicated they had been sworn and notarized, when they were not. But the substantive content of the affidavits was true, "and the Lanham Act has no requirement as to the method of presenting evidence in support of applications for registration." 264 F.2d at 92. Here, too, INO had no intent to defraud, SOF 107, and DNB agrees that the figures recited in Mr. Van Fleet's declaration were accurate. SOF 14.a.

There is no evidence suggesting the Examiner was misled. DNB has no documentary or testimonial evidence from the Examiner herself, and she is not included in DNB's witness list. (DE 28). Accordingly, DNB's entire claim rests on its own speculation. And INO's figure included radio advertising, an unlikely way to promote restaurant décor. Further, nowhere in INO's response to the Examiner (Ex 25) or in Mr. Van Fleet's declaration (Ex 26) did INO represent that the $100 million figure was specific to promoting the trade dress itself. To the contrary, despite the boilerplate instructions in the Examiner's office action, INO never purported to limit its arguments to evidence based on advertising of the trade dress alone, which would have been both unrealistic and unnecessary. Rather, INO explained it was relying on the rules of trademark practice that allow applicants to "submit declarations ... or other appropriate evidence tending to show that a Mark distinguishes the services at issue" (Ex 25), which is all the Lanham Act requires for registration. INO's primary argument for why its restaurants' décor has secondary meaning was expressly premised on the fact that its

3

advertising drives large number of customers to visit its locations, because all of those customers have necessarily viewed the trade dress. SOF 14. In sum, INO showed that it had promoted its trade dress by advertising its services, which in turn drove customers into its restaurants that bear the dress.[3] This argument was stated plainly, and in no way indicates that INO knowingly made a false, material misrepresentation of fact to constitute fraud on the USPTO. *See Maids to Order of Ohio Inc. v. Maid-to-Order Inc.*, 78 USPQ2D 1899 (TTAB 2006)).

Moreover, DNB notably omits mention of all of INO's other evidence it submitted in showing acquired secondary meaning of its restaurant décor. INO submitted newspaper reports, articles from national magazines, consumer surveys, declarations from customers, and declarations from experienced vendors in the quick-service restaurant industry all supporting that INO was a hugely popular brand. INO's restaurant décor was thus likewise widely-recognized and had acquired secondary meaning among consumers. According to the Trademark Manual of Examining Procedure, "The ultimate test in determining whether a designation has acquired distinctiveness is applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source." TMEP 1212.06(b). INO submitted multiple exhibits of this success to the Examiner, who in turn appropriately followed "the ultimate test" and allowed INO's trade dress application to register, with no indication that she relied solely on any one piece of evidence in doing so. There is nothing in the

---

[3] DNB founder Justin Dalenberg agrees that "any promotional activity you do, whether it's giveaways ... or other things to get your name out in the community, the end goal is always to get people in your restaurant." (Ex 19, Justin D. Dep. at 84).

4

record remotely constituting the requisite clear and convincing evidence that INO intended to defraud the USPTO. DNB's claim that INO committed fraud in obtaining its trade dress registration has no support and thus must be wholly dismissed.

### 2.    DNB Cannot Disprove That the Registered Dress Is Distinctive

"Registration ... under § 2 of the Lanham Act, 15 U. S. C. § 1052, ... entitles the owner to a presumption that its mark is valid, see § 7(b), 15 U. S. C. § 1057(b)." *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 US 205, 209 (2000). DNB's cannot overcome this presumption.

### i.  *As the Examiner Held, the Registered Dress Has Secondary Meaning.* The Sixth Circuit "applies a seven-factor test to determine whether secondary meaning exists in a trade dress: (1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 418 (6th Cir. 2006). "No single factor is determinative and every one need not be proven." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 528 (6th Cir. 2013).    The evidence INO presented to the Examiner to uphold this conclusion was substantial. In addition to the more than $100 million spent on drawing consumers to INO restaurants, this evidence included "national[] recogni[tion] by the restaurant industry and its consumers, as well as widely-read publications, as a leader in quality and service in the quick-service restaurant sector ...[;] feedback from the large number of customers ...[;] reference[s] in multiple news publications as a favorite restaurant of celebrities and an overall popular restaurant[;] [and] seven (7) executed declarations from customers,

5

architects, and a restaurant brand marketer describing the claimed elements of Applicant's Mark and how these elements are immediately recognizable as associated with [INO]." (Ex 25; SOF 14) That evidence remains persuasive today, and it is further supported by other sources.

*ii. Direct consumer testimony.* INO provided several sworn declarations from third parties attesting to the distinctiveness of the Registered Trade Dress, and has since obtained others. (SOF 14.b.)

*iii. Consumer surveys.* The Sixth Circuit has "historically favored the use of consumer surveys as proof of secondary meaning." *Lanard Toys,* 468 F.3d 405 , 419. It has clarified, however, that "[s]urvey evidence is not the only relevant evidence" and it is possible to "present[] sufficient evidence of secondary meaning at summary judgment without consumer surveys." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.* , 270 F.3d 298, 312-13 (6th Cir. 2001). INO's survey expert, Dr. Isabella Cunningham, is a seasoned marketing professional with more than 40 years of experience. (SOF 19.) Her survey of INO's service area found a remarkable degree of secondary meaning—92.5% of the subjects in the test group and 61% even after subtracting the control group. (SOF 20-21.) "[O]ver 45% of those subjects that attributed the IN-N-OUT trade dress to one source referred to the restaurant's distinctive design, the red and white colors, the interior layout and design and overall look (all elements of the IN-N-OUT registered trade dress)." (SOF 22.) This is powerful evidence.

*iv. Exclusivity, length, and manner of use.* The INO Registered Trade Dress has been in consistent commercial use since 1992, (SOF 24), and is used in the vast

majority of INO's restaurants. (SOF 25.) Neither DNB nor INO is aware of any other restaurant in the country that uses all of the alleged INO Trade Dress elements. (SOF 26.)

### v.  Amount and manner of advertising.

INO spent more than $100 million on marketing and promotional activity between 2000-2012, (SOF 27), and continued to spend at a comparable pace since then. (SOF 28.) The promotional activity reflected by these figures includes but is not limited to television, radio, billboards, social media, website, digital marketing, direct mail, gift cards, sports marketing, library programs, food giveaways, benevolent cookouts, cookouts at celebrity events, "lunch tour" donations to schools, and other field marketing—all of which draw customers to its restaurants, where they encounter INO's Trade Dress (SOF 29.) INO has also promoted various elements of the INO Trade Dress in print advertising, social media, its website, and in merchandise sales. (SOF 30-35.) INO currently has more than 2.7 million Facebook followers and more than 576,000 followers on Instagram. (SOF 31.) "[U]nsolicited media coverage" is also probative of secondary meaning. *Herman Miller, Inc.* 270 F.3d 298, 313. INO and its Trade Dress is frequently featured in third-party national news and entertainment reporting. (SOF 14.e, 43-48.) Celebrities and customers alike also frequently post photos on social media that feature the INO Registered Trade Dress. (SOF 48.)

### vi.  Amount of sales and number of customers.

INO has more than 225 locations in California, and over 360 in total throughout California, Arizona, Nevada, Utah, Texas, Oregon, and Colorado, and it is continuing to expand to other states. (SOF 36.)

### vii. Established place in the market.

DNB fully admits how well-established INO is in the market. Before this lawsuit was filed and before DNB even opened,

7

Defendant and DNB founder Justin Dalenberg touted INO as one "of America's great burger chains [that] have been able to eek out a large portion of market share in their respective markets." (SOF 52.c, 56.) Its principals have testified under oath that they knew INO to be "legendary," "impressive," "popular," that it has "a loyal following," that "people sought them and there would be long lines for people to get in there," "that their quality was great," and that it is "a destination location." (SOF 52.) INO's evidence echoes these conclusions. (SOF 37-51.)

        *viii.*      ***Proof of intentional copying***. The Sixth Circuit "has long held that evidence of intentional copying shows the strong secondary meaning of a product because there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 639 (6th Cir.2002) (cleaned up). With this lawsuit pending, DNB of course denies having intentionally copied INO. In addition to already having been familiar with INO by reputation and by having eaten in its restaurants, however, DNB's co-founders and designers admitted to conducting competitive market research on INO, including by visiting its restaurants and searching it online. (SOF 54, 55, 57, 61, 92.) INO was one of only a handful of chains Dalenberg cited as "comparable" companies that inspired his vision for DNB. (SOF 56-57.) Specific to the INO Registered Trade Dress, DNB admits that the red and white striping underneath its countertop was a "branding decision." (SOF 60.) It is meant to be the same stripe as on the DNB cup and to be consistent with the look of the cups and packaging and the overall branding of the restaurant, including the horizontal red stripe along the top of the cup. (SOF 60.)

That striping and color scheme, of course, is one component of the INO Registered Trade Dress, meaning that DNB admits to incorporating at least part of INO's dress into its own "branding."

Despite the collective strength of this evidence, DNB has *no* affirmative evidence of its own that the Registered Trade Dress does *not* have secondary meaning in the marketplace.[4] The best it can do is to point to a handful of other chains who use some—but not all, or even most—of the elements that make up INO's Registered Trade Dress. This fails to remove the secondary meaning in INO's Registered Trade Dress.

### C.     The Registered Trade Dress is Inherently Distinctive

The Examiner initially disagreed with INO's argument that its Registered Trade Dress is inherently distinctive, but INO contends that this finding was mistaken. If the Court finds the dress to be inherently distinctive, then the question of secondary meaning becomes moot. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 US 763, 769 (1992). The Supreme Court has held that trade dress (including a restaurant décor) may be inherently distinctive if it is "capable of identifying a particular source of the product." *Two Pesos*, 505 U.S. at 771. Trade dresses fall into one of several categories of increasing distinctiveness: generic, descriptive, suggestive, arbitrary, or fanciful. *See id.* at 768. "If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements." *Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 584 (2d Cir. 1993); *AMD Southfield Mich. Ltd.*

---

[4] DNB did commission a survey for the purpose of disproving INO's secondary meaning contentions, but it only tested the Common Law Trade Dress. Indeed, as explained further in the *Daubert* motion that INO is filing contemporaneously with this motion, the fact that DNB's "expert" left so many elements of the INO Registered Trade Dress in the images he used for "controls" completely undermines the usefulness of his survey results.

*P'ship v. Mich. Open MRI LLC*, 337 F. Supp. 2d 978, 982 (E.D. Mich. 2004). The INO Registered Trade Dress is at least arbitrary. It comprises a particular and very uncommon, diagonal orientation for its ordering counter. (SOF 12.) The combination of this layout with the red and white color scheme, stripes underneath the counter, tiled walls, and booths is even more uncommon and distinctive; indeed, no other quick-service restaurant uses this combination of elements. (SOF 12.)This is an additional basis for rejecting Counterclaim II.

## II.    INO Is Entitled to Summary Judgment on Its Claims Against DNB

### A.    INO's Trade Dress Comprises the Total Look and Feel Created By the Combination of the Specified Elements

While INO has described elements of its Common Law Trade Dress in literal terms for purposes of the present action, the Court must evaluate the overall look and feel of INO's Common Law Trade Dress that has long been incorporated in its restaurants. "Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, textures, graphics and designs. In the context of restaurants, all of the elements that make up the decor of the restaurant comprise the trade dress."[5] *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, No. 84-1115, 1984 U.S. Dist. LEXIS 22289, at *1 (D. Ariz. Oct. 31, 1984). "In other words, although a plaintiff must provide a precise expression of the character and scope of the claimed trade dress so that courts can sensibly evaluate claims of infringement and fashion relief tailored to the distinctive combination of elements that warrant protection[,] [t]he

---

[5] The elements that form "[a] restaurant's trade dress can include the shape and general appearance of the exterior of the restaurant, the identifying sign, the interior floor plan, the appointments and decor items, the equipment used to serve the food, and the servers' uniforms." *Prufrock Ltd., Inc. v. Lasater*, 781 F.2d 129, 132 (8th Cir. 1986) (cleaned up).

10

trade dress itself is not the combination of words which a party uses to describe or represent its total image, but, rather, the trade dress is that image itself, however it may be represented in or by the written word." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 539-40 (S.D.N.Y. 2011) (cleaned up).

Further, "[b]ecause these claims involve both registered and unregistered trademarks, and because these marks combine to form Plaintiff's overall trade dress, the Court analyzes them together, rather than as distinct elements." *Hershey Co. v. Art Van Furniture, Inc.*, No. 08-14463, 2008 U.S. Dist. LEXIS 87509, at *5-7 (E.D. Mich. Oct. 24, 2008). Accordingly, the Court should consider the combined look and feel of INO's Registered and Common Law Trade Dresses,[6] even if those dresses incorporate elements that are separately registered as trademarks in their own right (as the red-and-white palm tree images within INO's décor are).

### B.    Distinctiveness and Likelihood of Confusion Are Central to Each Claim

To prove infringement of its Common Law Trade Dress, INO must show "1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses [and] 2) that the trade dress is primarily nonfunctional." *Abercrombie & Fitch*, 280 F.3d at 629. Under the Lanham Act's "anonymous source rule," INO need not show that consumers can name the company associated with the dress [in order to establish secondary meaning]— only that they associate it with a single company. *See Tas-T-Nut Co. v. Variety Nut & Date Co.*, 245 F. 2d 3, 7 (6th Cir. 1957) ("[I]t is the article itself and its good qualities which the public

---

[6] Indeed, INO's 2AC defines the Registered Trade Dress as a "subset" of the Common Law Trade Dress. DE 21, PgID 159 ¶19; SOF 11.

11

appreciates and which cause it to desire to get the genuine article made by the manufacturer who has established its reputation, rather than something made by some one else").

As to this and the Registered Trade Dress (for which distinctiveness and non-functionality are presumed), INO must also show "3) that the trade dress of the competing good is confusingly similar."[7] *Abercrombie & Fitch*, 280 F.3d at 629. Therefore, INO must show DNB's actions are likely to cause "confusion among consumers regarding the origin of the goods offered by the parties," *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 09 (6th Cir. 2009)—in other words, that they are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of [DNB] with [INO], or as to the origin, sponsorship, or approval of [DNB's] goods, services, or commercial activities by [INO]." 15 U.S.C. §1125(a). The evidence on these factors weighs so strongly in INO's favor that no reasonable juror could find otherwise.

### C.     Décor Trade Dress (Such as INO's) Is Non-Functional

As should be self-evident, the décor of a restaurant does not, in and of itself, perform a function other than identifying source. A trade dress feature is only functional "if it is essential to the use or purpose of the article or it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165, (1995) (quotation omitted). By contrast, "an aesthetic design that merely communicates the *source* of the article—rather than anything about the article's use, purpose, cost, or quality—is not functional." *Leapers, Inc. v. SMTS, LLC*,

---

[7] The same standards govern INO's unfair competition and MCPA claims. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 521 (6th Cir. 2007).

879 F. 3d 731, 738 (6th Cir. 2018); *see also Abercrombie & Fitch*, 280 F.3d at 644 (6th Cir. 2002)

(holding that even if certain design aspects of retail clothing catalog were separately functional,

design aspects could constitute "more than the sum of the catalog's non-protectable parts");

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841-42 (9th Cir.1987) (functional

elements such as a restaurant's decor, layout and style of service that are separately

unprotectable can be protected together as part of a trade dress).

Here, INO's Trade Dress consists entirely of the non-functional aesthetic created by the

combination of several decorative elements. Even where the individual elements, when taken in

isolation, perform a function—such as cups or tabletops—they are claimed not for the manner

in which they perform those functions, but only for their appearance (*e.g.*, the decorative ring of

symbols adorning the cup, or the color of the tables). Neither the elements of INO's Trade Dress

nor the overall look and feel that actually constitutes the trade dress performs a function, nor

would protecting them put any competitor at a non-reputational disadvantage

### D.      INO's Common Law Trade Dress Is Distinctive of INO

As with the Registered Trade Dress, the record compels the conclusion that the INO

Common Trade Dress is inherently distinctive. If it is, then INO need not prove that it has

acquired distinctiveness to establish ownership of rights in the dress. Regardless, the record can

only support the conclusion that the Common Law Trade Dress has secondary meaning.

### 1.      The Common Law Trade Dress Is Inherently Distinctive

The INO Common Law Trade Dress comprises exterior and interior décor as well as

product packaging, menu design, and its use of the letter "N" in its name. "Since the choices that

13

a producer has for packaging are ... almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive." *Mexican Food Specialties, Inc. v. Festida Foods, Ltd.*, 953 F. Supp. 846, 850 (E.D. Mich. 1997) (holding that a trade dress's combination of lettering, styles, geometric shapes or colors, descriptive elements, and the "total impression" that the dress offers the observer, should be the focus of the court's inherent distinctiveness analysis). In *Mexican Food Specialties*, the plaintiff's product (tortillas) had a trade dress which included the registered trademark product name "Don Marcos," a picture of a man wearing a sombrero, stalks of wheat or corn and a combination of blocked text with descriptive words. The court found that the combination of elements—the depiction of a man wearing a sombrero, the use of a corn or wheat stalk, the style and six of the lettering and the use of the words "Don" and "Tortillas" and "Quality"—all contributed to an overall appearance that was inherently distinctive. *See id.*; *McNeil-PPC, Inc. v. Guardian Drug Co.*, 984 F. Supp. 1066, 1069-70 (E.D. Mich. 1997) (Rosen, J.) (following *Mexican Food Specialties* to hold that "the overall appearance of Plaintiff's packaging of LACTAID ULTRA with its combination of colors, block and script print, fading horizontal pinstripes and depiction of dairy foods, is 'inherently distinctive.'")[8]

---

[8] *See also Paddington Corp. v. Attiki Importers & Distrib. Inc.*, 996 F.2d 577, 584 (2nd Cir. 1993) ("[t]rade dresses often utilize commonly used lettering styles, geometric shapes, or colors, or incorporate descriptive elements, such as an illustration of the sun on a bottle of suntan lotion. While each of these elements, individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness."); *Sherwin-Williams Co. v. JP Int'l Hardware, Inc.*, 988 F. Supp.2d 815, 819 (N.D. Ohio 2013) (finding the arrangement and selection of design elements on a paintbrush package to be arbitrary); *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-cv-00981, 2019 U.S. Dist. LEXIS 198487, at *23-25 (M.D. Tenn. Nov. 15, 2019) (finding the design of a juice bottle comprising (1) a clear plastic bottle rectangular

INO's Trade Dress is at least (and likely more) suggestive or arbitrary—and thus inherently distinctive—as these examples. Even DNB—which makes much of the fact that certain other restaurant chains use *some* elements that bear *some* similarity to *certain* aspects of INO's dress—admits that it is not aware of *any* other company that uses *all* of them. (SOF 26.) It cannot be, therefore, that protecting INO's particular combination of these elements would cause any non-reputational disadvantage to any competitor. As a matter of law, then, the Court must conclude, consistent with the "typical" result taught by *Mexican Food Specialties* and *McNeil PPC*, that INO's Trade Dress is inherently distinctive as a matter of law.

### 2.    The Common Law Trade Dress Has Also Acquired Distinctiveness

The same seven-factor test identified above, *see Lanard Toys,* 468 F.3d at 418, compels the conclusion that the Common Law Trade Dress is distinctive. Each factor favors INO.

*i.    **Direct consumer testimony**.* In support of its trade dress application, and in addition to the testimony concerning the Registered Trade Dress, INO has provided several sworn declarations from third parties attesting to the distinctiveness of the Common Law Trade Dress. (SOF 18.)

*ii.    **Consumer surveys**.* Dr. Cunningham's survey tested the distinctiveness of the INO Trade Dress as a whole, and the Registered Trade Dress is a subset of the Common

---

at its base with sides rising essentially perpendicular from its base before beveling at the top of the bottle; (2) a black cap; (3) a label with a white circle outlined by a thin dark line surrounding the Juice Bar name; (4) a list (in white) of juice names including: "Orange You Glad," "We Got The Beet," "Sweet Greens," "Ginger Greens," "Fresh Greens," and "Coco Pro"; (5) heart-shaped bullet points next to each name on the list; and (6) the words "Shake Well" (in white) at the bottom of the bottle, "when considered as a whole ... [to be] at least suggestive.")

Law Trade Dress. So all of the responses previously discussed concerning INO's layout and overall look equally support the distinctiveness of the Common Law Trade Dress. But Cunningham also observes that other respondents likewise called out elements unique to the Common Law Trade Dress as being distinctive, including "the beverage cup, the restaurant exterior, the burger, the décor." (SOF 22.) Regardless, secondary meaning only requires evidence that consumers identify the dress with a single source; a net of 61% did. This is powerful evidence that INO's Common Law Trade Dress has acquired distinctiveness.

   *iii. Exclusivity, length, and manner of use.* The INO Common Law Trade Dress has been in consistent commercial use for decades, going back as far as 1960 in certain incarnations, (SOF 10, 23), and is used in the vast majority of INO's restaurants. (SOF 25.) Neither DNB nor INO is aware of any other restaurant in the country that uses all of the alleged INO Trade Dress elements. (SOF 26.)

   *iv. Amount and manner of advertising.* All of the millions of dollars' worth of promotion, social media exposure, advertising copy, media coverage, and consumer social media content discussed above applies with equal strength to the Common Law Trade Dress as it does to the Registered Trade Dress. Media coverage has also featured several elements that are unique to the Common Law Trade Dress—including pop star Taylor Swift posing with INO packaging, a national auto magazine featuring the INO burger wrapper and logo, and the *New York Times* displaying a photo of INO's interior décor. (SOF 27-48, 51.)

   *v. Amount of sales and number of customers.* See SOF 36.

16

*vi. Established place in the market*. INO's longstanding fame with consumers, and Defendants' admissions of same, establish secondary meaning for the Common Law Trade Dress in the same vein as the Registered Trade Dress. In addition, the distinctiveness of INO's trade dress has also been illustrated by the numerous instances in which consumers have notified INO that a third-party company appeared to be copying INO's appearance based on that company's use of various elements of the INO Common Law Trade Dress. This is further shown by INO's success in compelling changes to such offending dress through threatened or actual legal action. For example, INO has taken such action several times over the past 15 years, against infringers using confusingly similar combinations of color schemes, uniforms, décor, menus, packaging, striping, and trademarks. (SOF 49-50.)

*vii. Proof of intentional copying.* DNB's knowledge of, and research into, INO while designing DNB's décor is equally incriminating as applied to any iteration of INO's Trade Dress. (SOF 52-70.) Likewise, its admission to using red and white stripes as a "branding" decision, (SOF 60), and to extending that branding to DNB's cups and décor, (SOF 60), applies with equal force to the Common Law Trade Dress. Indeed, Griffin Zotter—who designed DNB's cups—"can't say that in the back of my mind" that decision wasn't influenced by the red vertical stripes with the red outline of a palm tree that appears on INO's cup. (SOF 66.) In addition, DNB also admitted to directly copying the structure, simplicity, and certain design elements of INO's menu (SOF 63-65). Such strong evidence of copying significantly bootstraps the overall argument that the Common Law Trade Dress has secondary meaning. *See Tas-T-Nut Co.*, 245 F. 2d at 7 (even where evidence of secondary meaning was "not

17

overwhelming," defendant's "deliberate[] [attempt] 'to take advantage of the great amount of advertising done by, the good reputation earned, and the style of package that has been gotten out by plaintiff'" necessarily required a holding that the packaging trade dress had secondary meaning). DNB's admitted copying from INO's menus and cups, and its adoption of a color scheme for DNB's "branding" that so strongly evokes INO's décor, is clear evidence INO's Trade Dress has secondary meaning. After weighing the evidence on all seven factors, a reasonable jury could only find the Common Law Trade Dress has acquired distinctiveness.

### E.    A Reasonable Jury Could Only Find That DNB's Infringing Dress Is Likely to Cause Confusion With INO's Trade Dress

"Eight factors ... are relevant in determining whether a likelihood of confusion exists:

(1) strength of the plaintiff's mark, (2) relatedness of the goods or services offered by the plaintiff and the defendant, (3) similarity of the marks, (4) any evidence of actual confusion, (5) marketing channels used by the parties, (6) probable degree of purchaser care and sophistication, (7) defendant's intent in selecting its mark, and (8) likelihood of either party expanding its product line using the marks."

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (cleaned up). "Not all of these factors will be relevant in every case, and in the course of applying them, the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002) (cleaned up).

#### 1.    The Strength of INO's Trade Dress

The distinctiveness inherent in, and acquired by, INO's Trade Dress (SOF 16-52) demonstrates that it is strong, both conceptually and commercially.

#### 2.    The Relatedness of the Parties' Goods and Services

18

"[I]f the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar." *Daddy's Junky Music*, 109 F.3d at 282. Services and goods "are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Grp. v. Home Marketing Specialists*, 931 F. 2d 1100, 1109 (6th Cir. 1991). "The question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" *Id.* (quotation omitted).

Here, the parties offer precisely the same types of services—restaurants that sell hamburgers, fries, and shakes. SOF 73. "The use of similar marks to offer similar products accordingly weighs heavily in favor of likelihood of confusion." *Brookfield Communs v. West Coast Ent'mnt*, 174 F. 3d 1036, 1056 (9th Cir. 1999).

### 3. The Similarity of the Parties' Trade Dresses

"Similarity of marks is a factor of considerable weight. When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks. The appearance of the litigated marks side by side in the courtroom does not accurately portray market conditions. Rather, courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark. Moreover, courts must view marks in their entirety and focus on their overall impressions, not

19

individual features." *Daddy's Junky Music*, 109 F.3d at 283 (cleaned up). DNB's Infringing Trade Dress mimics the layout and color scheme covered by the INO Registered Trade Dress, each of the elements comprising the INO Common Law Trade Dress, and the impression made by these elements combined, SOF 9-10, 74.

Several admissions by DNB witnesses establish beyond doubt that DNB's Infringing Dress "may confuse consumers who... have a general, vague, or even hazy, impression or recollection of [INO's] mark." *Daddy's Junky Music*, 109 F.3d at 283. 75. Griffin Zotter, who played a principal role in designing DNB's packaging and in marketing the DNB brand, admits "there's some degree of similarity [between the INO and DNB brands; for example,] they both use red and white color schemes." SOF 76. DNB frontline employee Gracie Fetters admitted interacting with "a lot" of customers who volunteered that DNB reminded them of INO, SOF 79, especially because of the parties' color schemes. SOF 78. Every one of DNB's principals has a story about a customer comparing DNB to INO—especially Ken Heers, who was accosted by customers upset that DNB's "sign" was a "rip-off" of INO. SOF 82. More than a dozen consumers have also spontaneously expressed their own perception of similarity between the INO Trade Dress and the Infringing Dress on multiple social media platforms. SOF 80-81. Several of those same customers, as well as others, have signed sworn declarations confirming this perception. SOF 17-18. Taken together, this evidence demonstrates a widespread consensus that DNB's dress evokes INO's in consumers' minds.

### 4. Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion. Due to the difficulty of securing evidence of actual confusion, [however,] a lack of such evidence is rarely significant[.]" *Daddy's Junky Music*, 109 F.3d at 284 (cleaned up). Each of the consumers who have commented on the similarity between the parties' dresses, whether in social media or by declaration, can be said to have expressed a degree of confusion as to whether the parties' goods "come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Group*, 931 F.2d at 1109. Multiple witnesses who have only seen DNB online have confirmed that, "If I encountered this restaurant in person, I am sure I would wonder whether DNB was somehow sponsored by or affiliated with In-N-Out Burger." SOF 18. Further, Dr. Cunningham's survey of the Midwest showed almost 50% of consumer would confuse the parties' dresses. SOF 83-84.

### 5. Marketing Channels Used By the Parties

Both parties market themselves in identical ways—through a combination of print, radio, digital advertising, social media engagement, cookout events, and food donations intended to drive "word of mouth" about the brand. SOF 27-35, 85-89.

### 6. Probable Degree of Purchaser Care and Sophistication

As a matter of law in the Sixth Circuit, fast food purchasers are presumed not to be sophisticated, discerning purchasers for purposes of a trademark confusion analysis. *Daddy's Junky Music*, 109 F.3d at 285 ("the standard used by the courts is the typical buyer exercising ordinary caution. ... For example, home buyers will display a high degree of care when selecting their real estate brokers, whereas *consumers of fast-food are unlikely to employ*

21

*much care during their purchases.*" (cleaned up, emphasized)). The goods at issue here range in price from roughly $5 to $11. SOF 90-91. This factor weighs in INO's favor.

### 7. Defendants' Intent in Selecting Their Infringing Dress

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Grp.*, 931 F.2d at 1111. "The converse ..., however, is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source." *Brookfield Communs.*, 174 F.3d at 1059 (citation omitted). The evidence demonstrates at least some, and perhaps a great deal, of subjective intent to copy INO's Trade Dress. SOF 52-70.

### 8. The Parties Are Likely to Expand Further Into Each Others' Markets—Although Any Geographic Distance Between the Parties Is Immaterial

"A strong possibility that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding [infringement].... A finding that the parties will not expand their markets significantly, however, does not address the ultimate issue of likelihood of confusion." *Daddy's Junky Music*, 109 F.3d at 287.

*i.* ***There Is Already Overlap Between the Parties in Michigan****.* DNB makes much of the fact that INO currently has no restaurants further east than Colorado and Texas—about 1,000 miles away from Tecumseh, Michigan. In our increasingly digital and connected world, however, this is no barrier to INO's brand having recognition and distinctiveness to customers residing in Michigan. Of course, DNB has repeatedly admitted the long-standing and widespread fame of the INO brand, SOF 52, which is also established

22

by independent evidence. But several lines of evidence in the record also show that Michigan consumers recognize INO's Trade Dress. DNB admits INO restaurants are travel destinations for Michiganders. SOF 41, 52.f. INO's EVP Denny Warnick testified from personal experience that INO customers come from all over the country. SOF 40-41. Michigan-based witnesses have sworn to, and online commenters have shown, their familiarity with INO's Trade Dress. SOF 18, 41. Several of DNB's customers have been previously familiar with INO, either because they were visiting from out of state, used to live out of state, or had encountered INO while traveling out of state. SOF 80-82, 98. Almost every DNB representative deposed admitted to having at least general (and, often, extensive) familiarity with INO and its trade dress. SOF 52-58. Even 16-year-old Gracie Fetters, who had never been to an INO restaurant, knew its color scheme and uniforms from social media posts. SOF 52.g.

Further, INO receives significant feedback urging it to come to Michigan. SOF 97. These comments strongly suggest these customers have been to INO restaurants. INO has also sold much merchandise bearing one or more element of INO's Trade Dress to Michigan over each of the last several years. SOF 35. Without doubt, INO's Trade Dress has at least some degree of secondary meaning in Michigan.[9] *Accord*, *White Tower Sys, Inc v White Castle Sys Corp*, 90 F2d 67, 68 (6th Cir. 1937) ("[plaintiff's] food products, trade name, slogan, and style of building were known in Detroit ... before [defendant] located there").

---

[9] The report of DNB's "expert," Dr. Stec, is not to the contrary, as it purports to measure secondary meaning across the entire United States. His methodology and conclusions are also fatally flawed, as explained in INO's *Daubert* motion.

23

### ii. The Overlap Will Increase as the Parties Expand. From DNB's first

days, its founders were proclaiming in press releases, local news, social media, and

elsewhere that they intended to expand nationwide. SOF 100-103. Their attempt to downplay

these statements (which were made even at the height of the pandemic) for litigation

purposes lacks credibility—especially since they still intend to spread throughout the Midwest,

and will not rule out going even further. SOF 104-105.   For its part, INO likewise cannot

rule out expanding to any area of the country. SOF 95. Its processing facilities in Colorado

and Texas are already capable of supporting restaurants throughout much of the Midwest,

and the company is open to expanding anywhere there is sufficient consumer demand. SOF

96. INO has already received a great deal of consumer feedback urging it to open in Michigan,

SOF 97, and it sells a significant amount of product there. SOF 35.

### iii. Geographic Separation Is Irrelevant to DNB's Liability. "[N]o

particular finding of likelihood of [market] entry or irreparable harm is necessary for injunctive

relief in trademark infringement or unfair competition cases." *Circuit City Stores, Inc. v.

CarMax, Inc.*, 165 F. 3d 1047, 1056 (6th Cir. 1999) (cleaned up).

> If a plaintiff can otherwise demonstrate a likelihood of confusion by a strong showing
> on the other seven factors, it seems an odd result that the same plaintiff cannot obtain
> an injunction against an infringer simply because the parties operate in different
> geographical regions.... [S]ociety is far more mobile than it was ... [and] recent
> technological innovations such as the Internet are increasingly deconstructing
> geographical barriers for marketing purposes[.] [*Id.* at 1057 (concurrence).]

This rationale has been further amplified by the emergence and ubiquity of social media and

the increasing ease of travel in the ensuing 22 years. Nor can DNB be found to be a good-

faith junior user of the dress within its market, where DNB had full knowledge of INO's décor.

See *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F. 3d 426, 436 (9th Cir. 2017).

On balance, the Court must conclude as a matter of law DNB infringed INO's dress.

Other courts have reached similar conclusions on analogous records.[10]

**F.      Alternatively, the Court Should Narrow the Issues For Trial**

At a minimum, the Court can dramatically narrow the issues for trial by ruling for INO on

specific issues. For example, the Court should rule that INO's Trade Dress is either inherently

distinctive or has secondary meaning; either holding would moot the need to present copious

amount of secondary meaning evidence—including two of the parties' four expert surveys—and

would focus the trial instead on the core issue of likelihood of confusion. The Court should also

prohibit DNB from distinguishing at trial between the distinctiveness INO's Trade Dress has in

Michigan compared to other regions. Clarifying this question of law will likewise save time and

expense debating distinctions that make no meaningful legal difference.

/s/ Brian Wassom
Warner Norcross + Judd LLP
45000 River Ridge #300 Clinton Twp, MI 48038
586.303.4139, bwassom@wnj.com

---

[10] See, e.g., *White Tower Sys,* 90 F2d 67 (affirming injunction against infringement of burger restaurant's exterior appearance); *Freddie Fuddruckers, Inc v Ridgeline, Inc,* 589 F Supp 72; 74 (ND Tex, 1984), *aff'd,* 783 F2d 1062 (CA 5, 1986) (issuing preliminary injunction where "Key features in both restaurants are the same," including wall tiles and layout); *Happy Sumo Sushi, Inc v Yapona, Inc,* 2008 WL 3539628, *7-8 (D Utah 2008) (preliminarily enjoining restaurant from using specified combination of décor and uniforms); *Ass'd Hosts of Cal, Inc v. Moss,* 207 USPQ 973, 976 (WDNC 1979) (preliminary injunction where plaintiff's "restaurants include distinctive appointments, such as furniture styles, lamps and the uniforms for waitresses and waiters, all of which, when combined, provide a distinctive trade dress"); *Calamari Fisheries, Inc v Village Catch, Inc,* 698 F Supp. 994 (D Mass, 1988) (preliminary injunction where restaurant interior and menu contributed to a likelihood of confusion).