**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

IN-N-OUT BURGERS,

      Plaintiff/Counter-Defendant,

v.

DOLL N BURGERS LLC, et al,

      Defendants/Counter-Plaintiffs.

Civil Action No. 20-11911

Hon. Robert H. Cleland

Magistrate Judge Anthony P. Patti

---

Brian D. Wassom (P60381)
Regina M. Gilmour (P83117)
WARNER NORCROSS + JUDD LLP
45000 River Ridge Drive, Suite 300
Clinton Township, Michigan 48038
(586) 303-4139
Attorneys for Plaintiffs
bwassom@wnj.com
rgilmour@wnj.com

Bradley L. Smith (P48138)
ENDURANCE LAW GROUP PLC
133 W. Michigan Avenue, Suite 10
Jackson, Michigan 49201
(517) 879-0253
Attorneys for Defendants
bsmith@endurancelaw.com

---

**REPLY IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................iii

REPLY STATEMENT OF MATERIAL FACTS ...................................................... v

REPLY.................................................................................................................. 1

I.   DNB's Inferences and Suppositions Cannot Support a Fraud Claim ......................... 1

II.   The Registered Dress Has Both Inherent and Acquired Distinctiveness.................... 2

III.   The Record Compels Summary Judgment in INO's Favor On Its Claims ................. 3

    A.   Trade Dress Is the Overall Impression Created By Its Elements Combined. ......... 3

    B.   The Trade Dress Is Not Functional. ....................................................................... 4

    C.   Inherent Distinctiveness. ........................................................................................ 5

    D.   Secondary Meaning ................................................................................................ 6

    E.   Confusion and Geographic Separation. ................................................................. 6

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Art Attacks Ink, Ltd. Liab. Co. v. MGA Enter. Inc.*,
    581 F.3d 1138 (9th Cir. 2009) ....................................................................... 3

*Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*,
    871 F.2d 590 (6th Cir. 1989) ......................................................................... 3

*Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*,
    78 F.3d 1111 (6th Cir. 1996) ...................................................................... 6, 7

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*,
    109 F.3d 275 (6th Cir. 1997) ......................................................................... 7

*GMC v. Keystone Auto. Indus.*,
    453 F.3d 351 (6th Cir. 2006) ......................................................................... 6

*Kerr Corp. v. Freeman Manufacturing & Supply Co.*,
    No. 08-3330, 2009 U.S. App. LEXIS 6342, 2009 WL 750986 (6th Cir. Mar.
    23, 2009)......................................................................................................... 5

*Leapers, Inc. v. SMTS, LLC*,
    879 F.3d 731 (6th Cir. 2018) ......................................................................... 5

*Learning Internet v. Learn.com, Inc.*,
    2009 U.S. Dist. LEXIS 126180 (D. Or. Nov. 25, 2009) .................................. 2

*Premium Balloon Access., Inc. v. Creative Balloons Mfg.*,
    573 F. App'x 547 (6th Cir. 2014) ................................................................... 3

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (1995).................................................................................... 4

*Ready Capital Corp. v. Ready Capital Corp.*,
    No. 19-13536, 2021 U.S. Dist. LEXIS 76571 (E.D. Mich. Apr. 20, 2021)........ 2

*Sterling Drug, Inc. v. Lincoln Labs., Inc.*,
    322 F.2d 968 (7th Cir. 1963) ......................................................................... 6

*Tumblebus Inc. v. Cranmer*,
    399 F. 3d 754 (6th Cir. 2005) ........................................................................ 7

*Virgin Enters. v. Nawab,*
    335 F.3d 141 (2d Cir. 2003) ............................................................................ 6

*Wal-Mart Stores, Inc. v. Samara Bros.,*
    529 U.S. 205 (2000) ......................................................................................... 5

*White Tower Sys, Inc v White Castle Sys Corp,*
    90 F2d 67 (6th Cir. 1937) ................................................................................. 7

## REPLY STATEMENT OF MATERIAL FACTS

For the Court's convenience, INO has incorporated below its original statement of facts and DNB's responses to each paragraph together with INO's replies to those responses, so the Court may read them all in one document.

Further, since DNB utilized this space in its Response to "urge the Court not to assume as true every aspect of a factual assertion that is not specifically addressed below," INO replies to insist that the Court do exactly that. Even in making its request, DNB acknowledged its awareness of the express warning in the Court's scheduling order that facts not contested in the counterstatement will be deemed admitted. DE 16 ¶7(g). DNB does not even attempt to articulate a reason that the Court should ignore its own protocols, and there is none. Indeed, it is Sixth Circuit law, not solely this Court, that deems the failure to respond an admission. *See*, *e.g.*, *General Motors Corp. v. Lanard Toys, Inc.*, 468 F. 3d 405, 415 (6th Cir. 2006) (defendant's "silence is taken as a concession of this element of ... infringement"). It certainly cannot be that it would have been too much work for DNB to articulate a responsive argument, as DNB has shown it is certainly capable of arguing on the issues it chooses to contest, even "at length." (SOF 16.) The point is significant here, because even just the statements that DNB admits are material enough to defeat DNB's request for summary judgment and to strongly reinforce INO's motion.

## A.   The Defendants and Their Participation In Decisions Relevant to This Case

1.   Each Defendant has a direct role in, and is at least partially responsible for, operating quick-service restaurants named "Doll N' Burgers" located at 411 E Chicago Blvd,

Tecumseh, MI 49286 (the "Tecumseh Restaurant") and at 323 S Cooper St, Jackson, MI 49201 (the "Jackson Restaurant"), including with respect to the restaurants' use of what INO defines below as the Infringing Trade Dress. (Second Amended Complaint ("2AC"), DE 21, ¶37; Answer, DE 25, ¶37). INO will sometimes refer to Defendants collectively as "DNB," with both locations being the "DNB Restaurants."

> _DNB_: The two restaurants are operated by only two of the five defendants: Doll n' Burgers Tecumseh, LLC and Doll n' Burgers Jackson, LLC, both principally controlled by defendant Justin Dalenberg. Dalenberg dep. 39-40 (INO Ex. 19). Doll n' Burgers, LLC has nothing to do with restaurant operations; it merely holds DNB's intellectual property, specifically its registered trademarks. Id. p.38. Veritas Vineyard, LLC performs supply and back office functions such as baking buns, grinding hamburger meat, employing and handling payroll for the restaurants' staff, and marketing including DNB's website and social media. Id. at 40-42.

> Reply: DNB cites only to Justin Dalenberg's descriptions of each entity in his deposition testimony. DNB does not attempt to, and cannot, distance itself from its admission in its Answer that each defendant is directly involved in what INO alleges are infringements of its rights. This admission alone defeats DNB's attempt to dismiss any of the Defendants on the grounds that they are not involved in the accused activities. Further, DNB's attempts to downplay Veritas' role fail; its admission that it employs the staff that operate the infringing restaurants is enough to establish liability. Furhter, as established in INO SOF 5 & 61, Griffin Zotter, who helped design and advertise the infringing trade dress, is a Veritas employee.

2.    Doll N Burgers Tecumseh LLC is a Michigan limited liability company with its registered address at 117 W Louis Glick Hwy., Jackson, MI 49201. (2AC, DE 21, ¶3; Answer, DE 25, ¶3.) The members of this LLC are Veritas Vineyard, LLC, Ken Heers, Joel Dalenberg

(beneficially through his membership in Veritas Vineyard, LLC), Justin Dalenberg, and (until January 2021) John Burtka. (Ex 17[1], DNB Resp. to 1st Interrog. ¶1; Ex 18, Burtka Dep. at 12; Ex 19, Justin D. Dep. at 37.) All of these members contribute to approving the actions taken by the business. *Id.* Heers and Justin Dalenberg chose the colors and decor in the restaurant shortly prior to and contemporaneously with construction. *Id.*

> *DNB: The two restaurants are operated by only two of the five defendants: Doll n' Burgers Tecumseh, LLC and Doll n' Burgers Jackson, LLC, both principally controlled by defendant Justin Dalenberg. Dalenberg dep. 39-40 (INO Ex. 19). Doll n' Burgers, LLC has nothing to do with restaurant operations; it merely holds DNB's intellectual property, specifically its registered trademarks. Id. p.38. Veritas Vineyard, LLC performs supply and back office functions such as baking buns, grinding hamburger meat, employing and handling payroll for the restaurants' staff, and marketing including DNB's website and social media. Id. at 40-42.*

> Reply: See Reply to ¶1.

3.    Doll N Burgers Jackson, LLC is a Michigan limited liability company with its registered address at 323 S. Cooper St., Jackson, MI 49201. (2AC, DE 21, ¶4; Answer, DE 25, ¶4.) Its members are Justin Dalenberg, Joel Dalenberg, Ken Heers, and Ryan Parshall. (Ex 19, Justin D. Dep. at 39.)

*DNB: -- .*

4.    Doll N Burgers Tecumseh LLC and Doll N Burgers Jackson, LLC are responsible for and actively involved in operating the Tecumseh Restaurant and the Jackson Restaurant, respectively.

*DNB: -- .*

---

[1] Exhibit references are to the numbered tabs in INO's Fact Appendix, filed herewith.

5.      Veritas Vineyard, LLC ("Veritas") is a Michigan limited liability company with its registered address at 117 W Louis Glick Hwy., Jackson, MI 49201. (2AC, DE 21, ¶5; Answer, DE 25, ¶5.) It is directly involved in operating the DNB Restaurants. (2AC, DE 21, ¶38; Answer, DE 25, ¶38). For example, Veritas "do[es] the staff, payroll, accounting, marketing, ... make[s] burger buns... [and] burger meat" for DNB. (Ex 19, Justin D. Dep. at 40.) "[T]he people who work at the Doll n' Burgers Tecumseh restaurant are employees of Veritas·Vineyard." (*Id*.) "Griffin Zotter, [who] does marketing [for] Doll N' Burgers ... is a Veritas employee." (*Id*.; Ex 20, Zotter Dep. at 9.) Veritas has run advertisements soliciting potential employees to apply to Veritas for employment at the Tecumseh Restaurant. (Ex 21, DNB Resp. to 2d RFAs, ¶12.) Until January 2021, Veritas was 51% owned by John Burtka. (Ex 18, Burtka Dep. at 11-12) and 49% by Justin Dalenberg; Justin is now the sole member. (Ex 19, Justin D. Dep. at 11-12).

> <u>DNB</u>: *Veritas Vineyards technically employees DNB restaurant staff, prepares certain food items (buns and meat), and performs certain other back office functions such as accounting and marketing support. Veritas is not "directly involved" in operating the DNB restaurants, as the remainder of plaintiff's statement makes clear.*

> <u>Reply</u>: See Reply ¶1.

6.      Defendant Justin Dalenberg is a founder of DNB, admits that he has described himself as "Chief Burger Flipper" of DNB, and admits that he has been involved in the majority of business decisions at DNB involving defendants' restaurant décor, signage, packaging, uniforms, and the like. (2AC, DE 21, ¶6; Answer, DE 25, ¶6.) At all times relevant to this lawsuit, he acted as an agent of the DNB companies. (2AC, DE 21, ¶7; Answer, DE 25, ¶7.)

> <u>DNB</u>: -- .

7.    Doll N Burgers LLC is a Michigan limited liability company with its registered address at 399 Old Creek Rd., Saline, MI 48176. (2AC, DE 21, ¶2; Answer, DE 25, ¶2.) Its sole member is Justin Dalenberg, and it owns DNB's trademark applications. (Ex 17, DNB Resp. to 1st Interrog. ¶1.)

*DNB*: -- .

8.    In or around 2018, Mr. Dalenberg met with Mr. Ken Heers who had an interest in property located in Tecumseh, Michigan that he had leased to Taco Bell, which was terminating its lease. Ken mentioned the availability of the space to Mr. Dalenberg and floated the idea of turning it into a quick service hamburger restaurant. Dalenberg promptly showed Mr. Heers an early draft of a menu and an early draft of a pro forma income statement. Things coalesced quickly and around November 2018, Heers and Dalenberg agreed to move forward with a hamburger restaurant at the Taco Bell site. (Ex 17, DNB Resp. to 1st Interrog. ¶2; Ex 22, first draft of DNB menu ca. 2018). Justin began discussing plans for DNB with co-founder John Burtka in mid-2019. (Ex 18, Burtka Dep. at 35.) Taco Bell vacated the premises around August 2019. Construction and remodeling of the site began shortly thereafter. (Ex 17, DNB Resp. to 1st Interrog. ¶3.)

*DNB*: -- .

Reply: This admission cements DNB's characterization as primarily a "hamburger restaurant," which solidifies the "similarity of the goods" factor in the likelihood of confusion analysis, and diminishes the significance of those

few items on DNB's menu that INO does not sell. It also reinforces the short

amount of time that DNB's marks have been in use.

**B.   INO and Its Well-Known Common Law and Registered Trade Dresses**

9.   Since first opening in 1948 in California, where it is still headquartered, INO has

operated a successful and popular chain of quick service restaurants offering made-to-order

burger sandwiches and other products and services. (Ex 16, Warnick Dec. ¶4).

*DNB*: -- .

Reply: This is an(other) admission that INO restaurants are "successful and

popular," which amplifies the secondary meaning in the INO Trade Dress.

10.   Since at least 1960, INO has consistently and exclusively used various

combinations of specific design elements in its restaurants and product packaging to indicate

INO as the source of its goods and services. These elements include, among others:

a.   A color scheme consisting of red and white with accents of yellow or gold;

b.   A primarily white exterior with a low red stripe and red awnings;

c.   Red and white interior décor, including a white counter featuring a stripe in red

with a gray countertop, red cushioned chairs and white table tops with one or

two red stripes, walls colored red and/or white, and gray floor tiles;

d.   A menu with a red and white color scheme and layout including a horizontal

line of boxes at the top featuring combo meals with no sizing options;

e.   White cups with red graphics, including a row of palm trees encircling the top

of the cup;

   f.  Employee uniforms featuring white collared shirts, red aprons, and red and white hats (both baseball caps and paper hats);

   g.  Using open-ended burger wrappers;

   h.  The use of the single letter "N" in the name;

   i.  Décor and photos emphasizing a classic car theme.

(Ex 16, Warnick Dec. ¶5.) These elements will be referred to collectively herein as the "INO Common Law Trade Dress."

> _DNB_: Defendants strongly contest these assertions and respond at length.
>
> _First_, the statement is nonsensical. One cannot "consistently" use "various combinations" of elements that "include, among others...." If INO used more than one combination, then any particular combination was plainly used inconsistently. If multiple combinations used various subsets of the listed elements, then it would be unnecessary to qualify the list as incomplete (i.e., "include among others").

Reply. DNB's hair-splitting of INO's language is unfair and unsuccessful. Read in good faith, the statement says that INO has, since 1960, used one or more combinations of the listed elements, and that its use of each such combination was exclusive, in that no other restaurant used that particular combination. Further, this language is taken directly from Mr. Warnick's cited, sworn testimony. DNB's nitpicking of his word choice does not decrease its evidentiary value.

> _Second_, INO's use of the listed elements (excepting palm tree silhouettes around cups) was not exclusive. As shown by photographs embedded in defendants' summary judgment brief, DNB Stmt Fact ¶ 32, the listed elements are commonplace in the fast food industry.

Reply. DNB's cited photographs are not authenticated or given any context in which to understand their significance. Regardless, they actually reinforce INO's point that two restaurants can use overlapping sets of design elements to create entirely different looks.

*Third, this statement of "fact" is absolutely false with respect to both INO's exterior features and its indoor décor. INO certainly has not consistently used all the alleged trade dress elements. Below are pictures of 68 INO restaurants copied directly from INO's website www.in-n-out.com/locations. Many INO restaurants (highlighted) do not display red chairs, barstools, or any other interior décor as trade dress because they do not have interior dining. Few have red awnings. Several are not primarily white. And **none** have "a low red stripe" on the exterior.*

[photos omitted]

Reply. DNB purports to disprove Mr. Warnick's testimony by producing photos of 68 out of INO's 367 locations. This is self-evidently insufficient to demonstrate what "most" INO restaurants look like. Further, DNB's nitpicking as to whether every aspect of every element appears in every restaurant misses the point. Mr. Warnick's testimony allows for some variation between locations—for example, by noting that INO uses "various combinations," (Ex 16, Warnick Dec. ¶5), over a "majority" (*id*. ¶11) of locations in a "materially identical" (*id*.) way, "subject [to various] constraints." (*Id*.) Trade dress does not require exact nationwide uniformity, only a cognizable commercial impression.

*Fourth, in those restaurants that offer indoor dining INO does not consistently use "red cushioned chairs" in its interior. Its primary table seating is hard white molded benches with red cushion backs. The white bench is the configuration that INO registered as its trade dress, Ex. D, and the configuration represented in virtually all of its restaurants, as shown in the Instagram and Tik Tok photographs posted by third*

*parties. See Plaintiff S.J. Ex. 42. Moreover, INO's chairs are uniformly red and fitted with a plastic or vinyl seat bottom, not a conventional cushion.*

Reply. See the prior reply above. Further, most INO restaurants include both chairs and benches. And INO's Trade Dress does not specify "conventional cushions" (whatever that means) versus any other type of cushioning.

*Fifth and finally, among the hundreds of Instagram photographs that plaintiff filed in support of summary judgment (Plaintiff's Ex. 42) defendants did not see a single photograph showing interior décor that featured a classic car drawing or photo. Defendants concede that palm tree silhouettes and the neon-lit "Quality You Can Taste" sign feature prominently in INO's marketing materials and third party photographs.*

Reply. Had DNB looked harder, it would have seen automotive imagery in the posters at DE 33-42, PgID 1452, 1454, 1455, 1457, 1459, 1462, 1463, 1464, 1470, etc. The fact that it is not prominently featured in these third-party images is immaterial.

## C.   The Procedural History of INO's Trade Dress Registration

11.   The US Patent and Trademark Office has issued U.S. Registration No. 4839216 for a subset of the Common Law Trade Dress (the "INO Registered Trade Dress"). The INO Registered Trade Dress consists of a three-dimensional trade dress depicting the interior of a restaurant. The interior includes white sectional dividing walls having horizontal rows of red stripes. The interior also includes clear glass panels positioned above parts of the dividing walls. The interior also includes a customer seating area with booths, barstools and chairs, wherein the chairs are red, the barstools are white, and the booths have red upholstery, and white countertops and tabletops. The interior further includes a customer

ordering area with sections of red tile walls and white tile walls around the customer ordering area and a silver counter. The INO Registered Trade Dress is depicted below; the matter shown in broken lines is not part of the mark and serves only to show the position of the mark.



(2AC, DE 21, ¶19; Answer, DE 25, ¶19; Ex 23 (Registration Certificate).

> *DNB*: *The description in INO's trademark registration speaks for itself. INO's Registered Trade Dress is not a "subset" of its alleged Common Law Trade Dress, at least because INO alleges that its Common Law Trade Dress comprises red bench bottoms, whereas the Registered Trade Dress comprises white bench bottoms. Compare SAC ¶29(b) (showing photos of red INO benches as INO trade dress) with Registered Trade Dress drawing, Ex. D (white benches).*

Reply: DNB's attempt to create a material distinction here fails. The factors listed in INO's Common Law Trade Dress include "red cushioned chairs." That is not restricted to cushions that appear on the bottom of the chair. The red seat-backs that appear in the Registered Trade Dress drawing *are* cushions. (*See*, *e.g.*, DE 33-42 at PgID1473.) Further, the same drawing depicts red chairs arrayed behind the row of benches, which also fit this description; most INO restaurants contain both individual chairs and

benches. Regardless, the distinction is an immaterial one, as the definition of INO's Trade Dress allows for some minor variation between locations.

12.     The diagonal and curved orientation of the ordering counter depicted in the INO Registered Trade Dress is an uncommon design within the restaurant industry, and is distinctive of INO. The combination of this layout with the red and white color scheme, stripes underneath the counter, tiled walls, and booths is even more uncommon and distinctive; indeed, no other company uses this combination of elements. (Ex 16, Warnick Dec. ¶7.)

> *DNB: Slanted/diagonal order counters are ubiquitous in fast food restaurants. Indeed, the Taco Bell restaurant that formerly occupied the Tecumseh restaurant site had a slanted ordering counter, which defendants did not move. Justin Dalenberg dep. 55-56 (Ex. C). Excepting horizontal rows of palm tree silhouettes on food packaging, hundreds – if not thousands – of restaurants use "various combinations" of the listed elements. See Defendants' Statement of Facts ¶32 (photographs). Any combination of these elements is a mere refinement of features commonly found in quick service restaurants.*

> Reply: INO relies on the sworn testimony of Mr. Warnick for its statement. Aside from the one example provided by Justin Dalenberg, DNB has no record evidence for its assertion that such counters are "ubiquitous." Further, it has produced only a handful— nowhere near "thousands"—of examples of other brands that include some (but not all) of the elements of INO Trade Dress in their own décor, albeit in a commercially distinct fashion.

13.     On December 18, 2014, the examining attorney ("Examiner") assigned by the U.S. Patent and Trademark Office ("USPTO") to review INO's application to register the INO Registered Trade Dress issued an Office Action denying the application, finding a lack of distinctiveness. (Ex 24, Office Action without attachments.)

_DNB_: -- .

14.    On June 8, 2015, INO filed a request for reconsideration of the Office Action, (Ex 25), supported by legal arguments as well as several pieces of evidence intended to persuade the Examiner that the INO Registered Trade Dress had, in fact, acquired distinctiveness in the marketplace. This evidence included:

a.   "[A] declaration by Carl Van Fleet, [who was then] INO's Executive Vice President, attesting that INO between 2000 and 2012, INO had spent in excess of $100 million on a combination of radio, television, outdoor and print advertising." (DE 25, PgID 213 ¶8; Ex 26 (copy of declaration); Ex 27 (Van Fleet Dep. at 10, 19 (authenticating signature)). This figure reflected INO's overall promotional spend during that period, (DE 25, PgID 214 ¶11), all of which was designed to encourage customers to visit INO restaurants, where they would encounter the INO Trade Dress.

_DNB_:    a.    The $100 million figure was not "INO's overall promotional spend." It was INO's entire budget for its marketing department, including salaries, overhead, etc._
        Reply: The figure did include overhead expenses for the marketing department, which are fairly characterized of part of INO's overall promotional spend. After all, the only job of the INO marketing department is to promote the INO brand.

b.  Sworn declarations from Michelle Todd, Mark Warshaw, Robert McLain, John Sizemore, Kevin Henrichson, Jathan Floren, and Mark Lamoureux—individuals

from various professions, geographies, and walks of life, affirming that they

perceived INO's trade dress as distinctive. (Ex 28.)

*DNB: b.     Four of the seven third party declarants were major outside contractors to INO. See DNB Statement of Fact ¶30.*

> Reply: DNB has shown only that the declarants' employers had a business relationship with INO, not that they were "major" contractor. Regardless, this does nothing to impugn the integrity of these individuals' sworn testimonies—either in 2015 or (in the case of Messrs. Floren and Lamourex) again in 2021, when they reiterated the same testimony under oath. *See* DE 33-33.

c.   Online reviews and articles observing the consistency and distinctiveness of

INO's trade dress. (Ex 29.)

*DNB c.     The various reviews and articles submitted to the examiner seldom touched on "the consistency and distinctiveness of INO's trade dress." Any mention of décor was nearly always to INO's red & white colors and its trademarked palm trees. See INO Nov. 2014 Response to Office Action (Ex. F) ECF 39-6 PageID 2144 ("one would be hard pressed to find a Californian who couldn't recognize the brand from the red silhouetted palm tree design" (emphasis added)); id. at PageID 2148 ("The walls bordering a stainless steel order counter are decorated with eye-catching candy apple red tiles and white tiles emblazoned with red palm trees. Off-white wallpaper featuring tiny gray palm trees surround the seating area."); id. at PageID 2155 ("Red palm trees are everywhere: on tiles, paper cups, soft-drink dispensers and awnings."); Plaintiff SJ Ex. 29, ECF 33-29, PageID 1149 ("You are welcomed in the entrance by bright white tiles with red palm trees painted on to them. A stripe of these red tiles surround the perimeter of the inside of the restaurant.")*

> Reply: The quoted portions only reinforce the strong secondary meaning in INO's décor. The fact that it was commented on repeatedly by multiple sources speaks to the consistency of its use.

d.  A collection of trademark registrations that the USPTO had previously granted

for other restaurant decors. (Ex 30.)

_DNB_ d.     _Defendants admit that INO offered evidence of other trade dress registrations but deny they are relevant here._

Reply: These registrations belie DNB's argument that a particular combination of common décor elements can be no more than a "refinement," or that it cannot achieve secondary meaning.

e.  Articles from various media outlets reporting on otherwise demonstrating INO's popularity. (Ex 31).

_DNB_ e.        _Defendants admit that INO submitted articles concerning INO's popularity but deny they are relevant here._

Reply: These articles reinforce the strong secondary meaning in INO's brand in general and its décor in particular.

15.     The Examiner was persuaded by INO's request for reconsideration. She responded by publishing the application, which was ultimately registered on October 27, 2015. (Ex 32, docket.)

_DNB_: -- .

## D.     INO's Trade Dress Has Acquired Distinctiveness in the Minds of Consumers

16.     The distinctive design of INO's Common Law Trade Dress and INO's Registered Trade Dress (together, the "INO Trade Dress") was adopted several decades ago to distinguish INO's goods and services from that sold by others and to create a very strong market and reputational presence as a source indicator of high-quality quick-service food products. (Ex 16, Warnick Dec. ¶¶5-9).

_DNB: Defendants contest this conclusory statement. As shown at length in defendants' motion for summary judgment, INO refuses to list the elements of its Common Law Trade Dress. The alleged elements are common and not distinctive, many if not most_

*of the asserted elements are functional, and INO has weak market and reputational presence, as shown by Dr. Stec's survey recording secondary meaning of only 15%.*

Reply: DNB fails to actually respond to the statement. INO cited Mr. Warnick's sworn testimony to describe the intent with which INO adopted its trade dress. DNB does not respond regarding this intent, but rather with a laundry list non sequitur arguments about how distinctive the dress is. INO has responded to each of these assertions elsewhere. In particular, INO has refuted DNB's tired and confused assertion that INO has "refused to list the elements" of its trade dress, a list that appears plainly in INO's complaint.

### *(1)   Direct consumer testimony*

17.    In support of its trade dress application, INO provided several sworn declarations from third parties attesting to the distinctiveness of the Registered Trade Dress. Ex 28. INO has since obtained additional declarations to the same effect, some of which are from the same witnesses and some of which are from others. Ex 33.

*DNB: These are boilerplate declarations solicited from INO customers. Query whether the signers even read them before signing. See assembled declarations at INO SJ Ex. 33 (consistently duplicating second bullet point "clear glass panels above the dividing walls.")*

Reply: DNB's "queries" and drafting critiques do nothing to detract from the evidentiary value of this sworn testimony, for which DNB has no contrary record evidence. Of course they were drafted with the assistance of counsel

18.    INO has also obtained sworn declarations from third parties attesting to the distinctiveness of the INO Common Law Trade Dress. Ex 34. Some of these declarants are Michigan residents.

> _DNB_:  Every single INO image embedded in the declarations in INO Ex. 34 contains registered INO trademarks which are impossible to ignore. In addition to the IN-N-OUT® name and arrow logo displayed in five of the eight photos, four photos prominently feature PALM TREE SILHOUETTES ®, one displays the registered trademark "QUALITY YOU CAN TASTE®" and two show the "DOUBLE-DOUBLE®" hamburger on INO's menu boards. Notably, only two declarants (Bingham and Vinatieri) have visited a DNB restaurant. The other three presumably viewed photographs chosen by INO's counsel.

Reply: This is entirely nonresponsive to INO's ¶18, which establishes sworn testimony of secondary meaning by Michigan residents, and a likelihood of confusion between INO and DNB. And DNB's comments do nothing to detract from this testimony. Whether the declarants have visited a DNB restaurant does nothing to diminish the secondary meaning they perceive in INO's trade dress or the confusion they perceive in images of DNB's dress. DNB does not contest the accuracy of these images, some of which come from DNB's social media or have been used in DNB's submissions. Further, as INO has established elsewhere, whether a component of INO's trade dress happens to be separately registered is entirely irrelevant to whether it can function as one element in a combination of elements that forms a trade dress. _See Bristol-Myers Squibb Co. v. McNeil-PPC, Inc._, 973 F. 2d 1033, 1042 (2nd Cir.1992) ("In examining trade dress the focus is on the entire look of the product or packaging. Individual aspects of a trade dress may be eligible for trademark protection in their own right, but in an action for trade dress infringement each aspect should be viewed in relation to

the entire trade dress.") *See also* INO Ex 73 (Stec Dep. at 31) (DNB's expert admitting that, in a prior case, he found a likelihood of confusion with a trade dress that consisted of both trademarks and décor).

### *(2)  Consumer surveys*

19.      INO hired Dr. Isabella Cunningham to survey consumers regarding the secondary meaning in INO's trade dress. Dr. Cunningham holds the Stan Richards Chair in Advertising and Public Relations in the Moody College of Communications at The University of Texas at Austin, in Austin, Texas. She is the past Chair of the Advertising and Public Relations Department in the Moody College of Communication, a position that she held for 20 years. She is the author and co-author of several books and numerous academic articles in marketing and advertising. She has also published several peer-reviewed papers in academic proceedings and has made numerous presentations to both academic and professional audiences. She is a member of several academic journals' review boards and also served on numerous academic and professional committees as both a member and in leadership positions. She has taught marketing and advertising courses at The University of Texas for the past 40 years and has served as Chair of the Department of Advertising from 1978 to 1985 and from 2001 to 2013. Before joining the faculty at The University of Texas, she was Assistant Professor of Marketing and the Acting Dean of the Business School at St. Edward's University. She has been a marketing and advertising consultant to several businesses and has been retained as an expert witness in several lawsuits. (Ex 35, Cunningham SM report at 20-21.)

*DNB*: -- .

Reply: DNB's silence is a full-throated concession of her impressive credentials and expertise in surveying.

20.     Dr. Cunningham's survey was successfully completed by 404 subjects—201 test subjects and 203 control subjects—residing in one of the states in which INO has a restaurant. (Ex 35, Cunningham SM report at 17.)

*DNB*: -- .

21.     Dr. Cunningham concluded that INO's trade dress has strong secondary meaning:

> 92.5% of the subjects in the test group stated that restaurants with the overall appearance of IN-N-OUT were likely owned by one company, while 31.5% of the subjects in the control group stated that restaurants with the appearance of the control restaurant images, they had seen were likely owned by one company. Thus, the net percentage of subjects attributing the trade dress of the IN-N-OUT restaurants to one source is 61%. This is a clear indication that the IN-N-OUT trade dress has acquired secondary meaning.

(Ex 35, Cunningham SM report at 17.)

> *DNB*:  *Defendants concede this paragraph states Dr. Cunningham's conclusion but obviously do not concede its substance.*

22.     She further concluded that this secondary meaning is attributable to both the Registered Trade Dress and the Common Law Trade Dress:

> It is important to note that an overwhelming number (46%) of the subjects who stated that the restaurant they saw in the test survey was owned by one company specifically mentioned IN-N-OUT as that company (verbatim answers to Q2 and Q2a) and many of them stated they recognized the restaurant overall appearance and design. Also, while a few respondents referred to some of the elements of the "INO Common Law Trade Dress" identified in the Plaintiff's Second Amended Complaint ( P.6) such as: the beverage cup, the restaurant

exterior, the burger, the décor, over 45% of those subjects that attributed the IN-N-OUT trade dress to one source referred to the restaurant's distinctive design, the red and white colors, the interior layout and design and overall look (all elements of the IN-N-OUT registered trade dress).

(Ex 35, Cunningham SM report at 18.)

_DNB_:  Same as No. 21 above.

Reply: DNB's concession here is significant, because it provides no basis to disagree (and thus agrees) with Dr. Cunningham's conclusion that the results of her survey are equally applicable to the Registered and Common Law Trade Dress.

### *(3)   Exclusivity, length, and manner of use*

23.    As indicated above, INO has used various combinations of décor and packaging elements identified as its Common Law Trade Dress since approximately 1960, and has used it in the specific combinations depicted by the photographs in the Second Amended Complaint for decades. (Ex 16, Warnick Dec. ¶¶5-10.)

_DNB_: Defendants strongly contest this paragraph. In addition to the reasons stated in ¶ 10 above, in his declaration Mr. Warnick offers a new definition of both the Registered Trade Dress and Common Law Trade Dress, which he defines as "the look and feel created collectively by these elements." Warnick Decl. ¶¶ 5, 6 (INO Ex. 16). "Look and feel" is nowhere alleged in the complaint. INO consistently responded to DNB's discovery requests regarding the composition of INO's trade dress by directing DNB back to its complaint. See DNB Exs. R, S (INO discovery responses). Additionally, the evidence suggests that red bench seating is uncommon and/or only recently introduced at INO restaurants. See INO Registered Trade Dress, Ex. D (white benches); INO SJ Ex. 42 (Instagram and Tik Tok photos nearly always showing white benches with red back cushions).

Reply: INO incorporates its reply to ¶10. Further, as INO has explained elsewhere (see, e.g., DE 55, PgID2721-2725), the look and feel created by the

combination of the listed elements is exactly how the Sixth Circuit (and every other court) define a trade dress. DNB's objections are the result of its own misapprehension of trade dress law, not any omission on INO's part. Additionally, the issue of "red cushioned chairs" is addressed in ¶11 above

24.    As indicated in INO's trade dress registration, INO has used its Registered Trade Dress in commerce since at least 1992. (Ex 16, Warnick Dec. ¶10.)

*DNB*: -- .

Reply: DNB's concession here moots any contention it may have about the continuous commercial use of INO's Registered Trade Dress.

25.    The vast majority of INO's restaurants feature a materially identical trade dress, subject primarily to constraints imposed on specific locations by space, size, or municipal regulations. (Ex 16, Warnick Dec. ¶11.)

> *DNB: Defendants contest this assertion for at least the reasons stated in paragraphs 10 and 23 above. Perhaps a majority of INO restaurants employ close variations of the Registered Trade Dress, but it is hardly a "vast" majority as shown by the many restaurants depicted in paragraph 10 that have no interior dining whatsoever. Defendants are confident that only a minority of INO's restaurants employ all nine INO common law trade dress elements (including a "low red stripe" and the red bench seating pictured in the SAC at ¶29(d), PageID 164).*

> Reply: INO incorporates its replies to ¶¶10 & 23. DNB's critique of INO's word choice is meaningless, especially when based on a small sample of INO locations. DNB's "confidence" in what the record would show is also immaterial in the summary judgment context when DNB offers no evidence to establish actual facts. Further, DNB's fixation on the "low red stripe" aspect of INO's

exterior is misplaced; even locations that, for whatever reason, do not include a prominent exterior stripe nevertheless incorporate a white exterior and (usually) red awnings. Again, not every facet of every element needs to appear in every location in order for consumers to perceive a consistent overall commercial impression.

26.    "Defendants admit that they are not aware of a restaurant that uses all of the alleged INO Trade Dress Elements." (Ex 21, DNB Resp. to 1st RFAs, ¶24). Neither is INO. (Ex 16, Warnick Dep. at 50; Ex 16, Warnick Dec. ¶7)

> *DNB: Defendants' admission is narrow and mostly based on the INO's allegation that its trade dress comprises palm tree silhouettes around its drinking cups; defendants are not aware of any other restaurant having drink cups with encircling palm trees.*

Reply: This distinction is supplied solely by counsel, not by any record evidence. Regardless, even this one distinction is still an important one, especially given how repeatedly DNB concedes the strong association between the palm tree logo and INO.

### *(4)    Amount and manner of advertising*

#### *i.    Traditional Advertising*

27.    As indicated above, between 2000 and 2012, INO spent in excess of $100 million on a combination of radio, television, outdoor and print advertising. (DE 25, PgID 213 ¶8; Ex 26 (Van Fleet declaration); Ex 27 (Van Fleet Dep. at 10, 19 (authenticating signature)).

> *DNB: This statement is false. INO spent only about $XX million on advertising during this period. See Defendants' SJ Brief Brief Statement of Facts ¶¶19-22.*

Reply: DNB's disagreement with INO's terminology does not render the statement "false." INO submits that marketing overhead and all promotional activities are fairly included within the $100 million figure.

28.    INO spent a comparable amount in 2013-present. (Ex 1, advertising figures, SEALED), authenticated by Ex 16, Warnick Dec. ¶13.)

DNB: This statement is also false. INO's exhibit 1 includes many "promotion" expenses unrelated to advertising, such as community programs, research, sponsorships, and gift certificates.

Reply: See reply to previous paragraph.

29.    The promotional activity reflected by these figures includes but is not limited to television, radio, billboards, social media, website, digital marketing, direct mail, gift cards, sports marketing, library reading programs, food giveaways, benevolent cookouts for the homeless and first responders, cookouts at celebrity events, "lunch tour" donations to schools, and other field marketing—all of which is designed to encourage customers to visit its restaurants. (Ex 36, Guzman Dep. 47-51, 60, 75-79; Ex 16, Warnick Dep. at 20-21, 55-56; Ex 27, Van Fleet Dep. at 19-23).

DNB: Defendants welcome these admissions.

Reply: DNB's acceptance of this statement includes the fact that all of these promotional activities have one goal—to encourage consumers to visit INO restaurants. This inevitably brings them into contact with the INO Trade Dress.

30.    INO's print advertising has frequently featured one or more of the elements that make up the INO Trade Dress. (Ex 2, example ads, authenticated by Ex 16, Warnick Dec. ¶15).

*DNB: This statement is untrue. First, nothing in INO SJ Exhibit 2 is print advertising. The first three pages (PageID 573-575) appear to be an application packet promoting "School Cookout Fundraisers." The next two pages (576-77) are September 2020 INO webpages promoting gift cards. The last 38 pages (578-616) are not print advertising but rather proof copies of tray-liners (a/k/a "lapmats") served with food purchased in INO restaurants. Guzman dep. pp. 111-12 (testifying that deposition exhibits 20-24 were all lap mats and none were print advertising; other than lap mats, INO purchased only a "smattering of print" advertising such as sponsor ads for local sports teams). Second, even if tray-liners constitute "advertising," nothing in INO Ex. 2 shows INO's alleged interior trade dress, which is the focus of INO's trade dress infringement. Third, only a few of the tray-liners show any features of the alleged exterior trade dress; most are nostalgic showing no low red stripe and no red awnings. Indeed, the one tray-liner that does show a more recent INO restaurant has a tan exterior, not white (and lacks the alleged low red stripe). INO SJ Ex.2, PageID 589. The remainder of this exhibit primarily displays INO food and food packaging which is irrelevant in this case (other than INO's frivolous allegation that open-ended burger wrappers is nonfunctional).*

Reply: Just because the print advertising does not come in the format DNB would prefer to see does not disqualify it as "print advertising." As DNB previously conceded (¶29), school cookouts are one form of encouraging consumers to visit INO restaurants. Further, the gift card advertisement depicts the interior décor in the background of the image. And the lapmats are absolutely forms of advertising, targeted to consumers who have demonstrated their willingness to visit an INO restaurant by having just visited one. The text of each lapmat self-evidently advertises INO. INO never claimed that these ads depict the entirety of the Trade Dress in one image, but they supplement the distinctiveness of the Trade Dress by highlighting certain elements at a time.

### ii.    *Online Marketing and Engagement*

31.    INO maintains social media accounts on Facebook and Instagram, and purchase advertising on these platforms and on Google. (Ex 36, Guzman Dep. at 19-22.) At

present, INO has more than 2.7 million Facebook followers and more than 576,000 followers on Instagram. (Ex 16, Warnick Dec. ¶16). The images shared on these accounts frequently feature one or more of the elements that make up the INO Trade Dress. (Ex 37 (Facebook posts); Ex 38 (Instagram posts).)

> _DNB_: Apart from the silhouetted palm trees and employee uniforms, INO's Facebook and Instagram accounts do not "frequently" show the alleged trade dress elements. Of the several hundred images shown in INO SJ Exs. 37-38, only a few show INO's alleged exterior trade dress elements, and even fewer the interior décor.

>> Reply: The images speak for themselves, and do show various elements of INO's red and white décor (of which the red and white palm trees are a part), uniforms, menus, and other elements of the Trade Dress.

32.    Facebook analytics demonstrate that, although many visitors to INO's Facebook page are located in California or in other areas where INO has a restaurant, the fifth most common residence for visitors to the page is New York City, (Ex 3, Facebook analytics, authenticated by Ex 16, Warnick Dec. ¶17)), which shows that INO is well-known by consumers even where it does not have brick-and-mortar restaurant locations.

> _DNB_: INO's Exhibit 3 shows that 94% of INO's Facebook followers reside in states in which INO operates. Only 6% of the 469,562 Facebook followers enumerated in this exhibit reside outside of INO's business boundaries.

Reply: The document shows no such thing. This is an incomplete screenshot listing, among other things, the top cities from which visitors come to the page most frequently. It is not a comprehensive list. Its primary significance here is to demonstrate how popular INO is in New York City, which is significantly farther away from the nearest INO location than Michigan is.

33.     INO's website at <in-n-out.com> has frequently featured one or more of the elements that make up the INO Trade Dress, including but not limited to wide-angle photographs of the restaurants' interior. (Ex 4, website excerpts, authenticated by Ex 16, Warnick Dec. ¶18).

> _DNB_: This statement is not true. Other than palm trees and pictures of employees in uniforms, INO's website only infrequently shows elements of the alleged trade dress. The interior is shown only on the help-wanted tab of its website, which is not an advertisement directed at consumers, but rather potential employees.

> > <u>Reply</u>: Nothing in this response diminishes the facts alleged. Red and white palm trees and uniforms are among the trade dress elements, and DNB ignores the depiction of other trade dress elements, such as the cups (PgID 621-623, 626-627, 629, 631-633, 635-636, 646, 649, 652, 654, 656-657), restaurant exteriors with white paint, red awnings, and low red stripes (PgID 623-625, 627-628, 630, 632-635, 638, 640); slight variations of the red-and-white exterior (PgID 629-634, 636, 641-645, 647); red and white interior décor (PgID 648-649, 653-654, 658, 661); burger wrapper (PgID 651, 658); and automotive images (PgID 625, 627-628, 630, 653, 655, 665)

34.     Merchandise sold through INO company stores and its website promotes the trade dress because it replicates elements of the trade dress and reminds people of their experiences at INO. (Ex 36, Guzman Dep. at 88; Ex 16, Warnick Dep. at 67-68; Ex 5 (examples of INO merchandise that replicate some or all of the elements of the INO Trade Dress, authenticated by Ex 16, Warnick Dec. ¶19)).

*DNB: Excepting photos showing silhouetted palm trees and uniforms, only a handful of pages from the INO company store and website show the alleged trade dress elements, and never all together.*

Reply: To the contrary, every piece of merchandise depicted shows at least one (and usually several) elements of the Common Law Trade Dress, frequently being worn by models standing inside an INO restaurant (thus showing the interior décor).

35.   INO has sold substantial amounts of INO-themed merchandise to Michigan over the years. For example, INO's records show that Michigan residents have purchased INO-themed merchandise from INO's online store in every month of every year between 2014 and the present. (Ex 6 (SEALED), sales records, authenticated by Ex 16, Warnick Dec. ¶20.)

*DNB: INO merchandise sales to Michigan addresses has little relevance to this case. The majority of Michigan purchasers (or intended gift recipients) probably either lived or worked (or will live/work) in California or another state in which INO operates.*

Reply: DNB's point may very well be true (although it's pure speculation of counsel), but DNB fails to understand that this strengthens INO's case. Secondary meaning is not a static thing confined to the boundaries of particular states. People are inherently mobile, and frequently travel or relocate from state to state—bringing their familiarity with brands with them. INO has cited cases recognizing this and protecting restaurant brands beyond their physical locations, DE 55, PgID 2734-2739, and this admission by DNB amplifies the point made by those cases.

### (5)   *Amount of sales and number of customers*

36.     INO has more than 225 locations in California, with over 360 locations in total throughout California, Arizona, Nevada, Utah, Texas, Oregon, and Colorado, and it is continuing to expand to other states. (Ex 16, Warnick Dec. ¶21).

_DNB_: -- .

### *(6)     Established place in the market*

37.     INO has developed a highly loyal customer base and has been consistently rated as one of the top quick-service restaurants in several customer satisfaction surveys. (Ex 16, Warnick Dec. ¶22).

_DNB_: -- .

Reply: DNB's admission cements the strength of INO's Trade Dress for purposes of the secondary meaning and likelihood of confusion analyses.

38.     For example, in a March 23, 1997 article entitled "Bonkers for Burgers,"[2] the _San Francisco Examiner_ (Exs 31, 39) reported on the customer devotion evident during the company's expansion into the San Francisco Bay Area:

A Southern California fixture for almost half a century, the family-owned chain opened its first Bay Area outlet in Rohnert Park last March, followed by Milpitas in September and San Ramon in February. The restaurant's menu hasn't changed since 1948 - but its fanatical following keeps mushrooming.

And in Northern California, where cults and cultures of all sorts have found a home, the cult of In-N-Out has surfaced in less time than it takes to order a "Double Double," vanilla shake and fries...

An instant conversation piece, the chain incites passions either way.

---

[2] This document is non-hearsay under the Ancient Documents Rule. FRE 803(16).

Some fans drive hundreds of miles just to get a $2.30 Double Double, as double cheeseburgers are called; directory assistance has been bombarded with calls about the San Ramon outlet. Other In-N-Out devotees feed their obsession by snapping up T-shirts, baseball hats, jackets, logoed golf balls, key chains, watches and fanny packs....

In its February issue, Restaurants & Institutions magazine announced a major upset in its 17th annual survey of chains, to which 2,800 U.S. households responded. In-N-Out won in the quick-service burger category, ending Wendy's eight-year run....

_DNB_: -- .

> Reply: DNB's admission cements the strength of INO's Trade Dress for
>
> purposes of the secondary meaning and likelihood of confusion analyses.

39.    The same article provides evidence that the INO Trade Dress was well-

recognized as distinctive even at that time:

In an Internet posting, Glenn Mandelkern recalled how mystified he was by the "cult thing" until he visited his first In-N-Out. His conversion culminated in a pilgrimage to the company store in Irvine.

"I must have tried on everything, including the aprons," he wrote....

The "associates" complement the red-and-white interior, a spiffed-up version of the '50s. Red palm trees are everywhere: on tiles, paper cups, soft-drink dispensers and awnings.

_DNB: Defendants agree that silhouetted red palm trees is a dominant element in INO restaurants. See Counterstatement of Fact ¶14, supra; see also Forbes Article, PageID2074 (Ex. B) ("Palm trees are a frequent motif—printed on the company's plates, painted onto restaurant walls")._

> Reply: DNB's admission cements the strength of INO's Trade Dress for
>
> purposes of the secondary meaning and likelihood of confusion analyses. Its
>
> fixation on the "palm tree" logo misses point; that logo is part of the red-and-

white décor in the trade dress, and this article also specifically mentions the uniforms, interior, and cups that are part of the INO Trade Dress.

40.     INO serves and has served thousands of out-of-state customers who regularly travel to INO's locations, such that INO's customers are located throughout the United States, including in Michigan. (Ex 16, Warnick Dec. ¶23).

_DNB_: -- .

Reply: DNB's admission cements the strength of INO's Trade Dress for purposes of the secondary meaning and likelihood of confusion analyses— here, specifically as to Michigan residents.

41.     INO is also well-known through its locations in tourist and other popular areas that are extensively visited by customers from all over the United States (including Michigan), such as Hollywood, California; Fisherman's Wharf in San Francisco, California; Las Vegas, Nevada; and the University of Texas at Austin. (Ex 16, Warnick Dec. ¶24; Ex 19, Justin D. Dep. at 18 (DNB principal agreeing that the INO at Fisherman's Wharf in San Francisco is "a pretty popular ... tourist attraction"); Ex 40, Johnson Dep. at 14 (testimony of third party Jim Johnson, a Michigan resident, recounting having visited INO while in Las Vegas); _id_. at 56 (agreeing that, in his experience, people in Michigan "generally at least have heard of the brand"); Ex 16, Warnick Dec. ¶23 (testifying "from personal experience interacting with INO customers over the years that they come from all over the country and the world.").)

_DNB_: -- .

Reply: DNB's admission cements the strength of INO's Trade Dress for purposes of the secondary meaning and likelihood of confusion analyses—here, specifically as to Michigan residents.

42.     The opening of a new INO restaurant often becomes an event. For example, when INO opened its location in Scottsdale, Arizona, there was a four-hour wait for food, and news helicopters covered the event from overhead. Similar fanfare and wait times of up to 14 hours occurred in November 2020 when INO opened its two newest locations in Colorado, a state in which INO had never previously done business. The new Colorado INO restaurants are a 500-mile drive from the next-closest INO location, in Texas. (Ex 16, Warnick Dec. ¶25).

DNB: These facts regarding INO's popularity, even if true, have virtually no relevance in this case except to the extent they rebut Dr. Cunningham's assessment that INO's trade dress is neither "top of mind" nor "readily accessible" to consumers, which she cited as justification for rejecting the "gold standard" Eveready survey format for testing likelihood of confusion. Cunningham rebuttal report pp. 1¬2 (Ex. W) (acknowledging that Eveready format is gold standard where senior mark is strong and top of mind or readily accessible); Cunningham dep. p.36 (testifying in her judgment INO's trade dress is neither top of mind nor readily accessible thereby making Eveready inappropriate).

Reply: This "response" is a complete non sequitur to what INO alleged, and thus is an admission of this statement. The admission further reinforces the fact that INO has strong secondary meaning even in markets hundreds of miles from the nearest INO location. DNB's attempt to tie this into the debate over which survey format Dr. Cunningham should have used fails. INO is not required to prove that its trade dress is "top of mind" *anywhere*, let alone everywhere in the country—only that it has secondary meaning.:

### *iii.*     ***Media and Third-Party Recognition***

43.     A number of renowned chefs publicly identified as fans of INO, including Gordon Ramsay, Thomas Keller, Julia Child, Anthony Bourdain, and Ina Garten. (Ex 16, Warnick Dec. ¶26; Ex 7 (articles).)

*DNB: See response to ¶43 above.*

Reply: DNB's admission cements the strength of INO's Trade Dress for purposes of the secondary meaning and likelihood of confusion analyses:

44.     Speaking in her personal capacity, attorney Lynne Boisineau testified to the international fame of INO and its trade dress: "I think it's pretty obvious.· I mean I have In-N-Out Burger stickers from 1987 when moved back to California from where I was living.· It's just -- of course it's famous, people around the world know it.· I mean that's just my own personal -- this has nothing to do with being a lawyer.· This is just my friends in France know it, my friends in England know it.· My friends in, you know, Sri Lanka have heard of In-N-Out Burger. It's just famous to me." (Ex 41, Boisineau Dep. at 24.)

*DNB: See response to ¶43 above.*

Reply: DNB's admission cements the strength of INO's Trade Dress for purposes of the secondary meaning and likelihood of confusion analyses

45.     INO's business practices also contribute to the strong goodwill it enjoys. One of the keys to INO's success is its decision not to franchise its operations or go public, in order to prioritize quality over excessively rapid business growth. INO is also well-known for employee-centered personnel policies. For example, INO has consistently had one of the

highest pay structures for quick-service restaurant employees that well exceed state and federally mandated minimum wage guidelines. (Ex 16, Warnick Dec. ¶27).

>_DNB_: Irrelevant.

>>Reply: To the contrary, these facts add some measure of strength to INO's brand and, by extension, to its trade dress.

46.    INO was one of the very few restaurant chains given a positive mention in the book _Fast Food Nation_. The book commended the chain for using natural and fresh ingredients and for looking after the interests of employees regarding pay and benefits. (Ex 16, Warnick Dec. ¶28).

>_DNB_: Irrelevant.

>>Reply: To the contrary, these facts add some measure of strength to INO's brand and, by extension, to its trade dress.

47.    Due to its popularity, INO and its Trade Dress is frequently featured in third-party national news and entertainment reporting, including the following examples:

>a. A 2002 _New York Times_ article (Ex 65) reported on the brand's popularity and on the opening of INO's 166th store, and featured a photo of the restaurant's interior:



b. In an article subtitled "Taking America's best fast car to America's best fast food," (Ex 66), the September 2006 issue of *Automobile Magazine* included several photos of INO, including of its burger wrappers:



c.   This full-page photo of pop star Taylor Swift ran in the February 8, 2008 issue of *Entertainment Weekly* demonstrating her affinity for the brand by posing with some of the packaging that makes up INO's Common Law Trade Dress in this case (Ex 31):



*DNB*: *See response to ¶43 above.*

Reply: This is direct evidence of the INO Trade Dress receiving unsolicited, third-party publicity in national publications. It is strong evidence of secondary meaning across the country, and DNB's failure to substantively respond is an admission of this evidence.

48.     Third-party social media posts by celebrities and average consumers alike frequently feature the elements of INO's trade dress. Many users are particularly inclined to take "selfie" photos inside INO restaurants or with INO packaging as a way of expressing affection for the brand. A collection of examples over the past few years is attached as Ex 42.

*DNB: See response to ¶43 above.  Additionally, see responses to ¶10, ¶23 above regarding more salient facts revealed by third party social media photos.*

Reply: This is direct evidence of the INO Trade Dress receiving unsolicited, third-party publicity in social media posts visible across the country. It is strong evidence of secondary meaning across the country, and DNB's failure to substantively respond is an admission of this evidence.:

### iv.     *Brand Protection Efforts By INO and Its Customers*

49.     The distinctiveness of INO's trade dress has also been illustrated by the numerous instances in which consumers have notified INO that a third-party restaurant appears to be copying INO's appearance. (Ex 43, Warnick Dep. at 59.)

*DNB: INO provides only weak support for its assertion that "numerous" third parties have notified INO of other restaurants imitating INO's alleged trade dress. Mr. Warnick testified that customers had provided such feedback but notably could offer no specific examples. Warnick dep. p.59 (Ex. 43).*

Reply: To the contrary, the evidence is substantial, and is only a representative sample. It is strong evidence of secondary meaning across the country, and DNB's failure to substantively respond is an admission of this evidence. Further, Mr. Warnick was a Rule 30(b)(6) designee, and the topic of third-party litigation was not among the noticed topics, so it is immaterial that he did not have all of these details immediately top of mind during his deposition. The information was produced in discovery.

50.    INO has carefully monitored and policed use of the INO Trade Dress and maintains tight control over its use—including, when necessary, by seeking judicial relief. (Ex 43, Warnick Dep. at 79). Usually these efforts have resulted in a negotiated resolution, although an Australian court ruled in INO's favor in a case against a company called "Down N' Out Burger." (Ex 43, Warnick Dep. at 79-81.) Other examples include the following:

d.    *In-N-Out Burgers v. Chadder's Restaurant*, Case No. 07-394 (D. Utah, filed June 14, 2007). INO filed this action against a Utah-based knock-off after several customers expressed confusion and complained about its similarities to INO, including its color scheme, uniforms, and menus. (Ex 16, Warnick Dec. ¶30.a; Ex 8 (customer complaints). In response, Chadders voluntarily made changes to its décor. (Ex 9 (initial response from Chadders to demand letter agreeing to change some challenged trade dress elements); Ex 44 (Complaint); Ex 45 (TRO Opinion at INO599) (noting that Chadders had voluntarily "already changed some of the elements that In-N-Out alleges

infringes its trade dress").) The parties ultimately reached a confidential settlement of all claims, including the trade dress claim. (Ex 16, Warnick Dec. ¶30.a).

e.  *In-N-Out Burgers v. Mr. Bill's In-N-Out Burgers*, Case No. 07-1249 (D.N.M., filed Dec. 11. 2007). This defendant that had copied various elements of INO's menu boards, color schemes, and trademarks. In response, the restaurant voluntarily agreed to change its red and white color scheme to blue and white and make other changes to its menu boards, among other things. (Ex 16, Warnick Dec. ¶30.b; Ex 46, Complaint; Ex 10, letters.)

f.  *In-N-Out Burgers v. Caliburger, LLC*, Case No. 11-1418 (C.D. Cal., filed Sept. 14, 2011). INO filed this suit against a China-based international INO clone, which took steps to open locations all around the Pacific Rim including Seattle, Europe, and Asia, after reports of the knock-off attempt were reported to INO by California natives living in China. (Ex 16, Warnick Dec. ¶30.c; Ex 11, customer report.) As reported in the February 11, 2012 issue of the *Los Angeles Times*, this defendant "agreed to tweak Caliburger's menu and décor after In-N-Out filed suit in U.S. District Court ... for trademark infringement and counterfeiting." (Ex 47, INO2725-2727). The same article reported that "Protecting its image is nothing new for In-N-Out, which has been quick to take legal action against U.S. copycats." *Id.* at INO2727.

g. From 2012 through 2021, INO battled a knock-off restaurant chain in Ethiopia that was utilizing photos of genuine INO food and packaging, white-and-colored stripes underneath the ordering counter, INO menus, the "In-N-Out" name, and orange/red uniforms. INO received multiple reports about the infringers from American and other international travelers who noted the clear references to INO in the U.S. INO obtained judgment in Ethiopian court against the restaurant chain, including monetary damages. (Ex 16, Warnick Dec. ¶30.d; Ex 13 (call sheet and photos)).

h. In February 2021, INO received notice that a new restaurant in California named Bixby Burger had copied the look and feel of the INO drive-thru menu design. INO legal counsel contacted Bixby Burger and persuaded it to remove the similarities to INO's design. (Ex 14, Bixby documents, authenticated by Ex 16, Warnick Dec. at ¶30.e.)

*DNB: INO's statement of fact buries the most critical aspect in the Chadders case. The District Court denied INO's request for a TRO regarding its trade dress: "[INO] has not shown that it is likely to succeed on the merits of its claim of infringement of trade dress." In-N-Out Burgers v. Chadder's Restaurant, Case No. 07¬394, Order on TRO Motion p.8 (Ex. Z) (denying TRO for trade dress, but granting TRO with respect to Chadder's use of INO's registered word trademarks, emphasis added). INO's other demands, threats and litigation against other start up restaurants are relevant only to demonstrate that INO regularly bludgeons weaker competitors with massive litigation expenses to coerce settlement and fortify its IP position.*

Reply: DNB's Response ignores each of these examples except for one case, which is a concession of their truth and their significance to establishing secondary meaning in the INO Trade Dress. The one sentence DNB cherry-

picks from the *Chadders* opinion does not carry the freight DNB gives it. It is a decision on a temporary restraining order motion, which is an extraordinarily high burden of proof. Despite that burden, INO succeeded in enjoining Chadders' use of INO's trademarks. The court did not enforce INO's common law trade dress rights (which are not as easy as registered trademarks) on a TRO basis because, "*at this time*, In-N-Out has not met its *heightened burden* of showing that it is entitled to an injunction against the use of its claimed trade dress because it has not shown that it is likely to succeed on the merits of its claim of infringement of trade dress." (DNB's Ex Z.) That is an observation about the degree of evidence in the record at the time, not an expression of opinion on whether INO would be able to meet its burden. Importantly, DNB also omits the next sentence in the court's opinion: "Further, where Chadders has already changed some of the elements that In-N-Out alleges infringes its trade dress, it has not been established that In-N-Out will suffer irreparable harm in the future if the injunction is not issued." (*Id.*) This, as INO has already argued in this SOF, actually strengthens INO's Trade Dress, since it demonstrates that Chadders at least partially complied with INO's trade dress demands without waiting for the TRO motion.

51.     There is also an active market on sites like eBay for resales of collectible and rare INO merchandise and memorabilia—much of which contains portions of the INO Trade Dress. (Ex 67, eBay pages.)

_DNB_: 51.     The relevant substance of this paragraph is not true. Excepting INO's registered palm tree silhouettes, none of the memorabilia in Exhibit 67 shows the trade dress alleged in this case.

Reply: Not so. This memorabilia displays the cups (INO7390, 7407), single-"N"

red & white logo (INO7398, 7423, 7427; see also SOF 74.a, showing the same

sign), automobile imagery (INO7407), and menu (INO7418) that are elements

of the Common Law Trade Dress. Collectively, it also demonstrates that the

"strong loyalty" that DNB admits INO consumers have extends to these trade

dress elements so much that they want to collect these items.

**(7)      _Proof of DNB's Intentional Copying_**

> **i.      _DNB's Knowledge of INO's Fame and Trade Dress_**

52.     DNB readily admits INO's goodwill and commercial strength.

a.   DNB principal John Burtka described INO as "kind of legendary," (Ex 18, Burtka

Dep. at 17, and remarked "it's pretty impressive that a company's been around

that long." _Id_. at 16-17.

b.   In conversations held during the creation of DNB, Burtka and co-founder Justin

Dalenberg discussed "how people sought [INO] and there would be long lines

for people to get in there. And ... that their quality was great." (Ex 18, Burtka

Dep. at 18.

c.   Before launching DNB, Justin Dalenberg identified INO as one "of America's

great burger chains [that] have been able to eek [sic] out a large portion of

market share in their respective markets." (Ex 48, Dep Ex C, DNB282-283.)

d. Justin Dalenberg also admitted that INO has "a loyal following ... in California," (Ex 19, Justin D. Dep. at 26) and are located "throughout the southwest region." (*Id.* at 30).

e. DNB's co-founder Ken Heers acknowledged, "We know that In-N-Out is popular in California [and] is in the news from time to time." (Ex 49, Heers Dep. at 16.)

f. DNB marketing lead Griffin Zotter admitted that INO restaurants are "a destination location, ... [that] when you go out west you need to try it," (Ex 20, Zotter Dep. at 10-11), and that "everybody [he knew at Michigan State] roasted me when I got back [from Las Vegas without visiting INO], because -- they said, how did you go there and not go to In-N-Out Burgers?" (*Id.* at 10.)

g. Even before this lawsuit, teenaged DNB employee Gracie Fetters was already familiar with the appearance of INO's menu and uniforms from having seen them through social media "on Instagram and TikTok." (Ex 50, Fetters Dep. at 11-12, 14).

<u>DNB</u>: *DNB and certain employees and/or affiliated persons have conceded that that INO is well known out west, and that it has loyal fans sprinkled outside its geographic area. Nobody at DNB testified that INO is well known nationwide, or that its alleged trade dress was commercially strong. Indeed, defendants believe that few people in Michigan have ever been to an INO restaurant or even heard of INO.*

<u>Reply</u>: Notably, DNB cites no record evidence to support its 13th-hour attempt to limit the scope of its admissions. The testimony speaks for itself, especially those from Mr. Zotter and Ms. Fetters, establishing that they and others in

Michigan recognize the INO Trade Dress. Additionally, each of the DNB principals are themselves Michigan residents who concede an awareness of the Trade Dress.

### ii. DNB's Use of Its INO Knowledge In Its Business and Trade Dress

53.    Before launching DNB, "Defendants were aware generally of INO and its western USA restaurants, its goods and services, and its trademarks IN-N-OUT BURGERS [sic] (both word and design). Defendants were also generally familiar with INO's food packaging and color scheme of red, white and yellow." (Ex 21, DNB Resp. to 1st RFAs, ¶15).

_DNB_: -- .

> Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

54.    "[A]s a restaurant and food consultant Justin Dalenberg has visited hundreds of restaurants including INO. He was generally aware of the major quick service restaurants and their marketing approaches, menus, service styles, etc. including the quick service hamburger market segment and INO." (Ex 17, DNB Resp. to 1st Interrog. ¶6). Justin had "eaten there a handful of times ... in San Francisco and .. a couple [of INO restaurants] in the Sacramento region." (Ex 19 Justin D. Dep. at 15-16.) He ordered his food inside the restaurant. (Ex 19, Justin D. Dep. at 17-18).

_DNB_: -- .

Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

55.     Justin and Ken Heers also ate at an INO restaurant in 2019 during a trip to California, which they did "for the purpose of ... scoping out the competition." (Ex 19, Justin D. at 16-17; Ex 49, Heers Dep. at 16-18 ("We went to the In-N-Out in Sacramento ... to take a look at it ... [and] check out what they were doing"). They ordered their food inside the restaurant. (Ex 19, Justin D. Dep. at 17-18; Ex 49, Heers Dep. at 17).

*DNB: 55.      INO distorts Justin Dalenberg's and Mr. Heer's testimony. They testified that the main purpose of their visit to California was to visit Justin's son and to investigate breweries, not INO. (At the time, Justin and Mr. Heers were contemplating opening a brewery in Tecumseh.) The line about "scoping out the competition" was uttered by INO's counsel, not the witness. INO's counsel even stated, "I didn't mean to imply that he [Justin] went to Sacramento for the purpose of going to In-N-Out." Heers dep. at 17 (INO Ex 49).*

Reply: DNB's accusations are unfounded. INO's quotations of the record are accurate and speak for themselves. To the extent quoted words were spoken by the questioner, that is only because the witness immediately agreed to and adopted them. The quote does not suggest that Dalenberg traveled to California for the purpose of visiting INO, but does (accurately) recite the reason for his visit to INO once he arrived.

56.     In "2018 or 2019," Justin Dalenberg drafted "a vision statement" for DNB, a quick-service fast food restaurant he intended to create. (Ex 48, Dep. Ex. C; Ex 19, Justin D. Dep. at 13). He wrote it for the benefit of his partners in DNB, Ken Heers and John Burtka.

(Ex 19, Justin D. Dep. at 14.) That document compared his vision for DNB to INO, among other upscale burger chains. Describing the leading companies in the fast food industry, the document identified

> "companies like In n' Out Burger in The Western Region of the USA, Culver's in the Midwest, and Five Guys Burger and Fries in the East Coast. The[se] burger places focus on quality rather than quantity and have thus joined the ranks of America's great burger chains and have been able to eek [sic] out a large portion of market share in their respective markets."

(Ex 48, Dep Ex C, DNB282-283; Ex 19, Justin D. Dep. at 14, 24-25.)

*DNB:* -- .

> Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

57.     Justin also contemporaneously created a document listing seven other burger restaurant chains as "comparables" to DNB. INO was first on that list. (Ex 51, Dep Ex. D, DNB093.) Justin, Burtka, and Heers used these "comparables" as "case studies ... when we were developing our business plan." (Ex 19, Justin D. Dep. at 27; Ex 51, Dep Ex. D). From these case studies, they drew information on INO's "[p]roducts, services, generalities in the ... quick service business world." (Ex 19, Justin D. Dep. at 27; Ex 18, Burtka Dep. at 16 (Justin discussed INO and other chains as "benchmark[s]" with John Burtka when designing DNB.)) This involved visiting INO's website and gathering additional information about INO through Google searches. (Ex 19, Justin D. Dep. at 27.)

*DNB:* -- .

Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

58.     DNB co-founder and principal Ken Heers was born and raised in Las Vegas, then lived in California and Arizona before moving to Michigan in 1998. (Ex 49, Heers Dep. at 11-12). California has had INO restaurants since 1948 and Las Vegas, Nevada has had INO restaurants since 1992, such that Heers was familiar with the INO brand (*id*. at 14) and had eaten at INO restaurants on at least three occasions in Las Vegas and California. (*Id.* at 13-14; Ex 18, Burtka Dep. at 18 ("Ken Heers had been familiar with [INO] and he said they were a really good burger joint. [H]e had been to [an INO restaurant[ before... [because] he used to live in California."))

*DNB: -- .*

Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

59.     The colors, interior design, and exterior design were chosen during a visit to the Tecumseh site by Dalenberg and Heers, in a brief conversation. For the interior, they determined to use the existing gray floor tile. The two agreed on a red and black color scheme. During construction, Joel Dalenberg was the primary day-to-day liaison for the building contractor, but Heers and Justin Dalenberg also contributed ideas. (Ex 17, DNB Resp. to 1st Interrog. ¶3; Ex 19, Justin D. Dep. at 77-78; Ex 49, Heers Dep. at 33-34.)

*DNB*: -- .

> Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

60.     "The red and white striping underneath the countertop ... [was] a branding [decision.]" (Ex 52, Joel D. Dep. at 48.) It is meant to be "the same stripe that's on the bottom of the cup ... [and] [t]o be consistent with the look of the cups and the packaging ... [and the] [o]verall branding of [the restaurant] ... [which] maintained the same kind of aesthetic consistency."(Ex 52, Joel D. Dep. at 49; Ex 20, Zotter Dep. at 62-63 ("that horizontal red stripe along the top [of the cup] ... matches the same kind of red striping underneath the countertop ... that kind of create[s] a visual consistency....·Kind of like a non-verbal branding element.")

*DNB*: -- .

> Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

61.     DNB consulted Griffin Zotter, the Marketing Manager at Veritas Vineyard, LLC, relating to the design of several aspects of the restaurant interior. Mr. Zotter did market research on all the major fast-food brands, including INO, during the DNB design process, "to know the state of the market and the branding around that type of service in the market , if nothing else just to know how [DNB] fit[s] into that and how [it] can compete." (Ex 20, Zotter

Dep. at 13-14, 18.) Specific to INO, Mr. Zotter recalls having performed internet research, including Google image searches. (*Id*. at 15-16.)

> *DNB*: *Mr. Zotter's work for DNB is mainly general marketing, some social media, and some food packaging design work. He testified he was not influenced by INO:*
>
> > *I actually didn't go to [INO's] website. I mean, I did a quick like Google image. I mean, I had all of these up and -- tabs and just quick look-through. But I didn't really want to be influenced. As a designer, I don't intentionally go out to make something like something else, by any means. I would rather do my own thing and have it stand on its own. Zotter dep. p. 16 (INO Ex. 20).*
>
> Reply: DNB's response confirms that INO accurately reported Mr. Zotter's Google search for images of INO. The witness is free to deny after the fact that he was "influenced" by those images, but he cannot (and DNB does not) deny that he contemporaneously viewed them. See also SOF 66 below concerning Mr. Zotter's admission that he may have been influenced.

62.    Mr. Zotter suggested that DNB incorporate and apply a single- or double-line red border to certain elements of the restaurant interior, and replicate the red border with DNB's food packaging, menu board, and certain elements of the uniform. Joel Dalenberg conceived the idea of continuing the existing wainscoting through the store. Justin Dalenberg and Ken Heers chose the look of the booth seating. (Ex 17, DNB Resp. to 1st Interrog. ¶3.)

> *DNB*: -- .
>
> > Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

li

63.     DNB looked to INO's exterior and interior menu boards in designing DNB's menu boards. (Ex 40, Johnson Dep. 32, 43 (he "ended up using In-N-Out's menu board ... as inspiration" for the physical "cabinet" of the interior and exterior boards); Ex 53, Emails mentioning DNB's menu board being "in the style of" the INO menu board, DNB039-040). Justin Dalenberg chose INO's boards because they were "the simplest design form that we could find, like in terms of framing." (Ex 19, Justin D. Dep. at 62; *id*. at 65-66). DNB contracted with Jim Johnson, of Johnson Signs, to build the structural housing for the drive thru menu. Justin Dalenberg provided Mr. Johnson with a picture of an INO drive thru menu to illustrate DNB's requested menu board design. (Ex 17, DNB Resp. to 1st Interrog. ¶3.) Mr. Johnson's construction documents depict the "existing" INO interior and exterior menu board designs that were supplied by DNB and used by Mr. Johnson as references in constructing DNB's menu boards. (Ex 54, DNB046-085; Ex 40, Johnson Dep. at 47).

> *DNB*: This statement is based on DNB's response to Interrog. 1, which response is not accurate in one respect: DNB hired Johnson Signs (Jim Johnson, principal) to design and create DNB's menu enclosures. DNB hereby supplements its response to Interrogatory No. 1 to be consistent with Mr. Johnson's testimony: Mr. Dalenberg did not provide the image of INO's drive-up menu enclosure to Jim Johnson. Rather, as attested by Mr. Johnson, he Googled images of fast food menu enclosures and provided the images, including INO's menu enclosures, to Justin. Jim Johnson dep. 26-33, 59-60 (Ex. AA) (testifying that Johnson performed internet search, displayed results for Dalenberg, and at his own initiative pasted images he found of INO's menu boards on the job order production page).

> Reply: This 13th-hour revision of DNB's sworn interrogatory responses fails, and cannot be given weight by the Court, because it is not verified, as interrogatory responses must be. Regardless, DNB does not (and cannot) deny the email evidence in which Justin Dalenberg referenced the menu boards

being :"in the style of" INO's, so the question of who gave what image to whom is wholly irrelevant; in either case, DNB admits intentionally copied at least the frame style of INO's menu boards.

64.     DNB also reapplied the simplicity of INO's menu content and its general appeal. Ex 18, Burtka Dep. at 27-28 ("it was mentioned [in that design meeting] how simple [INO's] menu was ... [and] the other in [that] conversation liked that idea of simplicity."; *id*. at 29-30 & (Ex 55) Dep. Ex. Y ("post from Doll N Burgers that [Burtka] shared [on Facebook] on April 17th, [2020,] ... say[ing] the menu is very simple.") Mr. Zotter designed the menu layout in consultation with DNB's principals, who approved the menu designs. (Ex 17, DNB Resp. to 1st Interrog. ¶3; Ex 20, Zotter Dep. at 48.)

> <u>DNB</u>: *DNB did not "reapply" INO's simple menu. Decision makers simply said they liked it.*

> > <u>Reply</u>: This is a distinction without a difference. DNB does not dispute the testimony showing DNB's decision-makers were aware of and discussed the simplicity of INO's menu during the process of creating a menu they would later tout as being "simple."

65.     DNB also reapplied portions of the typeface in INO's menu. Specifically, Mr. Zotter and the DNB principals discussed how they liked INO's depiction of the menu prices' cents portion and copied that design element. (Ex 20, Zotter Dep. at 53-55).

> <u>DNB</u>: *Mr. Zotter testified that during the menu design there was no mention of INO except for one detail: DNB liked the way INO indicated the "cents" portion of its prices in superscript (versus a decimal point). Zotter dep. at 53 (INO Ex. 20).*

> > <u>Reply</u>: Exactly. DNB admits INO's allegation.

66. Mr. Zotter designed the cup with input and approval from Justin Dalenberg. (Ex 21, DNB Resp. to 1st Interrog. ¶3; Ex 19, Justin D. Dep at 78.) Mr. Zotter designed the pattern of red cow-head silhouette images "repeating along the whole circumference of the cup," (Ex 20, Zotter Dep. at 64). Mr. Zotter testified that he "can't say that in the back of my mind" that the decision to use the red cow-head pattern encircling the top of the cup was not influenced by the red vertical stripes and palm tree pattern encircling the top of INO's cup. (*Id.*)

> *DNB*: The last sentence of INO's statement is false. Mr. Zotter testified that he could not say "in the back of his mind" that he was not unconsciously influenced by other fast food cup designs such as those used by Steak n' Shake and Five Guys. Id. at 64.

> Reply: Mr. Zotter's statement is not a model of clarity, but DNB's interpretation of it is unfairly restrictive. Read in good faith, Mr. Zotter's testimony admits that he cannot deny being influenced by sources that include the INO cup design.

67. Justin Dalenberg, in consultation with his partners, selected the DNB uniforms and the open-ended wrappers used by DNB. (Ex 17, DNB Resp. to 1st Interrog. ¶3.)

*DNB*: -- .

> Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

68. DNB opened the Tecumseh Restaurant in 2020, and advertised its grand opening for July 11, 2020. Its Tecumseh location is DNB's first restaurant. (2AC, DE 21, ¶26; Answer, DE 25, ¶26).

*DNB*: -- .

69.     DNB opened the Jackson Restaurant on November 20, 2020. (2AC, DE 21, ¶27; Answer, DE 25, ¶27). Although the Jackson Restaurant is located "in a brick building [and thus] in the dining area of the Jackson location there's more of a brick facade rather than the tile and the wainscoting [inside the Tecumseh location], ... there [are] obviously some aesthetic choices that were kind of imported from the Tecumseh location to Jackson to create a consistent look and feel between the two locations." (Ex 52, Joel D. Dep at 67-68.) "[F]or example, the exterior facade of the entrance of the Jackson location has that same kind of white exterior, [and] red awnings[.] ... And when you walk into the Jackson location there's the white or gray tiling on the floor[.] ... [The] dining tables have the same red and black aesthetic as the dining tables in Tecumseh[.] And in the ordering center you have the same white tiling and the red striping under the counter; that aesthetic is the same as in Tecumseh[.] ... ·That part is intentional[.]" (*Id*. at 68-69.)

> *DNB*: Large portions of the quoted "testimony" from Joel Dalenberg are excerpts of highly leading questions posed to him by INO counsel.

> > Reply: Notably, DNB does not deny that the testimony is accurate. INO's quotations of the record are accurate and speak for themselves. To the extent quoted words were spoken by the questioner, that is only because the witness immediately agreed to and adopted them. These admissions establish that, despite some differences in appearance due to the pre-existing nature of the Jackson building, DNB intentionally imported enough of the Infringing Trade Dress from Tecumseh to create the same commercial impression in both locations.

70.    Joel Dalenberg, in a former career, traveled to California "a lot," and spent "weeks" at a time working in California. (Ex 52, Joel D. Dep. at 11.) During those periods, which took place from the early 2000's to 2015, (id. at 12-13), Joel "ate [at INO restaurants] a number of times – just because they're a good place to eat at and people introduced me [to them] years ago." (Id. at 12.)

> _DNB_: -- .

>> Reply: This admission helps close the door on any assertion that DNB adopted its Infringing Trade Dress innocently, as DNB had full awareness of INO's Trade Dress.

## E.    DNB's Infringement of the INO Trade Dress

71.    Each of the _Frisch_ factors weigh in favor of finding a likelihood of confusion between the Infringing Dress and the INO Trade Dress.

> _DNB: This paragraph and all subsequent paragraphs concerning the Frisch factors are false. See DNB's SJ brief pp. 15-22._

>> Reply: The parties disagree on this argument, but that does not render anything "false."

### 1.    Strength of the Plaintiff's Mark

72.    INO's Trade Dress is strong, both commercially and conceptually. _See supra_ ¶¶14-51.

> _DNB: False. Dr. Stec found that INO's alleged trade dress registered only 15% secondary meaning. See also ¶ 71._

Reply: INO has rebutted Dr. Stec's conclusions, which are themselves only one out of many sources of evidence relevant to secondary meaning.

### 2.   *Relatedness of the Goods or Services*

73.   The goods and services sold in connection with INO's Trade Dress and DNB's Infringing Dress are materially identical. INO's menu is intentionally simple and consists almost entirely of hamburgers, milkshakes, and French-fried potatoes. (Ex 16, Warnick Dec. ¶31.) Similarly, the DNB Restaurants feature hamburgers, milkshakes, French-fried potatoes, and poutine. (2AC, DE 21, ¶28; Answer, DE 25, ¶28).

*DNB: DNB's menu also features poutine, hot dogs, coney dogs, salads, for a time malts, and more recently ice cream – none of which INO offers. SAC ¶29(c) (DNB menu image).*

Reply: See SOF 8 above, which establishes the obvious, that DNB is primarily a "hamburger restaurant." The two menus do not need to be identical for the parties' goods and services to be highly similar.

### 3.   *Similarity of the Marks/Actual Confusion*

74.   In its DNB Restaurants, product packaging, and related marketing materials, DNB has extensively copied and/or closely imitated the INO Trade Dress. Below are several non-exclusive examples of similarities between DNB's restaurants and branding, and those used by INO. The following DNB and INO images are accurate representations of DNB's and INO's respective restaurants, décor, and product packaging, and the INO images reflect its Common Law Trade Dress as it is used in commerce (Ex 21, DNB Resp. to 1st RFAs, ¶¶7, 25-32; Ex 16, Warnick Dec. ¶8.)

a. DNB has copied INO's color scheme, including the use and placement of red and white and even using a splash of yellow or gold in its logo:

| DNB | INO |
|-----|-----|



b. The layout and colors of the DNB Restaurant include a primarily white exterior with a low red stripe and red awnings, red and white interior décor including a white counter featuring a stripe in red with a black countertop similar to the In-N-Out gray countertop, red cushioned chairs and red tables, vertical red strips on interior walls or dividers, and gray floor tiles similar to INO's gray tiles:

| DNB | INO |
|-----|-----|










c. The red and white theme and layout of DNB's menu includes a horizontal line of boxes featuring single-size, single-price combo meals at the top:



d. DNB's cups are white with red graphics featuring horizontal lines and a horizontal series of red cow head silhouettes encircling the top portion of the cup, in the same way that INO's cups display a line of red palm tree silhouettes encircling the top portion of the cup.



e.  At the time INO initiated this lawsuit and for a period of time thereafter, DNB employee uniforms were comprised of white collared shirts, red aprons, and red and white baseball caps or paper hats, as shown below.



After the initiation of this lawsuit, DNB employees began wearing black aprons, but the rest of their uniform remains the same, as shown below:



  f. DNB uses open ended burger wrappers in the same manner as INO.



  g. DNB uses the single letter "N" in the center of its three-part name.

| DNB | INO |
|-----|-----|
|  | |

h. DNB promotes its products using a classic cars theme.

| DNB | INO |
|-----|-----|



Collectively, INO refers to DNB's depicted combination of color scheme, décor, and packaging as the "Infringing Trade Dress" or "Infringing Dress."

*DNB*: There is zero evidence that DNB copied any aspect of INO's packaging, décor, marketing material, or any other aspect of its alleged trade dress color scheme." Each of INO's subparagraphs is also untrue or misleading.

    a.    *INO has no evidence that DNB copied its color scheme. Red & white colors, often with splash of yellow, are ubiquitous in the fast food industry. See DNB SJ brief Stmt Fact 32 (photos); Examiner's first and second rejections of registration application (Exs. B, G) (showing scores of photos; see also Ex. G PageID2173 (color red works well in fast food industry because it stimulates impulse eating, provokes hunger, and people eat faster); id. PageID2178 (bold primary colors encourage fast food turnover, red & black is "classic combination" for restaurants, red enhances the appetite); id. PageID2222 (same).*

Reply: For evidence highly suggestive of DNB's intent to copy, see SOF 52-70.

Most of the "evidence" DNB cites for the functionality of colors is inadmissible hearsay. And INO is not seeking to restrict the use of any particular color, only its use in a manner that, especially when used in combination with other elements of its trade dress, is confusingly evocative of INO.

    b.    *the Jackson DNB restaurant exterior and interior is primarily orange brick, not white. There is zero evidence that DNB utilizes a white counter, let alone a white counter having a red stripe. INO's service countertop is silver (stainless steel) not "gray." See Registration Ex. D. DNB does not utilize vertical red stripes anywhere, including its interior walls. Other than booth backs, DNB does not have dividers between adjacent booths. DNB's floor tiles are not at all similar to INO's floor tiles, which are checkered.*

Reply: See SOF 69, establishing the continuity in commercial impression between the two location despite certain unavoidable differences in the characteristics of the pre-existing building in Jackson.

c.      *DNB's drive-up menu design bears only superficial resemblance to INO's drive up menu. The colors red and white, and displaying combo meals at the top of the menu, are ubiquitous in the fast food industry.*

<u>Reply</u>: Nothing DNB says here is based on any record evidence. DNB has not

shown a single third-party menu that is anywhere near as similar to

INO's as DNB's is. See SOF 63-65 regarding DNB's copying of INO's

menu.

d.      *DNB finalized design changes to its drink cup in about February 2021. DNB has since consumed all or nearly all of its old design of encircling cow heads.*

<u>Reply</u>: This statement of counsel is not based on record evidence. Even if true,

it does not prevent DNB from reverting to its original design, and INO is

entitled to a ruling that the original Infringing Trade Dress is infringing.

e.      *DNB transitioned from red to black aprons in about March 2021.*

<u>Reply</u>: see above.

f.      *False. Though the parties both utilize open-ended wrappers, DNB serves its burgers flat. INO serves its burgers "smiley side up." Wensinger Dep. at 161-62 (Ex. BB).*

<u>Reply</u>: The manner of presentation does not need to be identical in order to be

confusingly similar, as this is.

g.      *DNB uses a lower case "n" with apostrophe. INO uses a capital N.*

<u>Reply</u>: The manner of capitalization does not need to be identical in order to be

confusingly similar, as this is.

h.      --

Reply: DNB concedes the similarity between the parties' emphasis on automobile imagery.

75.   DNB has also adopted a number of additional business methods identical to those used by INO. These similarities further accentuate the similarity and the likelihood of confusion between itself and INO Trade Dress. For example:

a.   DNB advertises that its meat is butchered every morning and delivered fresh each day. (2AC, DE 21 ¶30.a; Answer, DE 25, ¶30.a; Ex 19, Justin D. Dep. at 60.) A similar promise has been one of the foundational distinctions of INO's commitment to quality throughout its existence. (Ex 16, Warnick Dec. ¶34.) Examples of each party's freshness statements are shown below:

| DNB | INO |
| --- | --- |
|  | |

|  |  |
|---|---|

b.      DNB has recently begun handing out free hot cocoa, (2AC, DE 21 ¶30.b; Answer, DE 25, ¶30.b; Ex 20, Zotter Dec. at 28-29 (explaining this was intended to draw more children into the store), exactly as INO has done since 2018. (Ex 16, Warnick Dec. ¶33.) Examples of each party's advertisement of this business method are shown below:



| DNB | INO |
|---|---|

_DNB_: This paragraph is irrelevant. Business methods are inherently functional and therefore unprotectable as trade dress as a matter of law. See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 643-45 (6th Cir.2002) (clothing designs, in-store presentation, and hiring college students as sales representatives all functional and not protectable trade dress even if distinctive).

Reply: DNB misrepresents the *Abercrombie* decision. That opinion accurately quoted the Supreme Court's teaching that "trade dress can comprise 'any thing,' 'even particular sales techniques.'" *Abercrombie*, 280 F.3d 630 (quoting *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 764 n. 1 (1992) (in turn quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F. 2d 966, 980 (CA11 1983)). The pages of the opinion to which DNB cites merely hold that the methods sought to be protected on the particular facts of that case did not merit protection. These additional points of similarity enhance the likelihood of confusion.

76.    Griffin Zotter, who played a principal role in designing DNB's packaging and in marketing the DNB brand, admits "there's some degree of similarity [between the INO and DNB brands; for example,] they both use red and white color schemes." (Ex 20, Zotter Dep. at 20-21.)

*DNB: Mr. Zotter testified the exact opposite. He said he was NOT principally responsible for brand design and packaging; rather, it was a team effort. Zotter dep. at 19 (INO Ex 20). The remainder of this paragraph excerpts words uttered by INO's counsel.*

Reply: DNB's objection is ill-founded. INO did not say he was "principally responsible" for brand design, but rather that he "played *a* principal role." That is true, and entirely consistent with the text DNB cites. Further, INO said (and DNB does not deny) that Mr. Zotter—the Marketing Director—played a principal role "in marketing the DNB brand," which is indisputably true. See Ex 20 at 20 (Q: "the digital aspect of things, that's mostly you?" A: "Yeah, yep."); see also

SOF 5, 52.f, 60-66, 87-88 (detailing Mr. Zotter's involvement in design and his responsibility for marketing). To the extent quoted words were spoken by the questioner, that is only because the witness immediately agreed to and adopted them.

77.     A number of consumers have already spontaneously and without external prompting expressed their own perception of similarity between the INO Trade Dress and the Infringing Dress. (*See infra* ¶¶79-81.) At a minimum, these expressions reinforce the similarity of the parties' respective dresses. In many cases, they also evidence actual confusion.

> *DNB*: Most of the "spontaneous" social media comments are directed to the quality of DNB's food and comparing it favorably to INO. For example, when another Facebook user queried Panda Ghagreat why he thought DNB "looked like a copy cat" of INO, he responded by posting pictures of the parties' hamburgers, not décor. More important, not one social media comment expressed actual confusion. INO's assertion of actual confusion is simply untrue.

Reply: DNB does not deny the substance of the statement, which is that third parties spontaneously mentioned INO upon viewing DNB trade dress. Regardless of whether certain comments mentioned food, the majority refer to the look, feel, and branding of the store. Panda's post specifically included the burger wrappers, an element of INO's Trade Dress. Even a comparison of food products requires consumers to first make the mental association between the brands. This is enough to constitute actual confusion as to whether the brands are affiliated with or sponsored by each other. And even if it does not amount to actual confusion, it is strong evidence of similarity between the dresses, a critical factors in the likelihood of confusion analysis.

78.     Gracie Fetters is a customer service employee who has worked at DNB's Tecumseh Restaurant since it opened in May 2020. (Ex 50, Fetters Dep. at 6.) She testified that, on multiple occasions within the first month that the restaurant was open, "when [customers] came in and were ordering, they might have just said some things like 'oh, this reminds me of In-N-Out.'" (Ex 50, Fetters Dep. at 7-8.) Specifically, she remembers commenting on "the color. They might say 'oh, your colors look similar.'" (*Id*. at 10.) "[F]rom those conversations, [she understood] that these customers ... found the color scheme of Doll N' Burgers to remind them on In-N-Out Burger." (*Id*.; Ex 19, Justin D. Dep. at 73-74 (verifying his awareness of "the fact that numerous customers have shared with [Ms. Fetters] that In-N-Out looks similar to Doll n' Burgers.")

<u>DNB</u>: *In this paragraph INO aggressively edits Ms. Fetter's deposition testimony, putting INO's counsel's words in her mouth. In any case, it is not trade dress infringement if DNB's burgers, atmosphere and service "remind" customers of INO's. Just as it is not trade dress infringement if a Texas Road House reminds a customer of an Outback Steakhouse.*

<u>Reply</u>: Once again, DNB makes non sequitur and unsupported statements, and continues to fundamentally misunderstand trade dress law. Ms. Fetter's words are accurately quoted and speak for themselves. To the extent quoted words were spoken by the questioner, that is only because the witness immediately agreed to and adopted them. The customer expressions of similarity, and the elements that Ms. Fetter says triggered customer comments—particularly the color scheme—are exactly what is relevant to a trade dress analysis.

79.     On June 24, 2020, while working at the Tecumseh Restaurant, Fetters took a drive-through order from Scott Lewis, a private investigator hired by INO. While interacting with Fetters at the drive thru window, Lewis remarked, "You know, you guys remind me—I used to live in California, just reminds me of In-N-Out." Fetters reacted by nodding and saying, "Right. Yeah, a lot of people say that." Lewis responded, "They do?" Fetters again said "Yeah." This interaction is recorded in the video submitted as Ex 56 (INO1744 & INO1756, at timecode 0:37-0:44), and was subsequently verified by Fetters under oath. (Ex 50, Fetters Dep. at 5-6; Ex 57, Lewis Dec. & Report.)

> _DNB_: This paragraph omits Miss Fetter's testimony that DNB employees are specifically trained to be agreeable. Fetter dep. p.10 (INO Ex. 50) ("We're taught to like try to make conversation with them [customers] and be really friendly with everyone that comes through.")

Reply: This response is absurd. Nothing about being "friendly" or making "conversation" has anything to do with agreeing with statements of fact or volunteering additional information about what other customers say, as Ms. Fetters did here. DNB's counsel attended Ms. Fetter's deposition, and had the opportunity to ask clarifying questions, or to supply a post-deposition declaration from Ms. Fetters if there was any additional, relevant (and non-contradictory) information to provide. He did not do that, and did not even go so far as to disclaim Ms. Fetter's testimony here. Her admissions stand uncontradicted, and remain powerful evidence that _even Michigan consumers_ perceive the trade dresses of the two parties to be similar.

80.     A collection of social media posts and online articles expressing similarity and/or confusion, and authenticated by the Declaration of Wendy Gabriel, are contained in Ex 58. (See also Ex 59, Dep Ex. J, containing most of these examples; Ex 19, Justin D. Dep. at 67 (verifying having encountered the posts in Ex J); *id.* at 74-77 (verifying DNB's awareness of online customer reviews comparing DNB to INO during the time DNB first opened and up to several months later); Ex 52, Joel D. Dep. at 74-76, 84 (acknowledging discussion of posts like those in Ex J with DNB principals); Ex 20, Zotter Dep. at 30 (acknowledging having seen at least a couple of these posts online)). For example, consumers have posted the following on:

    i.   DNB's own Facebook page:



(Authenticity admitted: Ex 21, DNB Resp. to 2d RFAs, ¶2).



(Authenticity admitted: Ex 21, DNB Resp. to 2d RFAs, ¶4)



(Authenticity admitted: Ex 21, DNB Resp. to 2d RFAs, ¶6)



(Authenticity admitted: Ex 21, DNB Resp. to 2d RFAs, ¶13 (INO 1787))



(Ex 60, produced as DNB 350; Ex 20, Zotter Dep. at 37-39 (authenticating this post))

j.  Third Party Facebook pages:



**Downtown Tecumseh** was live.

May 23 · 🌐

2.9K Views

99 Likes   31 Comments   14 Shares

https://www.facebook.com/downtowntecumseh/videos/d41d8cd9/239715000648772
link&__rv__=related_videos

**Mark James** · 7:55 Looks like in and out burger 😋! Great food

20w

(Ex 58, INO 417)

    k.   Google Reviews (Ex 58):



## Doll n' Burgers - Tecumseh

411 E Chicago Blvd, Tecumseh, MI

**Write a review**

4.1 ★★★★☆ 254 reviews ⓘ

Sort by: Most relevant ▾

All   drive thru 6   to go 4   poutine 16   cheese curds 15   +6

👍 Like

**Bryce Bingham**
Local Guide · 49 reviews · 50 photos
⋮
★★★★★ a month ago
Good burgers. Kind of like an off-brand 5 Guys or In-N-Out. Has that vibe about it. Service is a little slow, but usually worth it.

👍 Like

**Response from the owner** 4 weeks ago
Thank you, Bryce!

**austin zacharias**
Local Guide · 9 reviews
⋮
★★★★★ 5 days ago
Great burger, they're going for an in n out feel and I think they totally nail it!

👍 Like

**Response from the owner** 3 days ago
Thanks Austin!

**Scott Hoel**
Local Guide · 46 reviews · 121 photos
⋮
★★★★☆ 3 months ago
Took the 45min drive to come see this new establishment. Although no place - not one- can top In-N-Out Burger out west, these guys do a pretty good job with their flattery. Simple menu of a few different versions of their burger which was done very nicely. The buns are incredible! Dogs, fries, shakes and malts, a couple salads and - I want to come back and try their poutine. That's something In-N-Out probably never even heard of! I hope they make a name for themselves. It had to be difficult launching amid the Covid pandemic.

👍 Like



I.   Twitter (Ex 58):



(Ex 19, Justin D. Dep. at 76 (verifying having seen this tweet))

m. And Yelp! (Ex 58):



*DNB: See counterstatement to ¶77 above.*

Reply: See INO's Reply to SOF 77.

81.  DNB admits that "[a]n unknown number of people have posted comments on DNB's social media sites comparing DNB's food to other quick service burger outlets, including INO." (Ex 17, DNB Resp. to 1st Interrog. ¶5; Ex 18, Burtka Dep. at 20 (admitting he was "aware of ... others expressing the opinion that Doll N Burgers looked similar to an In-N-Out Burger....·I think I just saw a Facebook post or something.")

*DNB: DNB admits that its food has been compared to INO. In further answer, see ¶77 above.*

Reply: See INO's Reply to SOF 77.

82.     "A few times customers have remarked that DNB hamburgers were similar to but better than INO hamburgers .... Ken Heers encountered two men in the Tecumseh restaurant parking lot who said words to the effect "you're ripping off In-N-Out, look at your sign. We know In-N-Out, we're from Arizona.""" (Ex 17, DNB Resp. to 1st Interrog. ¶5; Ex 49, Heers Dep. at 47-49; Ex 19, Justin D. Dep. at 69-70 (verifying his awareness of this conversation)). Likewise, upon visiting a DNB restaurant, a relative of John Burtka's visiting from Texas "said, 'Wow, this is like In-N-Out Burger, but better.'" (Ex 18, Burtka Dep. at 23.) Both Justin and Joel Dalenberg recounted stories of visitors from California who volunteered a comparison between INO and DNB. (Ex 19, Justin D. Dep. at 68-69; Ex 52, Joel D. Dep. at 30-31, 88; *id*. at 89 "your burgers -- just, she said, it remind me of being in California at In-N-Out. That's what she said.").

*DNB*: See ¶¶ *77, 81.*

Reply: See INO's Reply to SOF 77. These examples (especially Mr. Heers' encounter) are powerful. They emphasize the degree of brand loyalty and awareness of INO held by many consumers, and that travelers from other states bring that awareness to Michigan and to DNB specifically.

83.     Dr. Cunningham performed a survey of 15 subjects--207 test subjects and 208 control subjects—living in the Midwest. The test survey indicated that 56% of the test subjects, when shown the test stimuli thought that the INO restaurants and the DNB restaurants were owned by the same company, and an additional 10.6% of the test subjects thought that the INO restaurants and the DNB restaurants were affiliated, associated, or connected. The results of

the test , therefore showed a gross confusion of 66.6%. The results of the control survey showed 8.2 % "noise" as to source and 9.1% "noise" as to affiliation, for a total 17.3% "noise". Subtracting the total; "noise" from the gross confusion (66.6% - 17.3%) results in a net confusion of 49.3%. This is a clear indication that there is a high likelihood of confusion between the Plaintiff's and Defendant's restaurants trade dress. (Ex 68, Cunningham LOC survey at 7, 34-36.)

> <u>DNB</u>: Dr. Cunningham's surveys are fatally flawed and unreliable. See DNB's Motion to Exclude her reports and testimony.

> <u>Reply</u>: Disagree. See INO's response to that motion.

84.     Among the subjects who stated the INO and the DNB restaurants were owned by the same company, 6 subjects spontaneously indicated that INO was that company. When asked to state why they thought the same company owned both restaurants, 52% of the subjects referred to the restaurant's distinctive design, the red and white colors, the interior layout and design and overall look ( all elements of the INO registered trade dress), 44% referred to the color scheme and the colors of both restaurants and 21% referred to some of the elements of the "INO Common Law Trade Dress" identified in the Plaintiff's Second Amended Complaint ( P.6) such as: the beverage cup, the restaurant exterior, the burger, or the shirts of the employees of the restaurant. Note that the red and white color scheme could be considered elements of both the INO registered trade dress and of the "INO Common Law Trade Dress". Among the subjects that thought the INO and the DNB restaurants were affiliated or connected, when asked to state why they thought so, 50% referred to the restaurant's distinctive design, the red and white colors, the interior layout and design and overall look (all elements of the INO registered trade dress); 31% referred to the color scheme and the colors of both restaurants; and 13%

referred to some of the elements of the "INO Common Law Trade Dress." (Ex 68, Cunningham LOC survey at 37.)

> _DNB_: _Dr. Cunningham's survey is fatally flawed and unreliable._

>> Reply: Disagree. See INO's response to that motion. Moreover, this data shows that Dr. Cunningham's data applies equally to the Registered and Common Law Trade Dress.

### 4.   _Marketing Channels Used_

85.   "DNB markets the DNB goods and services and the DNB Restaurant via Facebook." (Ex 21, DNB Resp. to 1st RFAs, ¶17)

> _DNB_: -- .

>> Reply: These admissions help solidify the high degree of similarity between the parties' marketing channels.

86.   "DNB markets the DNB goods and services and the DNB Restaurant through its internet website available at https://www.dollnburgers.com." (Ex 21, DNB Resp. to 1st RFAs, ¶18)

> _DNB_: -- .

>> Reply: These admissions help solidify the high degree of similarity between the parties' marketing channels.

87.   "Doll n' Burgers uses its website dollnburgers.com, Facebook, Instagram, and various other online places to advertise. John Burtka was somewhat involved in marketing initially but has little involvement now. Griffin Zotter is currently primarily responsible for posting

and monitoring content relating to DNB, as well as responding to posts and inquiries when appropriate. The DNB management team, and Ken's wife Heather Heers, also monitor FB and social platforms." (Ex 17, DNB Resp. to 1st Interrog. ¶4).

> _DNB_: -- .

>> Reply: These admissions help solidify the high degree of similarity between the parties' marketing channels.

88.    John Burtka supervised and coached Zotter's efforts to market DNB via social media. (Ex 18, Burtka Dep at 49-50).

> _DNB_: -- .

>> Reply: These admissions help solidify the high degree of similarity between the parties' marketing channels.

89.    All of DNB's promotional activity, which was conducted primarily through social media but also involved charitable community involvement, was designed "to drive word of mouth" interest in DNB. (Ex 18, Burtka Dep. at 50-53; Ex 19, Justin D. Dep. at 106 ("word of mouth is one of the best forms of advertisement"). DNB advertises through "[y]ard signs, social media, email ," (Ex 19, Justin D. Dep. at 103), and very limited amounts of print mailers and radio ads. (_Id_. at 105-06). It further promotes itself through "outdoor cookout events ... [in] the community ... and [charitable] donat[ions]." (Ex 19, Justin D. Dep. at 104-05). Any promotional activity [DNB] do[es], whether it's giveaways ... or other things to get [its] name out in the community, the end goal is always to get people in [the] restaurant." (Ex 19, Justin D. Dep. at 84.)

_DNB_: -- .

> Reply: These admissions help solidify the high degree of similarity between the
>
> parties' marketing channels.

### 5.   _Likely Degree of Purchaser Care_

90.    As of July 2021, the advertised prices of DNB's meal combinations were

between $9.50 and $11.50. (Ex 61, DNB menu.)

_DNB_: -- .

> Reply: These admissions help solidify the low degree of care purchasers will
>
> apply when buying the parties' goods.

91.    As of July 2021, the advertised prices of INO's meal combinations ranged on

average from $6.65 to $8.30. (Ex 16, Warnick Dec. ¶32.)

_DNB_: -- .

> Reply: These admissions help solidify the low degree of care purchasers will
>
> apply when buying the parties' goods.

### 6.   _The Defendants' Intent in Selecting Their Infringing Dress_

92.    For purposes of this litigation, DNB now denies any intent to trade on INO's

goodwill. Each of the DNB principals and other agents who participated in the design of DNB's

Infringing Trade Dress, however, had personal familiarity with INO, the INO Trade Dress, and

with the fame of the INO brand. DNB admits to having used INO's menus as a reference point

in designing DNB's menus, to having done market research on INO, and to having used INO

as a "comparable" during the DNB design process. _Supra_, SOF 52-70.

*DNB*: *Other than Justin Dalenberg and Ken Heers, and to a lesser degree John Burtka, DNB principals and agents had little familiarity with INO or its alleged trade dress. Griffin Zotter (who INO falsely asserts played a "principal role" in designing DNB's packaging and marketing the DNB brand) has never even been to an INO or visited the INO website. Zotter dep. p. 10 (never been to an INO); p. 16 (did not visit website) (INO Ex. 20). DNB strongly denies using INO menus as a reference point in designing its menus; the sign maker Johnson Signs searched and consulted images of INO menu enclosures to help design DNB's enclosures, particularly the tilted top section. Jim Johnson dep. 26-33, 59-60 (Ex. AA).*

> Reply: The litany of admission and acknowledgments in SOF 52-70 speak for themselves. Again, INO's characterizations of Mr. Zotter's testimony are accurate, and DNB's are not. SOF 5, 52.f, 60-66, 87-88. Regarding the design of DNB's menus, see SOF 62-65.

### 7. *Likelihood of Expansion of the Product Lines*

93.     The parties' product lines are likely to expand in such a way as to increase confusion going forward. INO's locations have steadily expanded eastward from California over the years, and are sufficiently popular that travelers from all parts of the country, including Michigan, are familiar with INO's branding. *See supra.*

*DNB*: *This statement is false. Mr. Warnick testified there are no plans to expand to the eastern US in the next 20 years. Warnick dep. 110-11 (INO SJ Ex. 43). INO's owner states that there is no likelihood of INO expanding east of Texas in her lifetime. Ex. B (Forbes Article) PageID2076. Mr. Warnick has no reason to believe the owner was misquoted, or that the statement is now untrue. Warnick dep. 113.*

> Reply: DNB again fails to respond to the statement being made. It does not (and cannot) contradict the testimony that INO has been steadily moving eastwards and is frequented by travelers from Michigan.

Moreover, DNB also again materially misrepresents the record. It quotes Mr. Warnick as saying "there are no plans to expand to the eastern US in the next 20 years." What he actually said—in response to DNB's question about INO's expansion plans in the next 20 years—was that INO is always discussion expansion, that it doesn't make written "expansion plans" at all, and that recent experience demonstrates that expansions occur organically and materialize very quickly:

> **"[W]e are always actively talking about expansion. I would say two years ago, we didn't know that we would be expanding into Idaho.· That plan has developed, and I anticipate we are about two years away now.· So the way I would answer is to say that we don't have a defined-enough expansion plan for me to define what would happen in the next ten years....**
>
> **We don't have a 20-year expansion plan. There's nothing written.·Like I say, the expansion plans have evolved on much shorter timelines than·this kind of time frame.· So it would be impossible for me to say now what expansion would look like for the next 20 years."**

DE 47, PgID 2520. Further, regarding Ms. Snyder's quoted statement in Forbes, while Mr. Warnick agreed that Ms. Snyder had spoken those words years earlier, he did ***not*** say (on the page DNB cites or elsewhere) that he "has no reason to believe ... that the statement is now untrue." To the contrary, he said that subsequent experience had proven that those words were no limitation on INO's likelihood of expansion:

> **Q.· ·Now, in the discussions that you've had about expansion in the last two years, has anything occurred in those discussions to alter what Ms. Snyder stated -- or purportedly stated in this interview?**

**A.·  ·I would say that since this time, we have opened our restaurants in Colorado.·  Colorado is an area where we received a lot of customer feedback asking us to come.·  I think the feedback -- I would say that that customer feedback also contributed to·the decision to expand into Idaho. So I would say what's happened in the·last -- in the time since is we have learned that we don't know exactly where we are going to be·expanding in the next number of years, that that's·always going to evolve, and that where customers, in a strong voice, asked for us to bring our restaurant there, if that matters to our owner, and that I can't say for sure what would happen in the next 20 years. ·But I don't think that this statement by·Ms. Snyder three years ago is a set-in-stone expansion plan for us.·  We just don't have any such·thing.**

DE 47, PgID 2520. It is a mystery why DNB feels compelled to so blatantly distort the record.

In addition, Mr. Warnick's subsequent declaration (which fills in information DNB's counsel did not ask at deposition) reinforces the fact that INO's expansion east of Colorado, and as far as Michigan, is entirely realistic. SOF 95-97; Ex. 16.

94.    INO is continuing to expand into states and areas where it does not currently have a restaurant. As one example, INO has publicly announced plans to open locations in Idaho. INO does not have a formal or informal policy in place that dictates the states or regions into which it will or will not expand. Rather, particularly in recent years, customer demand has played a key role in guiding INO's decisions about where to expand. For example, customer feedback led INO to open its locations in Colorado, a state in which it had not previously planned to expand. (Ex 43, Warnick Dep. at 109-113.)

*DNB*: -- .

Reply: DNB's wholesale admission of this statement—which reiterates that INO has no written expansion plans and makes its expansion decisions based on customer feedback—completely contradicts its response to SOF 93, and solidifies that this factor favors INO.

95.     There is no area of the country in which INO would categorically rule out expanding, including Michigan and other portions of the Midwest—especially if customer feedback asking for INO to open there was sufficiently strong. (Ex 16, Warnick Dec. ¶35.)

*DNB: Mr. Warnick's declaring that he does not "categorically rule out" expanding to Michigan means nothing. DNB does not categorically rule out opening a restaurant in Brazil. Justin Dalenberg dep. at 59 (Ex. C).*

Reply: This is sophistry, not a denial. Mr. Dalenberg's throw-away aspirational statement has no bearing on how INO discusses or conceives of the operation of its business. Mr. Warnick's declaration provides the context necessary to understand his remark. Specifically, he testified that INO's expansion into Colorado was driven by customer demand, SOF 93-94, that INO makes its expansion decisions based on customer demand, *id.*, and that INO has receive significant customer demand from Michigan. SOF 97 (which DNB admits)—all of which provides a compelling and uncontradicted evidentiary basis to conclude that the likelihood of INO expanding towards or into Michigan is substantial.

96.     INO's most fundamental rule for where it locates its restaurants is that they must be located within a day's drive of the nearest INO warehouse and processing facility, so that the

meat and other ingredients do not need to be frozen. Currently, INO has such warehousing and processing facilities in California, Texas, and Colorado. Therefore, many cities and states within the Midwest are currently within a day's drive of an existing facility. (Ex 16, Warnick Dec. ¶34.)

> _DNB_: _Regardless of feasibility, INO's owner has very publicly announced that INO will not expand to the Midwest in her lifetime. Ex. B._

> Reply: See Reply to SOF 93.

97.     INO has received a substantial amount of customer feedback urging INO to open a location in Michigan. (Ex 15, call sheet, authenticated by Ex 16, Warnick Dec. ¶36.) The substance of these comments strongly suggest that nearly every one of these customers has been to, or is at least familiar with, INO restaurants.

_DNB_: -- .

> Reply: This admission solidifies the conclusion that this factor weighs in INO's favor. See Reply to SOF 95.

98.     Several of DNB's customers have been previously familiar with INO, either because they were visiting from out of state, used to live out of state, or had encountered INO while traveling out of state. (Ex 18, Burtka Dep. at 23 (visitor from Texas); Ex 19, Justin D. Dep. at 68 (visitor from California)); Ex 52, Joel D. Dep. at 28-29 (visitor from California); _cf_. Ex 18 (Burtka Dep.) at 24 (visitors from Ohio).)

_DNB_: -- .

> Reply: This admission helps establish that INO's secondary meaning, and the likelihood of confusion, extends to Michigan in part through people who travel or move there from elsewhere.

99.     "DNB intends to expand its goods and restaurants." (Ex 21, DNB Resp. to 1st RFAs, ¶22).

*DNB*: -- .

> Reply: This admission solidifies the conclusion that this factor weighs in INO's favor.

100.    Defendants admit that they have publicly expressed a hope and desire to expand their restaurant concept to other locations, including other states and conceivably even "nationwide." (2AC, DE 21, ¶26; Answer, DE 25, ¶26).

*DNB*: -- .

> Reply: This admission solidifies the conclusion that this factor weighs in INO's favor.

101.    In a May 2020 press release issued by Griffin Zotter (Ex 62, DNB 2367) and approved by John Burtka (Ex 18, Burtka Dep. at 39) that was quoted in a May 26, 2020 news article published by JTV (Ex 63, JTV Article, Dep. Ex. K), DNB announced that its Tecumseh Restaurant would be "the flagship of a national chain" (*id*.), that DNB was "insane enough to launch a high-end national burger chain in the middle of a pandemic, awesome enough to pull it off" (*id*.), and that "[t]hese restaurants aim to bring the mid-western spirit and hospitality across the nation." (*Id*.; see Ex 52, Joel D. Dep. at 80, 85 (verifying that Burtka's statements were accurately reported in the JTV article)). The press release provided a timeframe of opening "several more [restaurants] over the next couple of years with plans to go national." (Ex 62.)

*DNB*: -- .

Reply: This admission solidifies the conclusion that this factor weighs in INO's

favor.

102.    After this litigation was filed, DNB principals admitted making these statements

about national expansion, but characterized them as "hopeful," (Ex 18, Burtka Dep. at 38),

"aspirational," (*id*.), or "marketer" (*id*.) language, although not "disingenuous." (*Id*.) Burtka said

that these comments about national expansion were designed to make DNB seem more

appealing and thus "increase[] [its] likelihood of success." (Ex 18, Burtka Dep. at 38; Ex 19,

Justin D. Dep. at 57 ("John liked to say very grandiose things [s]uch as 'national chain'") All of

DNB's founders "ran with that interesting news angle of a group of guys in Tecumseh launching

a national burger chain in the middle of a pandemic.'" (Ex 18, Burtka Dep. at 43.)

*DNB*: -- .

Reply: This admission solidifies the conclusion that this factor weighs in INO's

favor.

103.    Also in May 2020, Burtka repeated the message of national expansion in social

media posts. For example, on May 25, 2020, Burtka shared the JTV article on Facebook, which

he did "because I want people on my page to read it and go to the restaurant." (Ex 18, Burtka

Dep. at 44-45.) When a regular customer of another of Burtka's restaurants commented on DNB

being a "national chain," Burtka responded, "Why not?" (Ex 64, Dep. Ex Z; Ex 18 Burtka Dep.

43-44). Another person commented that DNB should open a location in Arizona. (Ex 64, Dep.

Ex Z; Ex 18 Burtka Dep. 44-45).Burtka clicked "like" on both of these comments, among others.

He did so because, "with Facebook, ... if you like something, it actually gets more airplay," (Ex

18, Burtka Dep. at 44-45)—in other words, it would be seen by more users.

> _DNB_: -- .

>> Reply: This admission solidifies the conclusion that this factor weighs in INO's

>> favor.

104.    At a minimum, DNB's principals have expressed, and continue to express, an

intention to expand across the Midwest. (Ex 48, Dep Ex C, DNB 283 ("we plan to open more

locations across the state and most certainly the Midwest"); Ex 19, Justin D. Dep. at 58 ("mostly

we talked about rustbelt, so that's my interpretation of nationwide in the next coming years, like

... Michigan, Ohio, Indiana, Illinois, Tennessee, Kentucky, Missouri, Arkansas .... Basically

what's defined as the Midwest."); Ex 52, Joel D. Dep. at 27 ("I think that sums it up right there,

generally Midwest ... it's a big area I know"); Ex 49, Heers Dep. at 46-47 ("Justin and I -- Justin

especially was pretty firm that we were going to grow this chain throughout the Midwest, the

Rust Belt ... I'm not prepared to put, you know, specific definition on what ... that means. In

general speaking, the Midwest."); Ex 18, Burtka Dep. at 35 ("expansion regionally across the

Great Lakes"); _id_. at 37 (same).)

> _DNB: All of the hopeful quotes in these comments and ambitious statements to the
> press relate back to the period around the time DNB opened its first restaurant. These
> and other comments by DNB's principals about their hopes of nationwide or regional
> expansion were plainly aspirational._

>> Reply: Not so. DNB continues to plan on regional expansion; see SOF 105.

>> Moreover, DNB did not begin to distance itself from these "ambitious"

statements until *after* they were sued, which decreases the credibility of their subsequent denials.

105.    But even now, DNB's principals "[w]ould not rule out going past the Midwest." (Ex 19, Justin D. Dep at 59.); *see also* Ex 49, Heers Dep. at 47 ("We really have no desire to go out to the west coast. We're not going to necessarily limit ourselves and say that we will never plan to do it if we get to that point, but our sights are really set on the Midwest.")

> <u>DNB</u>: *DNB is working hard to make its restaurants successful, and do hope that they will someday expand throughout the Great Lakes Region and even through the Midwest. Practically speaking, however, such expansion is years away. "Right now, practical is within 20 or 30 minutes drive of our core location." Justin Dalenberg dep. 59-60 (Ex. C).*

>> <u>Reply</u>: This is an admission that DNB continues to plan on regional expansion; see SOF 105. Moreover, DNB did not begin to distance itself from its "ambitious" statements until *after* they were sued, which decreases the credibility of their subsequent denials.

## F.    **DNB's Counterclaims**

106.    When asked in discovery to identify "each INO representation that was allegedly 'false or misleading'" in its trade dress application, the only specific argument DNB identified was its argument that the $100 million figure was not specific to the applied-for trade dress. (Ex 17, DNB Resp. to 1st Interrog. ¶13).

> <u>DNB</u>: *DNB has made clear its position that INO grossly misrepresented both the amount of advertising it expended and the subject of that advertising (i.e., promoting its food services in general, versus the promoting the specific trade dress at issue in its registration application).*

*Reply*: Notably, DNB does not suggest *where* or *how* it made this position clear, and it is not INO's or the Court's job to search the record for such statements. DNB's interrogatory response, which was never supplemented, speaks for itself.

107.    DNB deposed Lynne Boisineau, the attorney who at the time was with McDermott Will & Emory and represented INO with regard to its application to register the Registered Trade Dress. She verified her own belief in the accuracy and good-faith nature of INO's representations and arguments to the USPTO, and denied any intent to defraud. (Ex 41, Boisineau Dep. at 29 ("I understand trade dress law, and to the best of my ability, I read what the examiner asked for and I made what I thought were appropriate arguments."); *id.* at 31-32 (same).)

<u>DNB</u>: *As an attorney and INO's agent, Ms. Boisineau owed a duty of candor to the Trademark Examiner. 37 C.F.R. § 11.1 (this part governs practice of law before the Trademark Office); § 11.303 (duty of candor).*

<u>Reply</u>: Exactly. To the extent DNB's non sequitur response has any bearing, it merely underscores the reliability of Ms. Boisenau's representations to the USPTO, since she understood very well her duty of candor.

## G.    <u>INO's Attempt to Resolve the Dispute</u>

108.    On July, 3, 2020, counsel for INO delivered a letter to Defendants expressing INO's concerns with DNB having multiple examples of similarities to the INO Trade Dress and requesting that Defendants take voluntary action to change certain items to avoid confusion with the INO Trade Dress. (Ex A to the 2AC, DE 21, PgID 191-192.)

<u>DNB</u>: *-- .*

109.    On July 4, 2020, Dalenberg responded to INO correspondence by email. His message revealed personal familiarity with INO and the INO Trade Dress, but entirely rejected INO's concerns and refused (on behalf of all Defendants) to take any corrective action by stating, "I'd like to point out a couple of facts so you understand how hilarious your claims are … I'm flattered that [INO] believes we are utilizing elements of their brand but I assure you that we are not and I'm happy to argue any point you send my way". (Ex B to the 2AC, DE 21, PgID 194-195.) In responding to INO, Justin Dalenberg also commented that "[DNB]'s menus are completely different," even though DNB later confirmed that DNB (and Justin Dalenberg personally) did indeed model DNB's menu boards on INO's menu boards. *Supra*, SOF 63-65.

> DNB: *Again, DNB did not or model its menu boards based on INO's menu boards. Jim Johnson, DNB's sign maker, modeled DNB's menu enclosure structures on INO's structures which he searched and found on the internet, with Justin Dalenberg's approval.*

> Reply: INO relies on its statements and replies above.

<u>REPLY</u>

**I.    DNB's Inferences and Suppositions Cannot Support a Fraud Claim**

DNB's only bases for its "fraud" argument are (1) that part of the $100 million figure INO cited as advertising expenditure went to advertising overhead, and (2) that the advertising promoted INO generally rather than its trade dress specifically. Both arguments overlook the fact that, far from "rejecting" INO's other evidence of secondary meaning, the Examiner had already *invited* INO to amend its application to seek registration under §2(f) *based on* that evidence, submitted *before* the $100 million figure. DE 55, PgID 2731-2732. DNB merely "assume[s]," DE 57, PgID 2843, rather than showing any evidence that, the Examiner was later misled by the advertising figure. INO's inclusion of advertising overhead as a component of its advertising expenditure is plainly accurate; DNB's argument to the contrary is untimely, DE 55 PgID 2731, and based merely on its own *ipse dixit*. INO never claimed to have advertised the trade dress as such; all of its arguments cited consumers' widespread and longstanding interaction with INO restaurants bearing the trade dress, which the advertising bolstered.[3] This was part of a large body of evidence submitted over multiple filings that the Examiner found persuasive.

---

[3] DE 33-25,PgID 1090 ("*Applicant's marketing and promotional efforts ... resulted in Applicant having the highest estimated sales per unit in the US in 2010, and have led to recognition of* the trade dress shown in Applicant's Mark throughout the US by architects, advertising agencies, the restaurant industry and the relevant consuming public. Applicant has been nationally recognized ... based in part on feedback from *the large number of customers that visit Applicant's restaurants and view Applicant's Mark*, specifically Applicant's restaurant interior, on a regular basis. *Applicant has also been referenced in multiple news publications* as a favorite restaurant of celebrities and an overall popular restaurant. *This further evidences that a large number of consumers are very familiar with Applicant and Applicant's Mark*, such that consumers closely associate Applicant with Applicant's Mark." (emphasized).

1

## II.     The Registered Dress Has Both Inherent and Acquired Distinctiveness

DNB is wrong to suggest that INO's amendment of its application basis from §2(e) to §2(f) at the Examiner's suggestion is an "admission" the dress is not inherently distinctive. Those cases apply only when the applicant does not preserve its objection to the Examiner's finding.[4] INO preserved its objection here, DE 33-25, PgID 1090, and showed why its Registered Trade Dress is "unique" and inherently distinctive. DE 32, PgID 549-550, DE 55, PgID 2727-2729.

INO presented the Examiner with seven sworn declarations attesting to the distinctiveness of the Registered Trade Dress, DE 33-28, and has produced to this Court new declarations from two of these witnesses and multiple others. DE 33-28. DNB collaterally attacks the older testimony because *some* of the declarants had a business affiliation with INO to degrees DNB only speculates about. A decision to which DNB cites elsewhere refutes this argument. There, a party "criticize[d] ... testimony as ... 'self-serving,' but [had] not cited any authority that upsets the well settled principle that sworn testimony by a single witness with personal knowledge is first-class evidence, both for the purposes of trial and at the summary judgment phase.... It certainly is adequate to support a party's position in a civil proceeding, and when uncontested it can eliminate a material fact dispute." *Ready Capital Corp. v. Ready Capital Corp.*, No. 19-13536, 2021 U.S. Dist. LEXIS 76571, at *25-26 (E.D. Mich. Apr. 20, 2021).

The merits of Dr. Cunningham's survey, and the flaws of Dr. Stec's survey, are discussed

---

[4] TMEP 1212.02(c): "An applicant may argue the merits of an examining attorney's refusal and, in the alternative, claim that the matter sought to be registered has acquired distinctiveness under §2(f).... [T]he alternative claim does not constitute a concession that the matter sought to be registered is not inherently distinctive." (collecting cases); *Learning Internet v. Learn.com, Inc.*, 2009 U.S. Dist. LEXIS 126180, at *99 (D. Or. Nov. 25, 2009).

2

elsewhere. DE 31, 58. It is sufficient to note that INO only needed to prove its dress had secondary meaning *somewhere*—not *everywhere*—to obtain a registration. DNB admits INO's extreme popularity in the West. SOF 52-53, 56-58, 70. Once issued, the registration became enforceable nationwide. INO's testimony also establishes its consistent use of the dress, SOF 10, 23-25; contrary to DNB's criticisms, that use need not be universal or without minor variation.

DNB's advertising cases do not go as far as it claims. Many of them involve product design,[5] which (as discussed below) is more difficult to establish as trade dress than the décor or packaging at issue here; product designs thus require more targeted advertising evidence. The other cases cited do not close the door to the relevance of general advertising; to the contrary: "extensive advertising which results in consumer association with a single source can establish secondary meaning." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989). INO's rabid following that it commands from customers and travelers nationwide show INO's promotional activity (which extends well beyond mere print ads, and much of which DNB admits) has created wide recognition of its trade dress. SOF 16-51.

## III.  The Record Compels Summary Judgment in INO's Favor On Its Claims

### A.  <u>Trade Dress Is the Overall Impression Created By Its Elements Combined.</u>

There is nothing "overcomplicated" or "confusing" about defining a trade dress, as DNB complains. Nor has INO's identification of its trade dress changed. DNB simply misunderstands the Sixth Circuit's case law on the subject. *See* DE 55, PgID 2721-2725.

---

[5] *See Art Attacks Ink, Ltd. Liab. Co. v. MGA Enter. Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009); *Premium Balloon Access., Inc. v. Creative Balloons Mfg.*, 573 F. App'x 547 (6th Cir. 2014).

**B.  The Trade Dress Is Not Functional.** A feature is aesthetically functional if "exclusive use of [it] would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995). INO's red and white color scheme imposes no barrier to legitimate competition, as demonstrated by DNB's numerous photos of other chains using these colors in ways that do not mimic INO's appearance. Further, INO's red-white-yellow color scheme and the red and white décor are merely two of several elements of the Trade Dress, arranged in a specified manner.[6] INO does not claim all rights in all iterations of this two-color combination.

The colors themselves are not functional. What DNB calls a "replete" record actually falls short for only consisting of: one witness's statement that "red makes you hungry"; one unauthenticated, hearsay-excluded publication initially cited by the Examiner in a preliminary ruling but later disregarded when *granting* INO's application; and one INO witness who described its restaurants as "bright, white, and clean" (which says nothing about the function of the color itself). DE 57, PgID 2853. The most one can draw from this is the unexceptional observation that red is a nice color to use in restaurants. Even so, the Sixth Circuit has previously distinguished between specific colors and a party's color scheme:

> [W]hether any particular color provides a functional advantage is largely irrelevant, because Kerr does not claim trade-dress rights in any particular color. Rather, Kerr claims rights only in its overall color *scheme* .... Nothing in the record suggests that Kerr's *scheme* is 'essential to the purpose of' or 'affects the cost or quality of' the [goods.] *Qualitex*, 514 U .S. at 165. Moreover, nothing in the record suggests that Freeman would be placed at a significant non-reputation-related

---

[6] *E.g.*, the Common Law Dress specifies a white counter with red stripe and red seat cushions, among other things, while the Registered Dress depicts a specific wall tile arrangement.

disadvantage if it were forced to adopt a different scheme.... Kerr's color scheme therefore is not functional.[7]

This rationale applies equally to INO's color scheme, and to each of the other trade dress element DNB labels "functional." *See* DE 32, PgID 552-553, 565 n.10; DE 55, PgID 2726-2727.

**C. Inherent Distinctiveness.** DNB badly misrepresents *Wal-Mart Stores, Inc. v. Samara Bros*., 529 U.S. 205 (2000) as "stat[ing] that inherently distinctive packaging and design trade dress will be rare, and expressed strong concerns about the anticompetitive threat posed by strike suits asserting protectable trade dress in packaging and product design." DE 57, PgID 2855. In reality, even the language DNB quotes from *Wal-Mart* makes clear it is referring only to trade dress in *product design*—which makes sense, because products are presumptively functional and cannot be inherently distinctive as trade dress. But the very next paragraph after DNB's quote draws a sharp distinction between product design and "**the decor of a restaurant, [which] seems to us not to constitute product *design*. It [is]... product packaging—which ... normally *is* taken by the consumer to indicate origin**[.]" *Wal-Mart*, 529 U.S. at 215 (italics original, bold added). Similarly, *Golden Star* merely rejected a 12(b)(6) motion because the trade dress owner *alleged* inherent distinctiveness. It did not adopt any test. But both the *Seabrook* test it mentions and the *Gray*

---

[7] *Kerr Corp. v. Freeman Manufacturing & Supply Co*., No. 08-3330, 2009 U.S. App. LEXIS 6342, 2009 WL 750986, at *6 (6th Cir. Mar. 23, 2009); *see also Leapers, Inc. v. SMTS, LLC*, 879 F.3d 731 (6th Cir. 2018) ("there are few aesthetic designs that are so fundamental to an industry that competitors cannot fairly compete without free use of them Thus, a party's initial burden to show that a design lacks aesthetic functionality is not substantial" (cleaned up)).

case DNB cites reference the "uniqueness" of the dress; INO has shown that its dress is unique. *See* DE 32, PgID 549-550, 553-555; DE 55, PgID 2725-2726.

**D.** **Secondary Meaning** DNB doesn't like what the record reveals about its awareness of and borrowing from INO, but it points to nothing contradicting it. See SOF 52-70, 92. Further, DNB's potshots at INO's survey do not diminish the overwhelming secondary meaning it reveals, DE 58, and even its own expert's survey reveals INO has enough secondary meaning in Michigan to be actionable. DE 55, PgID 2727-2729. Surveys are useful evidence, but not crucial. DE 32, PgID 546. DNB also fails to discuss other key factors of the secondary meaning analysis, such as: consumer testimony; length and manner of use; amount of sales; and established place in the market—all of which it essentially concedes.

**E.** **Confusion and Geographic Separation.** Merely reciting minor differences between the parties' dresses, as DNB does, says nothing about their overall similarity,[8] on which consumers often remark. DE 32, PgID 559-560.

DNB now plainly paints itself as "innocent prior user"[9] because it adopted its dress in Michigan before INO opened there. DE 57, PgID 2864. Whether one draws that defense from *Allard*, as DNB does, or (more appropriately) from the *Tea Rose-Rectanus* doctrine, each hinges on DNB not having prior knowledge of INO. *See Champions Golf Club, Inc. v. The Champions*

---

[8] *GMC v. Keystone Auto. Indus.*, 453 F.3d 351, 356 (6th Cir. 2006) ("The trademarks at issue are virtually identical apparently with only trivial differences. This factor further points towards a likelihood of confusion."); *Virgin Enters. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003) ("the district court erred in concluding otherwise on the basis of comparatively trivial and often irrelevant differences"); *Sterling Drug, Inc. v. Lincoln Labs., Inc.*, 322 F.2d 968, 972 (7th Cir. 1963) (reversing decision based "on irrelevant differences between the products involved").
[9] DNB should be estopped from asserting this never-pled defense. DE 55, PgID 2735-2736.

*Golf Club, Inc.*, 78 F.3d 1111, 1124 (6th Cir. 1996); DE 55, PgID 2735-2739. Yet DNB was

intimately familiar with INO and its dress before creating its own. SOF 52-70; DE 55, PgID 2743-

2744. Further, *White Tower Sys, Inc v White Castle Sys Corp*, 90 F2d 67, 68 (6th Cir. 1937)

and other cases make clear that restaurants popular with travelers carry their reputation to other

states, preventing copycats from getting away with squatting in states before the senior user

arrives. DE 55, PgID 2735-2739. DNB again misrepresents the cases it cites on the subject.[10]

And the very next sentence after the one DNB quotes from *Champion Golf* agrees with INO that

"[m]ere geographical distance is not controlling where the reputation of the senior user's mark

has been carried into a trade area prior to the junior user's adoption and use." As DNB largely

concedes, Michigan residents, travelers; and transplants are all familiar with INO and its trade

dress. DE 32, PgID 562-563. With all the cards now on the table, DNB cannot escape liability.

INO respectfully requests that the Court grant summary judgment in INO's favor.

/s/ Brian Wassom
Warner Norcross + Judd LLP
45000 River Ridge #300, Clinton Twp, MI 48038
586.303.4139; bwassom@wnj.com

---

[10] DE 57, PgID 2861-2863. First, *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275 (6th Cir. 1997) does *not* say "only" strong likelihood of expansion supports liability. It says *the opposite*—that a strong possibility helps, but "[a] finding that the parties will not expand their markets significantly, however, "does not address" the ultimate issue of likelihood of confusion." 109 F.3d at 287. Second, *Tumblebus Inc. v. Cranmer*, 399 F. 3d 754 (6th Cir. 2005) did *not* "retreat" from *Circuit City*, but rather *agreed* "a junior mark-user's operation in a different geographic region from the senior mark-user might not, by itself, foreclose the senior mark-user's claim for infringement against the junior user." *Id.* at 765. Third, *Champions Golf* does *not* create "nationwide recognition" *requirement*; it only uses nationwide *example*. The very language DNB quotes seals INO's argument that showing recognition among an "appreciable number of customers" in Michigan is plenty. Even DNB's survey establishes a floor of 15% recognition in Michigan—more than an "appreciable number."

## CERTIFICATE OF SERVICE

I certify that on September 3, 2021, the foregoing document was filed with the Clerk of the Court, via the ECF system, which will provide electronic notification of the filing upon all parties of record.

*/s/ Kimberly Bankeroff*