## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

IN-N-OUT BURGERS,
a California corporation,

        Plaintiff,

                                  Civil Action No. 3:20-cv-11911

v.

                                  Hon. Robert H. Cleland

DOLL N BURGERS LLC,
DOLL N BURGERS TECUMSEH LLC,        Magistrate Judge Anthony P. Patti
and JUSTIN DALENBERG,

        Defendants.

---

| | |
|---|---|
| Brian D. Wassom (P60381) | Bradley L. Smith (P48138) |
| WARNER NORCROSS + JUDD LLP | ENDURANCE LAW GROUP PLC |
| 45000 River Ridge Drive, Suite 300 | 133 W. Michigan Avenue, Suite 10 |
| Clinton Township, Michigan 48038 | Jackson, Michigan 49201 |
| (586) 303-4139 | (517) 879-0253 |
| Attorneys for Plaintiff | Attorneys for Defendants |
| bwassom@wnj.com | bsmith@endurancelaw.com |

---

### PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION
### TO EXCLUDE REPORT AND TESTIMONY OF DNB'S EXPERT DR. JEFFREY STEC

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ....................................................................................... iii

ARGUMENT ............................................................................................................ 1

    A.   Dr. Stec's SM Survey is Fatally Flawed and Should Be Excluded ............................ 1

        1.   Arbitrary Removal of Trade Dress Elements From the Treatment Images ............ 1

        2.   The High Degree of Secondary Meaning in Dr. Stec's Control Images Render Them Useless as Controls ............................................................................... 3

    B.   The LOC Survey Should Be Excluded ........................................................ 5

        1.   *Eveready* is the Wrong Format Here ........................................................ 5

        2.   Dr. Stec's Images Created a Mere Reading/Memory Test .............................. 6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.*,
988 F.Supp. 322 (S.D.N.Y. 1997) ...................................................................... 7

*Instant Media, Inc. v. Microsoft Corp.*,
No. C 07-02639, 2007 U.S. Dist. LEXIS 61443 (N.D. Cal. Aug. 13, 2007) ...................... 6

*Int'l IP Holdings, LLC v. Green Planet, Inc.*,
No. 13-13988, 2016 U.S. Dist. LEXIS 41778 (E.D. Mich. Mar. 30, 2016)
(Cleland, J.) ........................................................................................ 3

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F.Supp.2d 558 (S.D.N.Y. 2007) ................................................................ 7

*Schmidt v. Quigg*,
609 F.Supp. 227 (E.D. Mich. 1985) ................................................................ 5

*Starter Corp. v. Converse, Inc.*,
170 F.3d 286 (2nd Cir. 1999) ...................................................................... 7

*Wrench Ltd. Liab. Co. v. Taco Bell Corp.*,
2003 U.S. Dist. LEXIS 7608 (W.D. Mich. May 2, 2003) .............................................. 5

**Statutes**

15 U.S.C. §1125(a) ................................................................................ 5

The Court should not overlook the glaring and fatal methodological flaws in Dr. Stec's surveys, which are evident notwithstanding DNB's retorts.[1] In particular, the flawed test and control images in the secondary meaning ("SM") survey, and the flawed design and images in the likelihood of confusion ("LOC") survey, require exclusion.

## ARGUMENT

### A.  Dr. Stec's SM Survey is Fatally Flawed and Should Be Excluded

#### 1.  Arbitrary Removal of Trade Dress Elements From the Treatment Images

It is plain as day that Dr. Stec purposefully eliminated the red-and-white palm trees from his treatment images not for any principled methodological reason, but in order to generate a result more to DNB's liking. As DNB freely admits, "One would be hard pressed to find a Californian who couldn't recognize the INO brand from the red silhouetted palm tree design" and "Palm trees are a frequent motif—printed on [INO's] plates, painted onto restaurant walls." DE 54, PgID 2691. Clearly, Stec knew any survey that included any aspect of this logo would generate significant secondary meaning results

But INO *specifically asserted* its palm trees on its cup as a trade dress element mimicked by DNB on its cup, 2AC, DE 21, PgID 159, and the palm trees are part of INO's "red and white décor" (as INO's Michelle Guzman testified[2] and DNB ignores) and are integral

---

[1] DNB is wrong to say INO's observations about Dr. Stec's lack of experience with trade dress are "false." DE 54, PgID 2689-2690. As INO explained and DNB did not refute, all but one of those cases dealt with the appearance of *products*, not trade dress—and *none* involved restaurants. DE 31, PgID 250. And it is entirely accurate to say that Stec disclaimed expertise in trademark law. DE 31-3, PgID 369.

[2] DE 31, PgID 256.

to the total look and feel of an INO restaurant.[3] For the same reasons, the neon signs form part of the "yellow accents" claimed in INO's color scheme. DNB has also admitted—again by its silence—that Dr. Stec's original excuse that these elements are separately registered trademarks is bogus; both case law and Dr. Stec's practice in other cases acknowledges there is no bar to registered trademarks being elements of a larger trade dress. DE 31, PgID 254; DE 55, PgID 2722 n.1. Neither element should have been removed when testing for secondary meaning, so Dr. Stec's results have no meaningful bearing on INO's trade dress.

Further, the distinctions between INO's Registered and Common Law dresses do not justify removing the palm trees, as DNB argues at DE 54, PgID 2692-2693. INO's registration[4] makes clear (through the use of solid and dotted lines) that it covers the counter, adjacent wall, and seating portions of the restaurant only. It does not include the other portions of the restaurant that bear the palm tree image, nor does it preclude displaying palm trees atop these registered portions of the restaurant. In her own survey, Dr. Cunningham makes clear she was testing the "registered trade dress and the additional unique [common law] elements [INO] has been using in its restaurants to complement its registered trade dress." DE 33-35, PgID 1284. DNB's admission that it removed the palm trees to test the Registered Trade Dress underscores that its survey has no bearing on INO's Common Law Trade Dress.

---

[3] As shown by their use on INO's website (DE 33-4), merchandise (DE 33-5), social media (DE 33-37, 33-38), third-party social media (DE 33-42), and third-party articles (DE 33-31).
[4] DE 33-23.

2

## 2.     The High Degree of Secondary Meaning in Dr. Stec's Control Images Render Them Useless as Controls

This Court has previously explained the purpose of controls in trademark surveys:

Controls are meant to cancel out the "statistical noise" created by survey conditions. For instance, the tendency of some respondents to simply guess creates some error. Using the control, researchers will take the level of response to the test stimulus and subtract the response that the control received. By way of illustration, if 50% of people associated an accused product with a plaintiff's product, and 10% of those people also associated (for some reason) a non-infringing control with the plaintiff's product, then one might reasonably say that there was 10% "noise" and that the actual rate of confusion was not really 50%, but closer to 40%.

*Int'l IP Holdings, LLC v. Green Planet, Inc.*, No. 13-13988, 2016 U.S. Dist. LEXIS 41778, at

*32-34 (E.D. Mich. Mar. 30, 2016) (Cleland, J.).[5] This is why Dr. Cunningham took pains to

use the most generic-looking restaurant images possible as the controls in her SM survey.

The problem with Dr. Stec's control images is that they subtract far more than "noise" from

the secondary meaning results discovered by his test survey, for two reasons.[6]

First, Dr. Stec's controls retain too much of INO's registered trade dress, since they

are simply color-shifted photographs of an INO restaurant. DNB downplays the significance

of showing the same counter shape and arrangement, but these are part of the Registered

Trade Dress, and undisputed testimony shows this counter shape is unusual in the industry.

DE 33-16, PgID 944. The images also retain the primarily white exterior, predominantly white

counter with a grey countertop, cushioned chairs, table tops with two stripes, and menu with

---

[5] (Cleaned up); *vacated after settlement*, 2017 U.S. Dist. LEXIS 67608 (Mar. 9, 2017).
[6] By saying nothing more than "I don't understand this," DNB has conceded this argument.

3

a layout including a horizontal line of boxes at the top featuring combo meals and no sizing options—all of which are elements of the Common Law Trade Dress. To the extent these similarities remind participants of INO, the "controls" account for more than "noise"—they are subtracting INO's own secondary meaning from itself.

Second, Dr. Stec's arbitrary choice to simply color everything blue did not create a generic restaurant image that accounts only for "noise." For many participants, it substituted INO's trade dress for that used by either White Castle or Culver's. A substantial number of participants in the control survey named those brands[7] (compared to 0% in the test survey),[8] and many more likely thought of those brands without giving their name. Using McDonald's as an example, Dr. Stec acknowledged the dangers of creating a "control" that bears too strong a resemblance to another company.[9] Just as the McDonald's signature golden arches would lead respondents to associate the control images with McDonald's, Dr. Stec's use of the blue-and-white color scheme led respondents to associate his control with blue-and-white restaurants such as Culvers and White Castle. Therefore, again, Dr. Stec improperly inflated the secondary meaning results in the control survey, which—when subtracted from the test survey results—led to an artificially low net secondary meaning number for INO's dress.

---

[7] DE 31-2, PgID 362; *compare* https://www.whitecastle.com/ & https://www.culvers.com/.
[8] DE 31-2, PgID 361-62.
[9] "[Y]ou want to make sure the control wouldn't be associated with one source because of other design elements, that would perhaps be associated with one company, then you could potentially consider that in the context of the control by removing those design elements." **Exhibit 10**, Deposition of Dr. Jeffrey Stec, p. 95.

These severe flaws in both the test and control images of Dr. Stec's SM Survey require its exclusion. At a minimum, the Court can conclude that the net secondary meaning number revealed by this survey, had it been done correctly, would have been substantially higher.

## B. The LOC Survey Should Be Excluded

### 1. *Eveready* is the Wrong Format Here

Likelihood of confusion here means DNB's dress "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of [DNB] with [INO], or as to the origin, sponsorship, or approval of [DNB's] goods, services, or commercial activities by [INO]." 15 U.S.C. §1125(a). Such confusion can exist regardless of whether consumers remember the name of either party. Both parties agree that *Eveready* surveys test only whether a plaintiff's *name* is "top of mind," meaning that it is the *first* name to come to mind upon seeing the stimulus.[10] Stec agrees that, in his own LOC study at issue here, if respondents thought they knew e the owner of the dress, but could not remember their name, "then essentially they would be counted as somebody who isn't confused." Ex 10 (Stec Dep. at 203-04).Therefore, as survey expert Jerre Swann says, "[f]or marks that are not readily accessible in memory, an *Eveready* may substantially underestimate the likelihood of real world confusion," and "the use of an *Eveready* alone to test likelihood of confusion may prove problematic." DE 58, PgID 2992-2993.

---

[10] *See*, *e.g.*, *Schmidt v. Quigg*, 609 F.Supp. 227, n.1 (E.D. Mich. 1985); *Wrench Ltd. Liab. Co. v. Taco Bell Corp.*, 2003 U.S. Dist. LEXIS 7608, *23 (W.D. Mich. May 2, 2003).

This also betrays Dr. Stec's results-driven motivation, since he simultaneously opined that INO's trade dress did not even have secondary meaning, let alone fame. If he actually believed that, he could not justify using *Eveready*. DNB's retort is that he was merely testing INO's *allegations* that its Trade Dress is "very strong" and "readily identifiable," rather than what Stec believed to be *reality*. But INO is only required to prove *some* degree of confusion with a mark that is *distinctive*, not "top-of-mind" status. DE 31 PgID 263 n.1. There is significant difference between even a strong mark and one "famous" enough to be top-of-mind. DE 58, PgID 2993, 3009 n.6. Since DNB's faulty logic is its only justification for using *Eveready*, its choice of format undermines the reliability of its LOC survey, especially in light of the flawed images Stec used in the survey.

## 2.    Dr. Stec's Images Created a Mere Reading/Memory Test

Dr. Stec left the DNB name on the images he used to prompt respondents' recall, in both the test and control groups. As INO has explained, DE 31, PgID 265-267, that decision further accentuates the problem with using *Eveready*, which tests for name recall, in this context. DNB is quite wrong to claim that all authorities support its approach "without exception." DE 54, PgID 2700. In reality, courts have frequently disregarded surveys that amount to "little more than a 'memory test,' measuring how many respondents who had just read the source indicators .... on a website could accurately recall them. Such a survey is *useless* in the Court's analysis in likelihood of confusion." *Instant Media, Inc. v. Microsoft Corp.*, No. C 07-02639 SBA, 2007 U.S. Dist. LEXIS 61443, at *41 (N.D. Cal. Aug. 13, 2007)

6

(emphasis added).[11] Even the Jacoby treatise cited by DNB notes ""[t]he admonition against modifying, obscuring, or removing portions of a product does not apply to all test stimuli"); Trademark Surveys, p. 495 (ABA 2013); *see id.* at 568-69 (acknowledging *Franklin* and *Malletier* opinions; "Removing the stimulus from view before asking questions is not necessarily a panacea, especially when testing for likely confusion between prominent marks as names"). By prominently retaining the DNB name on the images, Dr. Stec created a reading/memory test for respondents, rather than a useful measure of likely confusion.[12]

INO respectfully requests that the Court EXCLUDE Dr. Stec's testimony and report.

/s/ Brian Wassom
Warner Norcross + Judd LLP
45000 River Ridge #300, Clinton Twp, MI 48038
586.303.4139; bwassom@wnj.com

---

[11] *See also Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2nd Cir. 1999) (affirming exclusion of survey that "was little more than a memory test, testing the ability of the participants to remember the names of the shoes they had just been shown and gave no indication of whether there was a likelihood of confusion in the marketplace"); *Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.*, 988 F.Supp. 322, 334-35 (S.D.N.Y. 1997) ("Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion.... [T]he demonstrated ability of the present respondents, to read and remember the name 'Franklin' as having been in [the test images], [does not] adequately test the existence of confusion as to source"); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 628-29 (S.D.N.Y. 2007) ("The courts have, rightly we believe, held that surveys in which the respondents are able to read the name of the manufacturer on the product are not probative of consumer confusion"); *id.* at 631 (**this flaw "is enough on its own ... to render the survey inadmissible"**).

[12] DNB is also wrong to claim that it removed all INO trade dress elements from its control images. At least the following remain: A red logo on a white exterior; a red and white menu with yellow accents (the food) with no sizing options; employees wearing collared shirts and red and white paper hats; a white cup with a line of red graphics near the top of the cup; an open-ended burger wrapper appearing in the center of the menu; a framed photograph of a yellow classic car, emphasizing a classic car theme; and white walls with red accent panels.

## CERTIFICATE OF SERVICE

I certify that on September 3, 2021, the foregoing document was filed with the Clerk of the Court, via the ECF system, which will provide electronic notification of the filing upon all parties of record.

*/s/ Kimberly Bankeroff*