UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

IN-N-OUT BURGERS,
a California corporation,

                Plaintiff,

v.                                          Case No. 20-11911

DOLL N BURGERS LLC, et al.,

                Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION IN LIMINE, AND DENYING DEFENDANTS' MOTION IN LIMINE**

Plaintiff In-N-Out Burgers operates over 360 fast-food burger restaurant locations in seven western states. Defendants in 2020 opened two Michigan burger restaurants under the brand name Doll n' Burgers. Plaintiff alleges here that Defendants copied the overall look and feel of Plaintiff's restaurants, thereby illegally infringing both Plaintiff's registered trade dress and its protectable common law trade dress. Defendants have filed counterclaims seeking to cancel Plaintiff's registered trade dress and requesting declaratory judgment against Plaintiff's common law claims. The parties have filed cross-motions for summary judgment on all claims. Additionally, both parties have hired expert witnesses to conduct consumer surveys in support of their respective positions. After exchanging expert reports, both parties have also filed motions in limine seeking to exclude the report of the opposing parties' expert. Reviewing these motions, the court finds a hearing unnecessary. E.D. Mich. L.R. 7.1(f)(2). For the reasons provided below, the court will grant in part, and deny in part, Plaintiff's motion for summary judgment.

(ECF No. 32). The court will deny Defendants' motion for summary judgment (ECF No. 37), as well as both parties' motions in limine (ECF Nos. 31, 38).

## I. BACKGROUND

### A. Factual Background

Plaintiff In-N-Out is a privately held company founded in California in 1948. (ECF No. 32, PageID.485.) It currently operates over 360 stores throughout California (253 restaurants), Texas (40), Arizona (34), Nevada (21), Utah (11), and Colorado (4). (*Id.*, PageID.494; ECF No. 37, PageID.1864.) Plaintiff, a fast-casual eatery which is primarily known for its premium hamburgers, indicates its plans on continuing to expand in the future and contends that it has already developed nationwide recognition and brand awareness. In support, Plaintiff cites the location of its stores in popular tourist destinations, its social media presence, and the positive media attention it regularly receives from food critics and celebrities. (ECF No. 7, PageID.44.)

The primary Defendants are Doll n' Burgers Tecumseh, LLC, and Doll n' Burgers Jackson, LLC. Each entity is a holding company for one of the two Doll n' Burgers restaurants in Michigan (ECF No. 37, PageID.1864-65.) Additionally, Plaintiff has named three additional Defendants: Justin Dalenberg, the restaurants' founder and principal owner; Doll n' Burgers, LLC, an entity that holds Defendants' trademarks; and Veritas Vineyard, LLC, a related entity that makes products for the restaurants and performs certain "back office" functions for them such as marketing and accounting. (*Id.*)

Defendants opened their two first restaurants in 2020. The restaurant features hamburgers, milkshakes, French fries, and poutine. According to Defendants, the name "Doll n' Burgers" is a phonetic pronunciation of Dalenberg's last name. When creating

the concept for the restaurant, Dalenberg stated that he conducted case studies of several comparable restaurants, including In-N-Out, and he admitted to eating at an In-N-Out location during 2019 with another investor, Ken Heers, for the purpose of "scoping out the competition." (ECF No. 32, PageID.505.)

Dalenberg and Heers chose the color scheme (primarily red, black, and white) and interior/exterior design for the Tecumseh, Michigan restaurant—located in a former Taco Bell building—which opened in July 2020. (*Id.*, PageID.505-07.) A Veritas Vineyard employee, after consulting images of other restaurants online, designed graphics, uniforms, and packaging. (*Id.*, PageID.508.) Defendant Dalenberg worked with a sign company to develop both interior and exterior menu boards. (*Id.*) Dalenberg sent an email to the sign company providing an In-N-Out menu board as an example, and when the sign company provided their proposal to Defendants, it explicitly used pictures of In-N-Out's interior and exterior ordering boards in the mockups for Doll n' Burger's signage, marking them as the "existing" design on the proposal. (ECF No. 33-54, PageID.1620-21.)

*Doll n' Burgers Tecumseh Location*




 

(ECF No. 7, PageID.49; ECF No. ECF No. 37, PageID.1909; ECF No. 39-1, PageID.1989-90.)

Defendants opened the Jackson location in November 2020; since the existing building had exposed brick interior and exterior walls, the dining room has a somewhat different look. But Dalenberg made "some aesthetic choices that were kind of imported from the Tecumseh location to Jackson to create a consistent look and feel between the two locations" (ECF No. 33-52, PageID.1607.) Defendants have expressed a desire to grow their concept into a larger brand, though the parties dispute the intended scope of this desired expansion. (ECF No. 32, PageID.536.)

***Doll n' Burgers Jackson Location***

 

(ECF No. 7, PageID.49; ECF No. ECF No. 37, PageID.1909; ECF No. 39-1, PageID.1989-90.)

### B. Plaintiff Alleged Trade Dress

Plaintiff argues that Defendants' design choices make the look and feel of Doll n' Burger's restaurants confusingly similar to In-N-Out's ("INO") well-established "registered" and common law trade dresses covering the design of its stores.

### 1. "Common Law" Trade Dress

Plaintiff states that "[s]ince at least 1960, INO has consistently and exclusively used a combination of specific design elements in its restaurants and product packaging to indicate In-N-Out as the source of its goods and services." (ECF No. 7, PageID.45.) In its complaint, Plaintiff lists nine elements that "collectively" form its common law trade dress:

a. A color scheme consisting of red and white with accents of yellow or gold;

b. A primarily white exterior with a low red stripe and red awnings;

    c.  Red and white interior décor, including a white counter featuring a stripe in red with a grey countertop, red cushioned chairs and red table tops, and grey floor tiles;

    d.  A menu with a red and white color scheme and layout including a horizontal line of boxes at the top featuring combo meals with no sizing options;

    e.  White cups with red graphics featuring a line of palm trees near the top of the cup;

    f.  Employee uniforms featuring white collared shirts, red aprons, and red and white hats (both baseball caps and paper hats);

    g.  Using open-ended burger wrappers;

    h.  The use of the single letter "N" in the name;

(*Id.*, PageID.45-46.)

Many of the elements comprising the common trade dress can be seen in the following images Plaintiff provided:

 






(ECF No. 32, PageID.513-15.)

### 2.  Registered Trade Dress

In 2015, Plaintiff was also awarded a US Patent and Trademark Office ("USPTO") Registration for a trade dress depicting the interior of an In-N-Out restaurant. Plaintiff refers to this registered trade dress as a "subset of the Common Law Trade Dress." (ECF No. 32, PageID.487.) The certificate for Registration No. 4839216 lists the elements that comprise the registered trade dress.

Trade dress consists of a three-dimensional trade dress depicting the interior of a restaurant. The interior includes white sectional dividing walls having horizontal rows of red stripes. The interior also includes clear glass panels positioned above parts of the dividing walls. The interior also includes a customer seating area with booths, barstools and chairs, wherein the chairs are red, the barstools are white, and the booths have red upholstery, and white countertops and tabletops. The interior further includes a customer ordering area with sections of red tile walls and white tile walls around the customer ordering area and a silver counter. The INO Registered Trade Dress is depicted below; the matter shown in broken lines is not part of the mark and serves only to show the position of the mark.

(ECF No. 39-4, PageID.2085.)

When Plaintiff first sought registration of the trade dress in 2014, it submitted an application alleging that the trade dress depicted in the three-dimensional image was "inherently distinctive" under the Lanham Act.  (ECF No. 32, PageID.488.) In denying the application, the USPTO Examiner noted that a trade dress can only be considered as "'inherently distinctive if its intrinsic nature serves to identify a particular source.'" (ECF No. 39-5, PageID.2088 (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000)).) While noting that case law suggested some restaurant interiors are unique enough to qualify as inherently distinctive, the Examiner found that Plaintiff's proposed trade dress did not meet the standard. (ECF No. 33-24, PageID.1085.) Instead, the Examiner found Plaintiff's proposed trade dress was "a mere refinement of common features of fast food restaurant interiors." (*Id.*) The examiner cited images of other restaurants and commonly available designs of commercial furniture to support its conclusion that because "red and white elements are commonly used in restaurant interior design . . .  the public is unlikely to see the applicants . . . trade dress as inherently distinctive." (*Id.*)

8

After its initial appeal was denied, Plaintiff instead applied to register the mark under 15 U.S.C. §1052(f), commonly referred to as a "Section 2(f) registration." (ECF No. 32, PageID.488.) Section 2(f) allows an applicant to officially register a trade dress that has been used for five or more years if the applicant can show that the trade dress "has become distinctive" in the marketplace through its use so that it is recognized by members of the public. *See* 15 U.S.C. §1052(f). The amount of distinctiveness required for such a Section 2(f) registration is lower. Plaintiff provided several pieces of evidence supporting its Section 2(f) application. These include a declaration that Plaintiff "had spent in excess of $100 million on a combination of radio, television, outdoor and print advertising;" five declarations for members of the public affirming that they
perceived Plaintiff's trade dress as distinctive; online reviews and articles observing the consistency and distinctiveness of the trade dress; media coverage to demonstrate Plaintiff's popularity. (*Id.*) The Examiner ultimately found that Plaintiff's trade dress had, in fact, acquired distinctiveness in the marketplace. (*Id.*)

### C. Claims Asserted

Plaintiff brings two federal claims and three state law claims against the Defendants. Count I seeks injunctive relief and monetary damages for "trademark infringement" under the Lanham Act, 15 U.S.C. § 1114(1) for imitating Plaintiff's registered trade dress. (ECF No. 7, PageID.59-60.) Count II claims unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) for misleading the public by adopting an "infringing dress" that imitates Plaintiff's "common law" trade dress. (*Id.*, PageID.61.)

Plaintiff also asserts a claim for "unfair competition" under Michigan law (Count III), a claim for violation of the Michigan Consumer Protection Act M.C.L. § 445.903 (Count IV), and a claim of unjust enrichment (Count V). Both parties agree, however, that the court need not separately address the Michigan law claims when adjudicating the present motions because "all rely on a finding both protectable trade dress and infringement" under the same standard as the federal claims. (ECF No. 37, PageID.1913.)

Defendants have asserted two counterclaims. The first counterclaim seeks cancelation of Plaintiff's registered trade dress, arguing that Plaintiff's application contained "false or misleading" representations. (ECF No. 25, PageID.211-15.) Defendants' second counterclaim seeks a declaratory judgment "that [Plaintiff's] trade dress is not protectable because it has not acquired secondary meaning," and that it has not infringed on Plaintiff's trade dress. (*Id.*, PageID.215-16) Defendants also included a jury demand "for all jury-triable issues." (*Id.*)

The parties' cross-motions for summary judgment essentially cover all claims that have been asserted.

## II. MOTIONS IN LIMINE

Before reaching the merits of the cross-motions for summary judgment, the court must first make a preliminary ruling on each party's respective motion *in limine* seeking to determine the admissibility of the testimony and reports of two expert witnesses. Defendants move to exclude an expert report and testimony by Dr. Isabella Cunningham. She conducted online consumer surveys testing if Defendants' trade dress has acquired secondary meaning and whether there exists a likelihood of

confusion between the parties' stores. (*See* ECF No. 38.) Plaintiff has filed its motion in limine seeking to exclude the testimony of Defendants' expert, Dr. Jeffrey Stec, who conducted his own consumer surveys on the same topics yet, perhaps unsurprisingly, reached opposite conclusions. (*See* ECF No. 31)

The parties' respective reasons for the exclusions of their opponent's expert reports are legion. At the onset, the court views both sides' scattershot approach to discrediting the opposing expert with a degree of suspicion. *See* Thomas McCarthy, *Trademarks and Unfair Competition* § 32:178 (5th ed.) ("It is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by another. . . [o]ne must keep in mind that there is no such thing as a 'perfect' survey."). And, as the court explains below, neither party has overcome the general rule that "[m]ethodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004); *see also Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) ("As long as [a survey is] conducted according to accepted principles . . . survey evidence should ordinarily be found sufficiently reliable under Daubert. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value."); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006), aff'd, 502 F.3d 504 (6th Cir. 2007).

## A.  Standard

The court may, before trial, determine the admissibility of evidence through a motion in limine. "A motion in limine is a request for guidance by the court regarding an

evidentiary question." *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983). It is a procedural vehicle "to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013). "[A] preliminary ruling allows the parties to consider the court's ruling in formulating their trial strategy." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994). The court has "[b]road discretion . . . in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005) (quoting *Romstadt v. Allstate Ins.*, 59 F.3d 608, 615 (6th Cir. 1995)).

"Relevancy is the threshold determination in any decision regarding the admissibility of evidence; if evidence is not relevant, it is not admissible." *Koloda v. General Motors Parts Div.*, 716 F.2d 373, 375 (6th Cir. 1983). "The standard for relevancy is 'extremely liberal' under the Federal Rules of Evidence." *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) (quoting *United States v. Wittington*, 455 F.3d 736, 738 (6th Cir. 2006)). Under Federal Rule of Evidence 401, "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence . . . [and] the fact is of consequence in determining the action."

Not all relevant evidence is admissible. Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The court has "very broad discretion in making this

12

determination." *United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir. 2017) (quoting *United States v. Semrau*, 693 F.3d 510, 523 (6th Cir. 2012)).

Expert testimony is subject to additional screening. Pursuant to Federal Rule of Evidence 702, an expert witness's testimony is admissible only if it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993). In determining reliability, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93.

The *Daubert* Court provided a nonexclusive list of factors that courts should consider when analyzing reliability: "(1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error; and (4) general acceptance." *First Tenn. Bank Nat'l Ass'n v. Barreto,* 268 F.3d 319, 334 (6th Cir. 2001) (citing *Daubert,* 509 U.S. at 593-94) (quotation marks and alterations omitted). However, the test for determining reliability is "flexible," and the court is given "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141-42 (1999) (citing *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143 (1997)) (emphasis in *Kumho*).

An expert's testimony should be excluded when it "amounts to mere guess or speculation." *United States v. L.E. Cooke Co., Inc .,* 991 F.2d 336, 342 (6th Cir.1993). However, "where the opinion has a reasonable factual basis, it should not be excluded." *Id.* "[M]ere weaknesses in the factual basis of an expert witness' opinion bear

on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir. 2000) (citation and alterations omitted).

### B.  Expert Credentials

"It is now commonly accepted that consumer surveys are admissible in trademark actions and may provide strong evidence on issues of secondary meaning and likelihood of consumer confusion." *Leelanau Wine Cellars*, 452 F. Supp. 2d at 777-78 (citing *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 298, 312 (6th Cir. 2001) ("Because the determination of whether a mark has acquired secondary meaning is primarily an empirical inquiry, survey evidence is the most direct and persuasive evidence.") (quotation omitted)); *see also Simon Property Group L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1038 (S.D. Ind. 2000) ("Consumer surveys are generally accepted by courts as one means of showing the likelihood of consumer confusion."). And, "[t]he proponent of the survey bears the burden of establishing its admissibility." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988).

Dr. Isabella Cunningham was retained by Plaintiff; she conducted both a secondary meaning and a likelihood of consumer confusion survey. (*See* ECF No. 39-19, PageID.2452-74.) Dr. Cunningham is the chair of "Advertising and Public Relations" at the University of Texas at Austin, where she has taught for 20 years, has a number of academic publications to her name, and has "been retained as an expert witness in several lawsuits." (*Id.*, PageID.2471-72.) Defendants do not challenge her credentials; they only challenge her methodology.

Defendants retained Dr. Jeffery A. Stec, who conducted his own surveys on secondary meaning and likelihood of confusion. Dr. Stec is the managing director of

14

Berkeley Research Group's Intellectual Property Practice, he has a Ph.D. in economics and "has 17 years of experience in the areas of antitrust, finance, intellectual property, and survey research, both as a consulting expert and as an expert witness." (ECF No. 39-1, PageID.2039.) His resume indicates that he has provided expert testimony in past trademark cases, which required him to conduct both "secondary meaning" and likelihood of confusion" surveys. (*Id.*, PageID.2041.) But Plaintiff argues that Dr. Stec should be excluded as an expert because his past survey experience involved conducting consumer surveys with regard to trademarks, *not trade dress*. (*See* ECF No. 31, PageID.250.) And Plaintiff notes that Dr. Stec has never handled a case involving "the quick service industry" specifically. (*Id.*)

As a preliminary matter, the court rejects Plaintiff's attempt to exclude Dr. Stec based on his credentials. While trade dress involves some unique factors, the legal standards utilized are closely aligned, and the consumer survey methodology used for trademark and trade dress are largely interchangeable. Dr. Stec's past experience, conducting both likelihood of confusion and secondary meaning surveys, provides him with sufficient experience to serve as an expert here. As a result, the court's analysis below focuses only on challenges to the methodology used by each expert.

### C. Secondary Meaning Surveys

The parties and their respective experts provide dueling surveys that attempt to test if In-N-Out's "trade dress" has acquired secondary meaning among customers. For each survey, the court provides a summary and then addresses methodological challenges asserted in the dueling motions in limine.

15

### 1. Dr. Cunningham's Secondary Meaning Survey

Using an internet survey company, Dr. Cunningham conducted a survey with 404 subjects comprising a representative sample from the adult populations of "Arizona, California, Colorado, Nevada, Oregon, Texas, and Utah" who had recently eaten at, or planned to eat at, a quick service restaurant. (ECF No. 39-19, PageID.2456, 68.) She first showed all survey participants an introductory image collage—three photos of Apple stores—and asked if "[f]rom what you know, are retail establishments with this appearance/design likely to be owned or operated by one company, more than one company, no company, or don't you know?" (*Id.*, PageID.2460.) After this introductory question, the survey then showed each participant a set of two images. Half saw Cunningham's test images, and the other half saw control images. (*Id.*, PageID.2458.) The two photo collages shown to participants consisted of either the interior and exterior of an In-N-Out location (test) or a collage of images from other fast-food restaurants (control). Neither the test nor the control images had any reference to the restaurant brand name.

After participants viewed either the test or control images, they were again asked if "appearance/design likely to be owned or operated by one company, more than one company, or don't you know?" (*Id.*, PageID.2466.) If the respondents answered one company, they were asked to specify, "what company do you associate the overall appearance/design of the restaurant you just saw?" (*Id.*, PageID.2467.) To reach her conclusion, Dr. Cunningham took the 92.5% of respondents that identified the overall appearance of the In-N-Out restaurant test images as coming from one company and subtracted the 31.5% that identified the restaurants in the control images as coming

from one company, to arrive at here conclusion that a net 61% of respondents attributed the trade dress of the In-N-Out restaurant to one source. (*Id.*, PageID.2468.) And she highlighted that "(46%) of the subjects who stated that the restaurant they saw in the test survey was owned by one company specifically mentioned In-N-Out as that company" when asked if they recognized the restaurant shown. (*Id.*, PageID.2469.) Cunningham concluded that there is "a clear indication that In-N-Out trade dress has acquired secondary meaning." (*Id.*)

Defendants, and their expert Dr. Jeffery Stec, attack the survey arguing that it should be excluded under *Daubert* because it is "the product of unreliable principles and methods," Defendants further question the survey's probative value. (ECF No. 38, PageID.1922.) Specifically, Plaintiffs contends that Dr. Cunningham (1) failed to evaluate the trade dress actually asserted by Plaintiff; (2) failed to utilize the proper control; (3) "failed to remove indicators of source stimuli;" (4) utilized the wrong target population; (5) utilized a leading survey design. Plaintiff, in turn, contests each point. (*See* ECF No. 58.)

To start, the court finds that Dr. Cunningham's use of potentially underinclusive test images does not necessitate exclusion of the secondary meaning survey. Defendants assert that "all nine [alleged] common law" elements of Plaintiff's purported trade dress and "all six features" of its registered trade dress were not shown in the test images. But Defendants cite no case law supporting their implicit proposition that a survey cannot test the "overall appearance" of a retail establishment unless every possible element of the trade dress is visible in the test images. (*See* ECF No. 38, PageID.1933.) As Plaintiff points out, ensuring that every element of the alleged In-N-

17

Out trade dress was visible in the test photos here would have likely required a large number of images—a survey design decision that could itself have introduced other biases into the results. Defendants can argue at trial that the underinclusive set of images employed by the survey weighs against the relevance of its results, but this alleged methodological defect clearly does not justify exclusion.

While the court largely agrees with Defendants' next criticism—that the unrelated styles of the restaurants shown in the survey's control images at least somewhat inflated the 61% net distinctiveness result—the court finds this limitation also goes to the weight that the survey should be given by the factfinder, not to admissibility. *See Leelanau Wine Cellars*, 452 F. Supp. 2d at 786. The factfinder, viewing the control images used, can judge the degree of bias these images may have introduced. Because the control images are not blatantly inappropriate, the court finds this criticism is not grounds for wholesale exclusion of the survey.

Defendants further criticize Dr. Cunningham's decision to only remove the In-N-Out sign and name from the test images she employed. Specifically, they contend that Defendants should have removed "a horizontal line of palms trees" on the walls, and a yellow "quality you can taste" neon sign since both elements are not included in the trade dress Plaintiff alleges here and both are separately trademarked. (*See* ECF No. 38, PageID.1936.) Defendants' criticism may have some validity; certain authorities on survey design have argued it is proper to limit other non-trade-dress stimuli that might be independently recognizable when surveying secondary meaning. *See* Jacob Jacoby*, Trademark Surveys: Designing Implementing and Evaluating Surveys,* § 7.21.5 (2013) (asserting that a survey testing for secondary meaning should "obscure the brand and

company names and other source-identifying indicia (such as slogans)" that are not part of the trade dress). But what constitutes such "source-identifying indicia" is a close judgment call that depends on the underlying facts of the case. While Defendants may fairly disagree with the expert's judgment call, this clearly does not evince a significant methodological error. Courts in the past have still relied on secondary meaning surveys even though they might have contained such extra indicia. *See, e.g., Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500, 515 (M.D. Pa. 1998) (relying on a secondary meaning survey despite the defendant's argument that "additional elements" that were not part of the alleged trade dress "gave the survey respondents additional clues for the source of the dress").

Likewise, the inclusion of the test question at the beginning of the survey was clearly not a vast departure from accepted methods for such surveys. *See* McCarthy, § 12:16 (5th ed.) ("The most widely used survey format to resolve a genericness challenge is the 'Teflon' format. . . A 'Teflon Survey' is essentially a mini-course in the generic versus trademark distinction, followed by a test."). The use of such an introductory question seems to be a common part of the survey method employed. *Id.*

The closer question is whether Dr. Cunningham's decision to limit her survey sample to seven western states undermined the validity of the survey for purposes of determining secondary meaning of the trade dress. "Courts consider the selection of the proper universe as one of the most important factors in assessing the validity of a survey as well as the weight that it should receive." *Leelanau Wine Cellars*, 452 F. Supp. 2d at 781; *see also Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264 (5th Cir. 1980) (stating that "one of the most important factors in assessing the validity of an

opinion poll is the adequacy of the 'survey universe,' that is the persons interviewed must adequately represent the opinions which are relevant to the litigation"); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003) (Edmunds, J.) ("Selection of a proper universe is so critical that even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.") (quotation omitted).

Determining the proper population for a secondary meaning survey in the present case is complex because there are essentially two different trade dresses at issue: (1) a narrower, registered trade dress covering certain elements of the restaurant's interior, and (2) a broader common law trade dress. Plaintiff has alleged both that Defendants "intentionally" copied its trade dresses (*see* ECF No. 7, PageID.60-61), *and* that its trade dress has "gained nationwide secondary meaning." (*see id.*, PageID.57).

Since "Dr. Cunningham admits [in her deposition that] her survey did not test whether [Plaintiff]'s trade dress had secondary meaning in Michigan or across the entire United States," Defendants argue that this survey has no probative value for purposes of the present suit as Plaintiff "must prove its allegation that its trade dress has nationwide secondary meaning."  (ECF No. 38, PageID.1938; ECF No. 63, PageID.3284.) Defendants reason that it "cannot be the law" that "Plaintiff is only required to show secondary meaning *somewhere,*" since "tens of thousands of small vendors and diners could meet that low burden by limiting the survey universe of patrons to local patrons." (*Id.*, PageID.3284 (quotation omitted).) Plaintiff responds that Dr. Cunningham "selected a proper target population. . . by limiting her secondary

meaning [survey] to the universe of states with" In-N-Out locations. (ECF No. 58, PageID.3010.)

Defendants are correct that, at common law, a trade dress is "entitled to protection . . . only in the [geographic] area within which he had established secondary meaning" this is commonly known as either the concurrent use or Tea-Rose/Rectanus doctrine.[1] *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 987 (9th Cir. 1995) (citing *Bank of Texas v. Com. Sw., Inc.*, 741 F.2d 785, 789 (5th Cir. 1984)); *see also Allard Enters. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 571-572 (6th Cir. 2001); Joseph Michael Levy, *The Confusion of Trademark Territoriality,* 18 Chi.-Kent J. Intell. Prop. 324, 327 (2019) ("[Under the] common law concurrent use doctrine: similar marks may be used in remote geographic areas by good faith users, and if the area of use overlaps, exclusive rights belong to the first user."). However, under this doctrine, "[a] senior user may assert superior rights against an innocent junior user only in areas where the senior user has developed a reputation, but may assert superior rights as against a non-innocent junior user regardless of the area in which the junior user employs the mark." *Wigs for Kids, Inc. v. Wigs 4 Kids of Michigan, Inc.*, No. 17-11471, 2017 WL 6539271, at *5 (E.D. Mich. Dec. 21, 2017) (Edmunds, J.).

In *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*—another restaurant trade dress infringement suit brought by a growing burger chain—the Ninth Circuit held that

---

[1]     The fact that "[r]egistration under the Lanham Act confers upon the registrant nationwide trademark rights based on 'constructive use,' regardless of where the registrant actually uses the mark," thereby abrogating the common's law geographic limitations is a major benefit of such a registration. Joseph Michael Levy, *The Confusion of Trademark Territoriality*, 18 Chi.-Kent J. Intell. Prop. 324, 331 (2019) (citing 15 U.S.C. § 1057(c)).

Fuddruckers was not required to establish secondary meaning in Arizona if it could "show that its trade dress had acquired secondary meaning among some substantial portion of consumers nationally." 826 F.2d 837, 844 (9th Cir. 1987). The defendants in *Fuddruckers* were indisputably aware of Fuddruckers' unique restaurant interiors by the time they opened a new lookalike restaurant in Arizona because they had unsuccessfully sought to obtain a Fuddruckers franchise. *Id.* at 840. Consequently, *Fuddruckers* has also been noted to stand for the proposition that a plaintiff alleging intentional copying of a trade dress needs to make only a more geographically limited showing of distinctiveness. *See Adray*, 76 F.3d at 988 (citing *id.*) ("In *Fuddruckers* the alleged infringer had adopted its mark in bad faith with the intention of capitalizing on Fuddrucker[s'] goodwill, and bad faith adoption of a mark is a generally recognized exception to the requirement that secondary meaning be shown *in a disputed area*.") (emphasis added). *See also White Tower Sys. v. White Castle Sys. of Eating Houses Corp.,* 90 F.2d 67, 69 (6th Cir. 1937) (noting that the common law concurrent use doctrine only applies when "the junior user had no knowledge of the originator's trade mark and no intention to copy it").

The factual posture of this case is almost directly analogous to *Fuddruckers*; here, Plaintiffs alleged their trade dress has already acquired nationwide secondary meaning, and Defendants have admitted to significant exposure and familiarity with Plaintiff's alleged trade dress. In short, Plaintiff has two routes to establishing an enforceable, common law trade dress based on acquired secondary meaning. Plaintiff can demonstrate that the look of In-N-Out's restaurants has "acquired secondary meaning among some substantial portion of consumers nationally" *or* it can use a

narrower survey to help establish secondary meaning in a more limited geographic region and still pursue a claim for infringement if it can show Defendants (1) had "knowledge of" the trade dress and (2) intentionally copied it. *See id.* at 69; *Fuddruckers*, 826 F.2d at 844. While Dr. Cunningham's use of a sample that is not nationally representative at least somewhat reduces the survey's relevance as to the former question, Defendants nevertheless had knowledge of Plaintiff's trade dress when they developed Doll n' Burger. The survey at issue thus remains potentially relevant. After all, Plaintiff can still pursue a common law claim for intentional trade dress infringement even if its survey can only prove the trade dress had acquired distinctiveness on the west coast. *Adray*, 76 F.3d at 988; *see also Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 418 (6th Cir. 2006) (articulating the seven-factor test for determining whether a trade dress has acquired distinctiveness through secondary meaning). And of course, Plaintiff also does not need to establish nationwide secondary meaning before it can pursue an infringement claim based on its narrower registered trade dress. *See* 15 U.S.C. § 1072.

In sum, Defendants have failed to demonstrate that Dr. Cunningham's secondary meaning survey is so flawed in methodology or scope that it cannot be considered by the factfinder at trial. And although the survey does not test nationwide secondary meaning, it remains relevant to at least some of the questions at issue in this case, so the court also declines to exclude it under Rule 403.

## 2. Dr. Stec's Secondary Meaning Survey

Defendants' expert, Dr. Stec, prepared a rebuttal survey also testing the secondary meaning of the alleged trade dresses. Dr. Stec surveyed 501 adult

participants nationwide who indicated that "[i]n the last 12 months, they personally had purchased a hamburger/cheeseburger from a quick-service restaurant, and/or, in the next 6 months, they plan to purchase a hamburger/cheeseburger from a quick-service restaurant." (ECF No. 39-1, PageID.2022.) Participants were randomly divided into a treatment group and a control group. (*Id.*, PageID.2023.) "For the treatment group, respondents were shown images of the In-N-Out Burger restaurant, which included the alleged INO Trade Dress." (*Id.*) "For the control group, the same In-N-Out Burger restaurant images were used, but the alleged trade dress was removed" by changing red elements in the images to blue, removing glass dividers, and changing the color of other hard surfaces. (*Id.*) "In both the treatment and control images, the 'In-N-Out Burger' logo, the trademarked Palm Tree Design, and the yellow [neon] 'quality you can taste' sign were removed from the exterior and interior of the restaurant." (*Id.*) Respondents were then asked if they associate "restaurants that look like this with one company or more than one company?" (*Id.*, PageID.2033.) And participants were also asked if they could identify the restaurant the images showed. (*Id.*)

"When respondents from the treatment group were asked about the origin of In-N-Out Burger restaurant with the INO Trade Dress, 45.9% of those respondents associated that quick service restaurant with one company." (*Id.*, PageID.2036.) While 31% associated the control images with one company. In contrast to the net 61% secondary meaning found by Dr. Cunningham, this result meant that Dr. Stec found only 15% "net" secondary meaning. (*Id.*)

Plaintiff first challenges the modifications Dr. Stec made to the treatment images in his survey. Plaintiff contends that he "inexplicably removed [trademarked] elements"

from the test images, including bands of red palm trees on the restaurant walls, and a repeating band of red palm trees on a drink cup. (ECF No. 31, PageID.255.) Defendants respond, in the main, by noting that the palm tree graphics on the walls Dr. Stec removed from his test images were not included in Plaintiff's register trade dress, nor were they included in the enumerated elements of the common law trade dress alleged in Plaintiff's complaint. (ECF No. 54, PageID.2692.) Reviewing the complaint, this observation is correct.[2] (*See* ECF No. 7, PageID.45-16 (listing elements of Plaintiff's alleged trade dress).)

Additionally, Defendants argue that Dr. Stec also removed the palm trees—a registered trademark itself—from the cups in his test photos because, like the name In-N-Out, this trademark constituted a "source-identifying indicia" that needed to be obscured to properly test the entire trade dress. (ECF No. 54, PageID.2692.) As the court has already explained above, some "[p]roduct modifications are . . . acceptable . . . when testing for secondary meaning." Jacoby, § 7.21.5. For instance, in *Hershey*

---

[2]  While Plaintiff now contends that one of its employees explained in her deposition that the palm tree motif on the walls should be considered part of its trade dress, (*see* ECF No. 61, PageID.3254), such testimony is irrelevant to determine the components of the alleged common law trade dress. Plaintiff cannot modify its alleged trade dress simply by later expanding the definition through deposition testimony. If Plaintiff wanted to modify the trade dress it alleged in its detailed complaint, it could have moved to amend its complaint. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 634 (6th Cir. 2002) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir.1997)) ("'[F]ocus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market.'").

*Foods*, the court endorsed the plaintiff's decision to remove not only the trade name "Reese's," but also "the sawtoothed top of the peanut butter cup shape," from images of a bag of "Reese's Pieces" candy when testing for secondary meaning of the packaging. 998 F. Supp. at 510, 515-19. The court reasoned that the sawtooth shape was well known enough on its own that it was reasonable to remove it to avoid overwhelming the rest of the trade dress being tested in the survey. *Id.* In a unique juxtaposition, given the evidence it has submitted in support of its brand's national reputation, Plaintiff is essentially arguing here that its ubiquitous red palm tree mark is *not* well-known enough that it would overwhelm attempts to test for secondary meaning of the trade dress as a whole. Plaintiff is free to make this argument to the factfinder—at its own peril—but the validity of Dr. Stec's removal of the palm trees, just like Dr. Cunningham's decision to leave them in, is a judgment call based in part on the expert's assessment of underlying disputed facts. This is not grounds for the complete exclusion of an expert report through a motion in limine.

Next, Plaintiff argues that Dr. Stec's use of improper control images "cuts against the reliability of the survey." (ECF No. 31, PageID.257.) Plaintiff asserts that "Dr. Stec's controls manages to have both independent secondary meaning and too many similarities to [Plaintiff]'s trade dress." (*Id.*) Since Dr. Stec's control images are simply photoshopped pictures of an In-N-Out restaurant—with trademarks obscured, glass dividers removed, and the colors changed from red & white to blue & grey—Plaintiff notes that the control images retain some design elements, like the overall layout of the restaurant, the shape of the counter, and general design patterns of the tile walls that are depicted in the three-dimensional image of its registered trade dress. (*Id.* (citing

ECF No. 33-23, PageID.1078).) While at the same time, Plaintiff alleges that adoption of a blue and grey color scheme "was so distinctive that it led respondents to associate the control with . . . Culvers and White Castle" because they use such a color scheme. (*Id.*, PageID.259.)

These two arguments cut against each other. The court agrees as it did with Defendants' criticism of Dr. Cunningham's control images, that the controls selected by Dr. Stec may be introducing some level of bias into the results. (Predictably, both experts seem to have selected control images that would likely lean toward their client's preferred secondary meaning determination.) While the features that Dr. Stec failed to remove from the control were not enumerated as part of either the common law trade dress alleged in the complaint, or specifically listed in the registered trade dress, these features do show up in the registered dress's three-dimensional graphic so it would likely have been best to not have them reproduced in the control images. But again, since the control images chosen by Dr. Stec are not blatantly improper, given the trade dress elements specifically asserted by Plaintiff's complaint, it will be up to the factfinder to decide how much weight should be given to the respective surveys. *See Leelanau Wine Cellars*, 452 F. Supp. 2d at 786.

Finally, Plaintiff argues that Dr. Stec used the incorrect universe for the survey when he limited the population to adults who had recently "personally purchased" from a fast-food restaurant.[3] (ECF No. 31, PageID.261.) Plaintiff is concerned that freeloaders (the court's term)—who ate at a fast-food restaurant in the past six months only when

---

[3]     Plaintiff also raises a minor quibble about the wording of one of the survey questions, but the court finds the survey question at issue to be easily comprehended as written.

someone else paid for the meal, and who apparently also don't plan to invest in a hamburger any time in the next six months—are excluded from the sample based on the definition that Dr. Stec used. The court is highly skeptical that the inclusion of the word "personally" caused any material change in the survey's population or led to bias in its results. Regardless, such a minor criticism also does not support exclusion of Dr. Stec's expert report. *See* McCarthy, § 32:162 ("In most cases, the selection of an inappropriate universe will lessen the weight of the resulting survey data, not result in its inadmissibility.").

### D. Likelihood of Confusion ("LOC") Surveys

### 1. Dr. Cunningham's LOC Survey

Dr. Cunningham also conducted a separate survey "to determine whether the trade dress of [Doll n' Burgers] causes a likelihood of confusion with the trade dress of [Plaintiff's] restaurants among U.S. consumers who are customers or potential customers of quick service restaurants." (ECF No. 39-18, PageID.2394.) When reviewing survey methodology, it is important to remember that "[a]t bottom, . . . a survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace." *Simon Prop. Grp. L.P.*, 104 F. Supp. 2d at 1038.

Dr. Cunningham determined that the target population for her internet survey was "adults who live in Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin who had eaten inside a quick service restaurant in the previous 12 months or were planning on eating inside a quick service restaurant in the following 6 months," she surveyed 415 respondents.

(ECF No. 39-18, PageID.2400, 03.) She utilized a "modified squirt format" for the survey. (*Id.*, PageID.2398.)

> The survey was designed to split respondents into four cells based on the combination of image sets seen; the "Test #1" cell was first shown the Plaintiff's image set (images 1, 2, 3, 4) then shown the Defendant's image set (images 5, 6, 7, 8); the "Test #2" cell was first shown the Defendant's image set (images 5, 6, 7, 8) then shown the Plaintiff's image set (images 1, 2, 3, 4); the "Control #1" cell was first shown the Plaintiff's image set (images 1, 2, 3, 4) then shown the Control image set (images 9, 10, 11, 12); the "Control #2" cell was first shown the Control image set (images 9, 10, 11, 12) then shown the Plaintiff's image set (images 1, 2, 3, 4). In aggregate, half of the respondents saw the Defendant's image set (images 5, 6, 7, and 8) and the other half of the respondents saw the control image set (images 9, 10, 11, and 12)

(ECF No. 39-1, PageID.1961.) After viewing these images, participants were asked if they thought, "the restaurant that you saw first and the restaurant that you saw second are owned by different companies, by the same company, or don't you know?" (*Id.*) Respondents who did not indicate that the two restaurants are owned by the same company in the first question were then queried in a follow-up question, whether they thought the two restaurants shown were "affiliated or associated or connected." (*Id.*, PageID.1962.)

Controlling for "noise," Dr. Cunningham concluded that "[a]lmost half (49.3%) of consumers who are exposed or will be exposed to both [In-N-Out] restaurants, and the [Doll n' Burger] restaurants are likely to be confused into believing that both restaurants are owned by the same company or are owned by companies that are affiliated or connected." (ECF No. 39-18, PageID.2431.) She further explained that "[w]hen asked why they thought the restaurants were owned by the same company, while 52% of them referred to the [In-N-Out] registered trade dress, 44% mentioned the colors and color

scheme displayed in the interior of both restaurants and 21% referred to some of the elements of the '[Plaintiff's] Common Law Trade Dress.'" (*Id.*)

Defendants argue that "Dr. Cunningham's LOC report suffers from at least five major flaws, any one of which would justify exclusion under FRE 702." (ECF No. 38, PageID.1922.) Defendants state that (1) the LOC survey "failed to utilize a proper survey design;" (2) "improperly removed indicators of source from stimuli;" (3) failed to address the asserted issue of "forward confusion;" (4) used flawed control images; (5) failed to utilize the proper target population. (*Id.*)

First, the court rejects Defendants' contention that Dr. Cunningham's choice of the "modified squirt" survey method makes it invalid. The "Squirt format" employed by Dr. Cunningham, and the "Eveready" format employed by Defendants' expert Dr. Stec, represent the two leading formats "used to test for confusion of source or connection." *See* McCarthy, § 32:173 ("A likelihood of confusion survey that makes use of neither the Eveready nor Squirt formats [is] highly suspect and require[s] an explanation for its basis.") As such, the general propriety of both the Squirt or Eveready formats for testing LOC is well established. Defendants argue that the Squirt format should not be used here because "the Squirt test is not appropriate where the marks are not used in the same market," basing this proposition on assertions made by their expert Dr. Stec. (ECF No. 38, PageID.1924.) In the present situation, the court finds that the choice between these two court-endorsed survey formats is necessarily a professional judgment call that goes only to the weight the survey should be given, not its inherent reliability.

This fact is perhaps best highlighted by Dr. Stec's own methodology in another recent trademark case. In that case, Dr. Stec utilized the "modified Squirt" method to conduct a survey testing the level of confusion between the names of two real estate companies who "d[id] not serve the same geographic regions." *See Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, No. A-19-CV-696-RP, 2020 WL 710198, at *3 (W.D. Tex. Feb. 12, 2020). In *Rex Real Est*, the court rejected an almost identical argument in favor of excluding Dr. Stec's own use of the *modified Squirt format*—as opposed to the Eveready format—by noting that "[b]ecause the strength of Real Estate's mark is disputed, [as was the potential for direct competition,] this argument is at best premature, and Stec's methodology cannot be deemed unreliable on this basis." *Id.* The court reaches the same conclusion here.

Second, the court finds that Dr. Cunningham's decision to remove the name "Doll n' Burgers" completely from the photos used in the survey—as opposed to merely substituting in fake names like Dr. Stec's survey—is a methodological decision within the bounds of accepted practice for such surveys. Plaintiff's briefing notes case law finding that the deletion of such branding is the proper approach to a likelihood of confusion survey because removing such branding prevents the survey from turning into a "reading test" where participants simply answer survey questions with the name they see in the pictures. *See, e.g.*, Starter *Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (affirming the exclusion of a LOC survey where the district court found "that the survey was little more than a memory test, testing the ability of the participants to remember the names of the shoes they had just been shown and gave no indication of whether there was a likelihood of confusion in the marketplace"); *Malletier v. Dooney*

& *Bourke, Inc.*, 525 F. Supp. 2d 558, 628-29 (S.D.N.Y. 2007) ("The courts have, rightly we believe, held that surveys in which the respondents are able to read the name of the manufacturer on the product are not probative of consumer confusion.").

Other experts and courts have taken the opposite view; finding the removal of such branding creates conditions that do not accurately reflect whether actual confusion would occur in the real world where consumers are always able to view the name of the establishment along with the rest of the trade dress. *See, e.g.*, *Schwinn Bicycle Co. v. Ross Bicycles*, Inc., 678 F. Supp. 1336, 1343-44 (N.D. Ill. 1988), *vacated on other grounds*, 870 F.2d 1176 (7th Cir. 1989). ("[In a] likelihood of confusion survey, . . . removing the manufacturer's name eliminates a cue as to the origin of the product—a cue which in an *actual* purchasing situation might well reduce the level of confusion."); *Beverage Mktg. USA, Inc. v. S. Beach Beverage Corp.*, No. 97CIV.4137(LMM), 2000 WL 1708214, at *2 (S.D.N.Y. Nov. 15, 2000) (discounting a likelihood of confusion survey because the survey compared the bottles without their labels, "a very significant element of their trade dress"); Vincent N. Palladino, *Surveying Secondary Meaning*, 84 Trademark Rep. 155, 164 (1994) (noting that modification "[c]reating a 'prop' for a secondary meaning survey should not be confused with failing to replicate the market place in a likelihood of confusion survey").

But Jerre Swann, an expert in trademark survey design who is cited extensively in both parties' expert reports, states that such design decisions "are typically a matter of expert choice." *See* Jerre B. Swann, *A Reading Test or a Memory Test: Which Survey Methodology Is Correct*, 95 Trademark Rep. 876, 880 (2005). And, the Jacoby treatise notes, "[t]hough every likelihood of confusion . . . survey must have used one or

the other approach, most courts opining on such matters provide neither favorable nor unfavorable comments on either approach." Jacoby, § 7.61.2. Since neither party has cited a controlling precedent taking one view or the other regarding this issue, the court also declines to wade any more deeply into this methodological disagreement. After all, when weighing the results of the competing likelihood of confusion surveys, the factfinder can simply be informed, through other expert testimony, that Dr. Cunningham's decision to eliminate the restaurant name means her survey is likely to at least somewhat overestimate the amount of consumer confusion found.

Third, the court finds that Dr. Cunningham's decision to randomize the order in which survey participants saw the image sets is not a serious methodological error. If Defendants were actually concerned that randomizing the order of the image sets affected the outcome of the survey in a statistically significant way, they could have easily tested this hypothesis by requesting a breakdown of survey results by order of display during discovery. Instead, Defendants present the court with mere speculation. And, in any event, the difference between forward and reverse confusion is not especially important here, "while certain circuits have adopted a different test for claims of forward and reverse confusion, the Sixth Circuit is not one of them." *Progressive Distribution Servs., Inc. v. United Parcel Serv.*, Inc., 856 F.3d 416, 431 (6th Cir. 2017) (citing *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 640 (6th Cir. 2002) ("the presence of a reverse confusion claim does not alter this analysis.")).

Fourth, Defendants argue that "Dr. Cunningham's choice of control stimuli also hopelessly corrupts her survey" because she "modified and chose photographs from four different restaurants that were widely dissimilar from the Doll n' Burger . . . images

she presented as test stimuli." (ECF No. 38, PageID.1928.) Defendants explain that because the chosen controls did not "share as many [non-trade-dress] characteristics with the experimental images as possible," Dr. Cunningham "depressed the single-source confusion in the control group, resulting in artificially inflated 'net' confusion." (*Id.*) Plaintiff responds by arguing that Dr. Cunningham did a reasonable job of selecting control images that were similar in character to the test images while ensuring that no "non-asserted" trade dress elements tainted the results by "artificially inflating the confusion numbers." (ECF No. 58, PageID.3002.) While the court finds it likely that the control images selected by Dr. Cunningham may have introduced some bias into her survey results—thereby inflating the amount of confusion observed—the court also recognizes that the selection of control images is a professional judgment call made within a spectrum of possible options. Since Dr. Cunningham's selections were not blatantly improper, any bias these images may have introduced can simply be considered by the factfinder when weighing the value of this survey. *See*, *e.g.*, *Ducks Unlimited, Inc. v. Boondux, LLC*, No. 214-cv-02885-SHM-TMP, 2017 WL 3579215, at *29 (W.D. Tenn. Aug. 18, 2017) ("limit[ing] the importance it accord[ed to a] study in its likelihood of confusion analysis" because of "[plaintiff]'s failure to use a proper control image.").

Fifth, the court rejects Defendants' argument that the target population selected by Dr. Cunningham evinces a serious methodological flaw. While Defendants take issue with the fact that Dr. Cunningham selected a target population consisting of twelve "mid-western states," instead of just Indiana, Michigan, and Ohio as used by Dr. Stec, this is not a methodological criticism but instead a factual dispute—essentially dueling

interpretations of what Justin Dalenberg meant when he testified in his deposition that he reasonably hoped to expand Doll n' Burger throughout the "midwest." As the court has already noted, a Daubert challenge is not the proper vehicle for raising such a factual dispute. *See Rex Real Est. I,* 2020 WL 710198, at *3. In any event, since In-N-Out has no locations in any of the states Dr. Cunningham surveyed, it seems a dubious assumption that the use of this wider survey population had a statistically significant effect on the survey's results.

### 2. Dr. Stec's LOC Survey

Dr. Stec conducted his own "rebuttal" likelihood of confusion survey for Defendants. "To show the impact of the severe flaws [in] Dr. Cunningham's survey," he limited his survey population to residents of Indiana, Michigan or Ohio who "personally had purchased a hamburger/cheeseburger and/or a hotdog from a quick-service restaurant" in the last year "and/or" planned to do so in the next six months. (ECF No. 39-1, PageID.1977.)

Dr. Stec utilized the Eveready survey format, where a treatment group was shown a set of images from a Doll n' Burgers restaurant, and the control group was shown the same set of images after they were modified to remove "accused trade dress." (*Id.*, PageID.1980.) "To do this, every instance of 'Doll n' Burgers' was changed to 'Doll & Burgers,' the red awnings, stripes, and umbrellas in the exterior photo were changed to grey, and the red stripes on the counter were removed." (*Id.*)

After viewing the test or control images, respondents were asked a number of questions inquiring if respondents had an opinion about what company puts out the

products from the restaurant in the photos or if they thought the restaurants were sponsored by or affiliated with another company.  (*Id.*, PageID.1992, 2000.)

Based on responses from 488 participants, Dr. Stec reached the following conclusion:

> When respondents from the treatment group were presented with the set of Doll n' Burgers' restaurant images, 80 of the 243 respondents (32.9%) indicated they had an opinion about what company or brand puts out the Doll n' Burgers' restaurant, but only 2 respondents (0.8%) named In-N-Out Burger as the company or brand. When respondents from the control group were presented with the set of modified Doll n' Burgers restaurant images, 73 out of 245 respondents (29.8%) indicated they had an opinion about what company or brand puts out the modified Doll n' Burgers restaurant. Of these respondents, 4 (1.6%) named In-N-Out Burger as the company or brand that puts out the modified Doll n' Burgers restaurant.177 Accordingly, after controlling for pre-existing beliefs, guesses, and other background noise, this net result of-0.8%

(*Id.*, PageID.2002.)

Plaintiff's argument begins by criticizing Dr. Stec's use of the Eveready format because the format "is appropriate for well-known top line brands, or brands that are nationally well-known" but not for less well-known marks. (ECF No. 31, PageID.262.) "Unlike the 'Squirt' format, the 'Eveready' survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience" as they are not shown pictures of the senior mark during the survey. McCarthy, § 32:174. Plaintiff, in its complaint, took the position that its trade dress has "gained nationwide secondary meaning" because it has "served thousands of out-of-state customers. . . through its locations in tourist and other popular areas that are extensively visited by customers from all over the United States (including Michigan)," (ECF No. 7, PageID.43-44, 57.) But Plaintiff now argues that "Dr. Stec's failure to consider the possibility—which is not [Plaintiff]'s position—that its trade dress

36

has strong secondary meanings in some areas and more modest secondary meaning in others," thereby making Dr. Stec's use of the Eveready format inappropriate.

As the court has already explained, however, the choice between these two accepted survey formats is unlikely to be grounds for the complete exclusion of one survey when the parties also dispute the geographic reach of the underlying senior trade dress. *See Limited v. Macy's Merchandising Group Inc*, 2016 WL 4094913, *9 (S.D.N.Y. 2016), aff'd, 695 Fed. Appx. 633 (2d Cir. 2017) (noting that the Eveready format is "widely accepted" where the two marks do not appear in direct proximity in the marketplace.); McCarthy, § 32:173. Despite finding little nationwide secondary meaning in his other survey, Dr. Stec was on solid ground in assuming nationwide recognition, for the purposes of his LOC survey, because Plaintiff strongly and repeatedly alleged such nationwide brand recognition existed for In-N-Out in its complaint.[4]

Next, Plaintiff alleges the test images employed by Dr. Stec are flawed because he did not remove the name of Defendants' restaurant. (ECF No. 31, PageID.265.) The

---

[4]     The court also notes that even if it accepted Plaintiff's argument and excluded Dr. Stec's LOC Eveready format survey on such grounds, it would not necessarily help Plaintiff's overall case. *See* Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 728 (2016) ("The two formats, neither singly nor in combination, are comprehensive in their coverage. There is, for example, no appropriate format for a senior mark that is: (i) neither sufficiently accessible in memory to be cued (in an Eveready) by a monadic exposure to a similar junior use; (ii) nor sufficiently proximate to the junior use in the marketplace so that a (Squirt) dual exposure represents the real world experienced by consumers."). Since In-N-Out and Doll n' Burgers do not currently operate in the same markets, Plaintiff's argument against the Eveready format here does not lead inexorably to a conclusion that its own LOC survey utilizing the Squirt format should be relied on by the court. Instead, if Plaintiff's argument is correct, the most logical conclusion is likely that "both survey instruments" are inapplicable here, a finding that itself "counts against actual confusion" in a likelihood of confusion factorial analysis. *See Hypnotic Hats, Ltd. v. Wintermantel Enterprises, LLC*, 335 F. Supp. 3d 566, 597 n.10 (S.D.N.Y. 2018).

court has already discussed this issue at length when considering the validity of Dr. Cunningham's LOC survey, which took the approach Plaintiff advocates for here. And, as the court explained, there is a split among experts regarding the best approach to trademark names in secondary meaning trade dress surveys. Consequently, it is clearly inappropriate to exclude Defendants' survey simply because it chose not to remove the restaurant name while testing the likelihood of confusion. *See* Jacoby, § 7.61.2.

Finally, Plaintiff criticizes Defendants' control images because Dr. Stec "simply changed the name 'Doll n' Burgers to 'Doll & Burgers' and removed some red accents and stripes." (ECF No. 31, PageID.267.) But Plaintiff fails to provide a convincing explanation of how these control images, which deleted stated elements of Plaintiff's registered and common law trade dresses, were so inappropriate that they justify the report's complete exclusion. At most, the images caused the survey to somewhat underestimate the potential for confusion. In sum, Plaintiff has failed to present any convincing reason to exclude Dr. Stec's LOC of confusion survey, so like the three surveys before it, the court finds excluding this survey on a motion in limine is inappropriate.[5]

---

[5]    Plaintiff raised two other arguments trying to exclude Dr. Stec's LOC survey that the court sees no need to address at length. First, Plaintiff raises essentially the same "improper universe" argument that the court discounted regarding Dr. Stec's secondary meaning survey. The court's reasoning rejecting this argument applies equally here. Second, Plaintiff argues that "Dr. Stec created bias by asking his permission questions before his affiliation questions." (ECF No. 31, PageID.268.) This argument receives only the most cursory treatment in Plaintiff's briefing, and in any event as the court has repeatedly explained above, any minor biases introduced by survey techniques can be considered by the factfinder.

### III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

The court next addresses the parties' cross-motions for summary judgment. The court finds that Plaintiff should be granted summary judgment on Defendants' counterclaims and that Plaintiff is entitled to a finding that its registered trade dress is valid and has acquired secondary meaning as a matter of law. And the court holds that both Plaintiff's registered and common law trade dresses are primarily non-functional. Still, Plaintiff's summary judgment motion is denied because it has not proven every element of its claims. By contrast, Defendants' motion for summary judgment is denied *in toto.*

### A. STANDARD

To prevail on a motion for summary judgment, a movant must show—point out—that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presentation that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement, however, that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary judgment, "the evidence [must be] such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

## B. DISCUSSION

Section 43(a) of the Lanham Act provides a private cause of action for violations of protected trademark rights:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

The protection provided by the Lanham Act "is not limited to goods, services or commercial activities protected by registered trademarks," but "extends as well, in certain circumstances," to both registered and unregistered "trade dress." *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1238 (6th Cir. 1991). Trade dress "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) (quotation omitted). "It embodies that arrangement of identifying characteristics or decorations connected with a product,

40

whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale." *Ferrari*, 944 F.2d at 1238-39 (quotation omitted).

"[T]o recover for trade dress infringement under § 43(a), a party must prove by a preponderance of the evidence: 1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (citing *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000)). "The first two elements are the requirements for protectability, and the third element is the standard for evaluating infringement." *Id.* "All three of the foregoing requirements . . . are elements of a trade-dress infringement claim, not defenses to such a claim." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 504 (6th Cir. 2013) (citing *Lanard Toys*, 468 F.3d at 414).

But "[o]nce a mark [or trade dress] is registered, the [Lanham] Act affords a plaintiff one of two presumptions: (1) that her registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark [had obtained a] secondary meaning." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 514 (6th Cir. 2007) (quoting *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001) (citing 15 U.S.C. §1115(a)) It also "creates a rebuttable presumption" that the trade dress is "non-functional." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (citations omitted).

Since Defendants contest Plaintiff's ability to meet all three prongs required for protectability under the Lanham Act, the court begins its analysis by assessing whether Plaintiff has been able to satisfy the distinctiveness prong for protectability by either method. *Am. Eagle Outfitters*, 280 F.3d at 629. The court then addresses the question of trade dress functionality under the second prong. Finally, the court conducts a likelihood of confusion analysis by weighing the relevant factors and concludes that significant questions of fact remain preventing the court from granting summary judgment to either party on the ultimate issue of trade dress infringement.

## 1.  Inherent Distinctiveness

There are two possible ways of establishing whether a trade dress is distinctive in the marketplace thereby satisfying the first prong required for a valid trade dress infringement claim under the Latham Act. *See Am. Eagle Outfitters*, 280 F.3d at 635 (citing *Two Pesos*, 505 U.S. at 769). "A mark or dress can be inherently distinctive if its intrinsic nature serves to identify a particular source." *Id.* (quotation omitted). But even a non-inherently distinctive mark or dress can acquire distinctiveness through attachment of secondary meaning, which occurs when, "in the minds of the public, the primary significance of a [mark or dress] is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982). Plaintiff first asserts that its broader "common law trade dress," containing its registered trade dress as a subset, is inherently distinctive. In the alternative, Plaintiff argues that both its registered and common law trade dresses have acquired secondary meaning justifying protection.

Plaintiff's alleged common law trade dress is listed in its complaint as consisting of nine elements: color scheme, exterior decoration, colored furniture, menu layout, red & white cups with palm trees, employee uniforms, open-ended burger wrappers, "single letter 'N' in name," art with a classic car theme. (ECF No. 7, PageID.45-46.) The Registered Dress lists a number of elements concerning the layout, color scheme, and aesthetics of the restaurant's counter and seating area. Because these elements are largely a combination of unremarkable features of a 1950s car-culture-themed fast-casual burger restaurant, the court finds this alleged trade dress cannot be considered inherently distinctive.

The Sixth Circuit has previously summarized, at a generalized level, the test for determining if a trademark is inherently distinctive.

> Judge Friendly formulated a "now-classic test," *Samara Bros.*, 529 U.S. at 210, to conceptualize distinctiveness. The so-called *Abercrombie & Fitch* taxonomy deems word marks inherently distinctive when they are arbitrary ("Lucky Strike" cigarettes), fanciful ("Kodak" film), or suggestive ("Tide" laundry detergent). *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 10-11 (2d Cir. 1976). By contrast, descriptive ("Soft Soap") or generic ("soap") terms do not inherently distinguish a good as coming from a particular source. *See id.* Context is important in distinguishing among categories: whereas an air conditioning company placing a penguin on its products has selected a suggestive mark, a publishing company with the same logo has an arbitrary mark. *See Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.,* 187 F.3d 363, 369 (4th Cir. 1999). While not inherently distinctive, descriptive marks can identify a source and acquire distinctiveness if secondary meaning has attached to the term, such that consumers recognize "Soft Soap" as a product of a certain manufacturer. *See Two Pesos*, 505 U.S. at 774 (explaining 15 U.S.C. § 1052).

*Am. Eagle Outfitters*, 280 F.3d at 635-36.

"Although Sixth Circuit case law is fairly developed as to the inherent distinctiveness of word marks, it provides minimal instruction" with regard to trade dress. *Spangler Candy Co. v. Tootsie Roll Indus.*, LLC, 372 F. Supp. 3d 588, 600 (N.D. Ohio

2019). Justice White's opinion in *Two Pesos*, a case involving a trade dress infringement dispute between two Texas taco restaurant chains, expressly held that the trade dress of the plaintiff's restaurant can be inherently distinctive without the need to acquire secondary meaning. 505 U.S. at 776. But aside from reiterating the Friendly formula, *Two Pesos* does little to explain its application to a non-word trade dress as the opinion essentially accepted the factual conclusion of the district court below. *See id.* at 765.

However, other courts that have considered the inherent distinctiveness of restaurant interiors have made clear that it is challenging to demonstrate that a restaurant's overall trade dress is sufficiently distinctive to be considered "arbitrary," "fanciful," or "suggestive." In *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC,* for example, the Eleventh Circuit found that the "'composite commercial impression' created by its 'interior and layout, the prominent use of the ALE HOUSE logos throughout the restaurants, menu design and placement, method of service, and uniforms'" was not inherently distinctive at summary judgment. 702 F.3d 1312, 1323 (11th Cir. 2012). The court reasoned:

> We find nothing particularly unique in a restaurant fixing its name in red letters on the outside of its building and on its menu, branding items it sells with that name, dressing its staff in khakis and a polo shirt, featuring a center bar with a soffit, offering seating at "high-top" tables, and paneling its walls with wood. These are the prototypical features—what we might call the "common ... design," *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir.1983)—of a standard sports bar or brew pub. The particular name affixed on the wall and to menu items, the specific color of the polo shirts, the type of wood on the walls, the placement of the "high-top" tables, and the openness of the kitchen, "even if they in combination could be deemed unique," *Wiley v. American Greetings Corp.*, 762 F.2d 139, 142 (1st Cir.1985), are all "mere refinement[s]" of this "commonly-adopted and well-known form of ornamentation," *Brooks Shoe*, 716 F.2d at 858.

*Id.* at 1324. Other courts have reached similar conclusions. *See*, *e.g., Fuddruckers*, 826 F.2d 837 at 843 (declining to find the interior trade dress of a *Fuddruckers* to be inherently distinctive even though the court found it had acquired secondary meaning); *Buca, Inc. v. Gambucci's, Inc.*, 18 F. Supp. 2d 1193, 1203 (D. Kan. 1998) (finding "evidence that no other [Italian] restaurant has the precise combination of features arranged in the same excessive, irreverent manner as [plaintiff] Buca simply does not militate a finding of inherent distinctiveness" because "Buca's trade dress [was] best classified as 'descriptive'").

Here, Plaintiff has failed to establish that its trade dress is inherently distinctive; it is at most descriptive.[6] Defendants have provided a voluminous collage of images confirming the court's intuition that the different elements of the alleged common law trade dress are often used together, albeit in slightly different combinations, in burger restaurants, many of which also have dining rooms with a loosely 1950s theme. (*See* ECF No. 37, PageID.1878.) While it may be possible for this specific combination of design elements to acquire secondary meaning over time, showing inherent distinctiveness requires more. A trade dress can only be inherently distinctive if its "intrinsic nature serves to identify a particular source." *See Two Pesos*, 505 U.S. at 769. Even if the court assumes the complete list of elements alleged in Plaintiff's complaint are present in such a combination only at In-N-Out restaurants, that fact alone does not meet the standard. (Any small restaurant could surely come up with a list of design

---

[6]      While the parties dispute what kind of deference or precedential weight should be given to the USPTO's previous ruling—that Plaintiff's registered trade dress was not inherently distinctive—the court need not decide the issue here because, after reviewing Plaintiff's registered dress *de novo*, the court reaches the same conclusion.

elements and features that, in combination, theoretically make it unique so that alone cannot be the test.) And the court notes that Plaintiff's alleged trade dress is not even present in a substantial number of Plaintiff's own restaurants, an observation that further undermines Plaintiff's contention that the dress is intrinsically linked to In-N-Out. (*See* ECF No. 57, PageID.2811 (showing pictures of 68 locations from In-N-Out's website that do not have all elements of the alleged trade dress).) In sum, Plaintiff has failed to present enough evidence that would allow a reasonable factfinder to conclude that its trade dress—made from elements and designs common in fast food that are not always present in the same combination across different In-N-Out locations—should be considered inherently distinctive.

Furthermore, while it is unclear which test the Sixth Circuit would choose to apply here, *see Golden Star Wholesale, Inc. v. ZB Importing, Inc.*, 531 F. Supp. 3d 1231, 1243 n.1 (E.D. Mich. 2021) (Davis, J.), if it adopted the increasingly popular *Seabrook* test for analyzing trade dress distinctiveness, the test would also intimate that Plaintiff's trade dress is not arbitrary or distinctive as a matter of law, *see Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1978). The *Seabrook* test asks: "[1] whether [the trade dress] was a "common" basic shape or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." [7] *Amazing*

---

[7]    It appears that the USPTO has also adopted the *Seabrook* test for determining the inherent distinctiveness of a trade dress. *See* U.S. Patent & Trademark Office, Manual of Patent Examining Procedure (TEMP) § 1202.02 (July 2021). (ECF No. 33-24, PageID.1085.)

*Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 232 (5th Cir. 2010) (citing *Seabrook*, 568 F.2d at 1344). If a trade dress "fails any one of the [Seabrook] factors, then it is not inherently distinctive." McCarthy*,* § 8:13.

Here, the court finds that In-N-Out's alleged trade dress would fail both the second and third factors of *Seabrook*. Plaintiff has not established that the trade dress is unique or unusual for fast food eateries; the overall color scheme and much of the interior design "are the prototypical features" of a retro drive-thru burger restaurant. *See Miller's Ale House*, 702 F.3d at 1324. And "even if [the elements] in combination could be deemed unique, are all mere refinements of this commonly-adopted and well-known form of ornamentation." *Id.* (quotations and alterations omitted). Consequently, as a matter of law, the court concludes that Plaintiff's overall trade dress does not qualify as inherently distinctive.

## 2.  Acquired Secondary Meaning

Plaintiff next claims that even if its trade dresses are not inherently distinctive, both its common law trade dress and its registered trade dress have acquired secondary meaning in the marketplace, fulfilling the first prong required for protection under the Lanham Act. Plaintiff moves for summary judgment on this issue. Defendants also move for summary judgment, arguing that the evidence presented by the parties leads inexorably to the conclusion that Plaintiff's registered trade dress must be canceled, based on fraud in the registration process. Alternatively, Defendants contend that Plaintiff has failed to show that its broader common law trade dress has acquired secondary meaning.

Because Plaintiff's registered trade dress is given a prima facie presumption of validity, the Defendants must make a significant evidentiary showing to support their assertion that Plaintiff's registered trade dress does not have secondary meaning. *Leelanau Wine Cellars*, 502 F.3d at 514 ("Once a mark is registered, . . . [t]he effect of the statutory presumption contained in § 1115(a) is to shift the burden of proof to the alleged infringer, . . . to prove the absence of secondary meaning.") (citations omitted); 15 U.S.C. § 1115(a) (providing that registration on the principal register "shall be prima facie evidence of the validity of the registered mark. . . ."). And as explained below, a viable claim for outright cancellation of the registered trade dress, while a way around this presumption, also requires a significant evidentiary showing by the alleged infringer. By contrast, Plaintiff bears the evidentiary burden of establishing acquired distinctiveness for its alleged common law trade dress because such burden-shifting presumptions do not apply. *See Ferrari S.P.A.*, 944 F.2d at 1239 (noting that at common law the plaintiff's "burden is to show by a preponderance of the evidence . . . that [its unregistered] trade dress . . . has acquired secondary meaning").

Considering the two cross-motions for summary judgment, the court concludes that Plaintiff's *registered* trade dress is protectable as a matter of law. The court also finds, however, that a genuine factual dispute exists over whether Plaintiff's *common law* trade dress has acquired secondary meaning, and this dispute of fact prevents the court from awarding summary judgment to either party on that issue.

### a)  Registered Trade Dress

As to the registered trade dress, Defendants first argue in their summary judgment motion that fraud during the registration process should invalidate Plaintiff's

48

registration and the accompanying presumption of validity. The court finds this

argument to be unavailing.

While a third-party may always seek cancelation of a registered trade dress on

the ground that "registration was obtained fraudulently," 15 U.S.C. §§ 1064(3), 1119,

proving that a registrant engaged in fraud applying for a Section 2(f) registration is

almost always an uphill battle. Case law has imposed significant evidentiary

requirements that Defendants must fulfill when asserting such a claim:

> 'Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application.' *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986). A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. *W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.*, 54 C.C.P.A. 1442, 377 F.2d 1001, 1004 (1967). Indeed, 'the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.' *Smith Int'l, Inc. v. Olin Corp., 209 USPQ 1033*, 1044 (T.T.A.B.1981).

*In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009).

Defendants argue that Plaintiff "grossly misled the examiner concerning its

advertising expenditures" (ECF No. 37, PageID.1903), when Plaintiff submitted an

affidavit as part of its application to the USPTO stating that "[b]etween 2000 to 2012, In-

N-Out invested in excess of US $100 million on a combination of radio, television,

outdoor and print advertising," (ECF No. 39-8, PageID.2277). Defendants say that in

reality, Plaintiff spent "$[0] promoting the specific configuration of its trade dress." (ECF

No. 37, PageID.1903 (underline omitted)).

Specifically, Defendants contend that "the gist" of Plaintiff's argument to the

USPTO for Section 2(f) registration "was that its trade dress was famous and nationally

recognized as a result of over $100 million spent on 'advertising and deliberate

marketing.'" (ECF No. 37, PageID.1870.) But they contend that discovery now shows that "none of [Plaintiff]'s advertising and promotional spending was specifically directed at promoting the applied-for trade dress, as required by law." (*Id.*, PageID.1872.) Furthermore, Defendants point to a spreadsheet produced by Plaintiff that indicates that it spent only $103.6 million on its entire advertising department between 2002 and 2012—including overhead—and "Plaintiff spent only $69.4 [million] on . . . [the] 'combination of radio, television, outdoor and print advertising'" listed in the original affidavit. (*Id.*, PageID.1873.)

Plaintiff responds that Defendants' fraud argument essentially amounts to an exercise in hair-splitting since Defendants "present[] absolutely no accounting standard or other evidentiary basis demonstrating that marketing expenditures must be categorized or subject to any kind of exclusions." (ECF No. 55, PageID.2731.) Plaintiff asserts that its executive was acting honestly when he calculated advertising expenditures. And Plaintiff argues that Defendants have "no actual evidence that [the USPTO] Examiner was misled" into believing that $100 million figure was spent specifically on promoting the trade dress. (*Id.*, PageID.2730.) "To the contrary, [Plaintiff's] argument was that, by promoting its services, customers would visit its restaurants and encounter its trade dress." (*Id.*)

The court finds that Plaintiff's view is largely correct. Defendants bear the burden of providing evidence supporting their allegation of fraud in the application. *See In re Bose Corp.*, 580 F.3d at 1243, 1245 ("[W]e hold that a trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, *material* representation with the *intent to deceive* the [US]PTO.") (emphases

added); *see also* McCarthy, 31:67 ("A misrepresentation can be 'material' so as to

constitute fraud only if the registration of the mark would not have been granted in the

form it was if the true facts had been known to the USPTO examining attorney."). Here,

Defendants have failed to present sufficient evidence that would allow the factfinder to

reasonably conclude that any alleged misrepresentation was either intentional or

material. Indeed, it strains credulity to contend that the Examiner would have been

misled into believing that Plaintiff was promoting its trade dress specifically through

"radio" advertisements and materially relied on such an understanding in reaching her

conclusion. The most straightforward reading of Plaintiff's application—which asserted

that its advertising spending had "resulted in Applicant having the highest estimated

sales per unit in the US in 2010, and [has] led to recognition of the trade dress shown in

Applicant's Mark throughout the US"—is that Plaintiff was not declaring it was spending

vast sums to specifically promote its trade dress.[8] (ECF No. 39-8, PageID.2262.)

Indeed, reviewing the application, it is readily apparent that Plaintiff listed the advertising

spending figure merely as a fact supporting the popularity of its hamburgers—which are

presented to the consumer in trade dress packaging—and in turn supporting its brand

as a whole. Furthermore, to the extent Defendants argue that it was impermissible,

under USTPO guidelines, for the Examiner to count general advertising spending, not

specifically related to the trade dress, when reviewing the application, such a mistake by

the Examiner is irrelevant to the question of fraud.

---

[8]     Nor does it matter that Plaintiff may have only spent $69 million on "actual"
advertising as opposed to overheard. The court struggles to see how the difference
between $100 million and $69 million would have been material here for the purposes of
determining acquired distinctiveness.

In sum, the evidence provided by Defendants at most leads to "speculation" and "inferences" that the Examiner was misled, and as such is insufficient to sustain the burden of proof required for a claim of fraud in the application process. *See In re Bose,* 580 F.3d at 1243. Here, since no reasonable factfinder could conclude both that *intentional* fraud occurred and that it had a *material* effect on the Examiner's decision, the court must conclude, as a matter of law, that Plaintiff's registered mark should not be canceled.

The court also finds that Defendants have failed to present a viable challenge to the prima facie assumption of acquired distinctiveness for a registered mark. Again, 15 U.S.C. § 1115(a) provides that registration of a trade dress "shall be prima facie evidence of the validity of the registered mark . . . ."  Defendants' secondary meaning survey simply does not constitute material evidence capable of overcoming the presumption of acquired distinctiveness created by the USPTO registration. In support of their argument, Defendants contend that their nationwide survey found that only "15% of likely purchasers accorded secondary meaning to [Plaintiff's] alleged trade dress" and that Plaintiff's competing survey should not be considered due to its flaws. (ECF No. 57, PageID.2846.) But there is nothing in the Lanham Act that requires a registered mark to demonstrate nationwide secondary meaning before it can be enforced. *See* 15 U.S.C. §1052(f); U.S. Patent & Trademark Office, Manual of Patent Examining Procedure (TEMP) § 1212.06 (July 2021). In fact, a primary benefit of USPTO registration is it "confer[s] a right of priority nationwide," allowing a company to protect its mark/dress while it still operates in a more limited geographic market. *See* 15 U.S.C. § 1057(c). One of the purposes behind allowing 2(f) registrations is to put others on notice of the

registrant's use of a trade dress before conflicts can occur. McCarthy, § 26:42 ("The junior user has only itself to blame for the loss of good will built up around a mark adopted without searching the Patent and Trademark Office files of applications and registrations.").

So even assuming *arguendo*, that Defendants' survey establishes that In-N-Out's registered trade is *not* recognized by consumers nationwide, such evidence is of little relevance to the question of the registered trade dress's protectability. Plaintiff need not demonstrate *nationwide* secondary meaning for its registered trade dress to be protectable.[9] A nationwide survey does not negate the Examiner's conclusion that Plaintiff's dress has acquired secondary meaning in a limited geographic area.

For instance, a local retail chain could be readily granted a valid 2(f) registration after proving to the USPTO that its name possessed acquired secondary meaning in metro Detroit only; in such an instance, no one would expect a nationwide survey to indicate any significant percentage of the public recognized the mark.

Defendants fall short of the evidentiary presentation required by the statutory burden-shifting framework. *See* 15 U.S.C. § 1115(a). Defendants' nationwide survey evidence cannot overcome the presumption that a registered trade dress possesses acquired secondary meaning. Nor do Defendants present any other evidence that is sufficient to overcome its burden. Because no genuine factual dispute exists regarding this issue, the court must conclude as a matter of law that Plaintiff's registered mark

---

[9]     Defendant's arguments, and survey data showing an alleged lack of nationwide secondary meaning are still relevant to the present dispute, but they are best deployed as part of the likelihood of confusion analysis, not on the threshold question of the registration's validity.

possesses acquired secondary meaning, and Defendants' cross-motion for summary judgment must be denied as to this issue.

### b) "Common Law" Trade Dress

Plaintiff next argues that it has presented sufficient evidence to show that its broader common law trade dress has also acquired secondary meaning. To demonstrate secondary meaning for an unregistered trade dress under the Lanham Act, "the evidence must show that 'in the minds of the public, the primary significance of the trade dress is to identify the source of the product rather than the product itself.'" *Lanard Toys,* 468 F.3d at 418 (quoting *Inwood Laboratories,* 456 U.S. at 851). The Sixth Circuit applies a seven-factor test to determine whether secondary meaning exists in a trade dress: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Id.* at 418. "No single factor is determinative and every one need not be proven." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 312 (6th Cir. 2001)

In support, Plaintiff provides: 1) affidavits from third parties attesting to the distinctness of the trade dress; 2) Dr. Cunningham's survey of seven western states indicating that 61% of respondents attributed the In-N-Out trade dress to one source; 3) testimony that it has used at least some elements of the trade dress since 1992; 4) example advertisements indicating that In-N-Out has promoted its brand nationwide; 5) an affidavit indicating it currently operates over 360 stores in seven western states; 6) new articles and social media postings indicating that individuals nationwide look

forward to visiting In-N-Out locations while traveling; 7) deposition testimony by some of the Defendants and other Doll n' Burger employees that Plaintiff contends demonstrates strong evidence of copying. (ECF No. 32, PageID.555-57.)

Defendants contest each of these points in their response brief, arguing: 1) that the third-party declarations of acquired distinctiveness deserve little weight; 2) that Dr. Stec's rebuttal secondary meaning survey shows that Plaintiff's trade dress has no acquired nationwide secondary meaning; 3) that evidence suggests Plaintiff has not consistently used the claimed trade dress; 4) that neither Plaintiff's longevity and customer base nor its established place in the marketplace should be given much weight; 5) that Plaintiff is simply mischaracterizing testimony when it contends intentional copying of Plaintiff's trade dress occurred. (ECF No. 75, PageID.2844-48.) Defendants do not merely contest Plaintiff's summary judgment argument; rather, Defendants argue in their cross-motion that evidence of the common law trade dress's secondary meaning is so lacking that the court should grant them declaratory judgment on the issue. (*Id.*)

At this stage, the court need not delve into a detailed analysis and weighing of all these factors because the court finds that a genuine factual dispute exists with regard to both the applicability of survey evidence establishing secondary meaning and the existence of intentional copying. These two factors, when relevant, are often given significant weight when adjudicating a claim of acquired distinctiveness. *See Herman Miller*, 270 F.3d at 312 (emphasizing that "survey evidence is the most direct and persuasive evidence" for establishing secondary meaning); *Am. Eagle Outfitters*, 280 F.3d at 639 ("This court has long held that 'evidence of intentional copying shows the

strong secondary meaning of [a product] because [t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'") (quoting *Ferrari*, 944 F.2d at 1239); *Golden Star Wholesale*, 531 F. Supp. 3d at 1245 (noting that an "allegation[] of intentional copying . . . [o]n its own. . . may be sufficient" to establish a prima facie claim of secondary meaning).

Here, as the court has already discussed in detail while resolving the motions in limine, the parties have presented competing empirical surveys on secondary meaning. If both surveys are taken at face value, Defendants' survey—finding that only 15% of consumers nationwide attributed secondary meaning to In-N-Out's trade dress—would seem to prevail because when analyzing secondary meaning for an unregistered mark, "the focus is on the market in which the allegedly infringing defendant operates" so Plaintiff's survey of seven western states would be less directly applicable.[10] *Marco's Franchising LLC v. Marco's Coal Fired Pizza Inc.*, No. 17-CV-2550-MSK-NYW, 2019 WL 4645431, at *8 (D. Colo. Sept. 23, 2019) (citing *Adray*, 76 F.3d at 987.) ("In other words, a mark that has substantial market penetration in one location may still lack secondary meaning in a distant market where it is not so well established."). *See also*

---

[10]  Plaintiff's briefing seems to suggest that the Sixth Circuit's pre-Lanham Act decision in *White Tower Sys. v. White Castle Sys.*, 90 F.2d 67 (6th Cir. 1937), created an expectation—for fast food restaurants—from the requirement that the senior user provide evidence of secondary meaning in the disputed market. (*See* ECF No. 55, PageID.2734-35.) Plaintiff argues that because In-N-Out is "a destination eatery . . . its goodwill (i.e. secondary meaning) extend[s] to this state." (*Id.*) Plaintiff is correct that a business's trade dress can acquire secondary meaning beyond its immediate geographic market, but it must still offer proof that such good will exists in the disputed market. *See id.* (noting that White Castle, in an era before consumer surveys, provided substantial evidence of pre-existing secondary meaning in Detroit through testimony "of residents. . . who had known of the White Castle lunchrooms prior to the opening of the White Tower" and through evidence that White Castle previously "advertised in various newspapers, trade journals and over the radio" in the region).

*Lanard Toys,* 468 F.3d at 419 (noting that when considering survey evidence, "50% is generally acceptable for secondary meaning and 38% is marginal recognition"). But given the various methodological objections raised in regard to both parties' surveys, the factfinder will first need to determine if Defendants' finding of only 15% recognition nationwide should be accepted, making this issue inappropriate for resolution at the summary judgment stage.

And even if Defendants are able to show that empirical evidence does not weigh in favor of a finding of secondary meaning in the Midwest, the factfinder will still need to determine if Defendants intentionally copied the trade dress. A conclusion by the factfinder that Defendants intentionally copied Plaintiff's trade dress would be a powerful finding that could indicate acquired distinctiveness in the market nearly on its own. *See Am. Eagle Outfitters*, 280 F.3d at 639; *White Tower Sys.,* 90 F.2d at 69; *Fuddruckers*, 826 F.2d at 844. While Defendants contend that Plaintiff has failed to present sufficient evidence of intentional copying to create a factual dispute, the court disagrees. As the Sixth Circuit has made clear, "[c]ircumstantial evidence of copying. . . may be sufficient to support an inference of intentional infringement where direct evidence is not available." *Progressive Distribution Servs.*, 856 F.3d at 436.

While Plaintiff has fallen short of providing a smoking gun showing intentional copying, it has brought forth enough circumstantial evidence that the factfinder will need to weigh this evidence against testimony denying that purposeful replication occurred. Plaintiff provides evidence that Doll n' Burger's co-founders all had previously eaten at In-N-Out locations, while Defendant Dalenberg and his business associate Ken Heers, admitted to visiting a west coast In-N-Out location in 2019 to "scop[e] out the

competition." (ECF No. 32, PageID.505.) As he both devised a vision statement and conducted case studies of "comparables," Dalenberg admitted that In-N-Out was the first restaurant he considered. (*Id.*, PageID.506.) Perhaps the strongest evidence suggesting intentional copying is that when Dalenberg hired a sign company to create menu boards for the new restaurants, he emailed the sign company a picture of the In-N-Out drive-thru menu as an example. (*Id.*, PageID.508.) When the sign company provided their proposal to Defendants, it explicitly used pictures of In-N-Out's interior and exterior ordering boards in the mockups for Doll n' Burger's signage, marking them as the "existing" design on the proposal. (*Id.*; ECF No. 33-54, PageID.1620-21.) Additionally, Griffin Zotter, a marketing manager for Defendant Veritas Vineyard, who worked on aspects of the design, admitted to looking at images of In-N-Out restaurants, among other fast-food restaurants, during the design process—though he denies purposeful copying. (*Id.*, PageID.208-09.)

In sum, Plaintiff has provided sufficient circumstantial evidence to create a genuine dispute regarding whether Defendants intentionally copied significant elements of Plaintiff's common law trade dress, and so the factfinder must review this evidence and assess the credibility of Defendants' testimony directly denying such intentional copying. And since both intentional copying and empirical survey evidence are important *Lanard* factors, without resolution of these factual disputes, the court cannot reach a determination on the acquired distinctiveness of the common law trade dress at this time. Consequently, neither party is entitled to summary judgment on the issue.

To reiterate, however: these factual disputes involve only the more broadly defined common law trade dress. They do not alter the court's holding, above, that

Plaintiff is entitled to a finding, as a matter of law, that Plaintiff's more limited *registered* trade dress has acquired secondary meaning.

### 3.  Functionality

For a trade dress to be protectable under the Lanham Act, it must be primarily nonfunctional. *Am. Eagle Outfitters*, 280 F.3d at 629. "[A] product feature is functional and cannot serve as a trademark [or protectable trade dress], if it is essential to the use or purpose of the article or it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32, (2001) (quotations omitted). "A functional feature is one the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *Id.* (quotations omitted). By contrast, "an aesthetic design that merely communicates the source of the article—rather than anything about the article's use, purpose, cost, or quality—is not functional." *Leapers, Inc. v. SMTS, LLC,* 879 F.3d 731, 738 (6th Cir. 2018). While "[a]esthetic intent alone is also insufficient because some products function based on their aesthetic properties through so-called 'aesthetic functionality'. . . 'there are few aesthetic designs that are so fundamental to an industry that competitors cannot fairly compete without free use of [them].'" *Id.* at 737 (quoting McCarthy, § 7:81).

Sixth Circuit precedent also makes clear that a trade dress containing some functional components can still be protected. *Am. Eagle Outfitters*, 280 F.3d at 644 ("Even if the elements [the plaintiff] identifies were all separately functional . . . [an] arrangement of these features can constitute more than the sum of its non-protectable parts."); *see also Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 341-43 (7th Cir. 1998) (holding various elements of a cookbook's design are functional but recognizing

that their appearance in concert could garner legal protection "unless it was the only way the product could look, consistent with its performing each of the product's functions optimally"). Likewise, the same principle has been applied to restaurant trade dress. *See Fuddruckers,* 826 F.2d at 842 (noting that "[w]e examine trade dress as a whole to determine its functionality. . . functional elements that are separately unprotectable can be protected together" so "[a] restaurateur cannot prevent others from using any particular color or feature, but can protect a combination of visual elements 'that, taken together, ... may create a distinctive visual impression'") (quoting *Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336, 346 (5th Cir.1984) (citations omitted)).

The burden of proving non-functionality "rests on the plaintiff." *Am. Eagle Outfitters*, 280 F.3d at 641 (citing 15 U.S.C. § 1125(a)(3)). Defendants contend that Plaintiff's "trade dress"—presumably a combination of Plaintiff's registered trade and alleged common law trade dress[11]—is primarily functional and therefore not protectable. (*See* ECF No. 57, PageID.2852-55.) Defendants list six specific trade dress elements they allege are actually functional: the primary color scheme promotes hunger (red) and

---

[11] While Plaintiff bears the burden of proving non-functionality for its broader common law trade dress, it technically does not bear such a burden with regard to its narrower registered trade dress. *See Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.,* 461 F.3d 675, 683 (6th Cir. 2006) ("Registration of a trademark gives rise to a rebuttable presumption that the trademark is valid. The burden falls on a challenger to rebut this presumption."); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 514 (6th Cir. 2007) ("The effect of the statutory presumption contained in § 1115(a) is to shift the burden of proof to the alleged infringer."). The parties, however, did not isolate their functionality analysis between elements of the registered trade dress and the broader common law trade dress alleged by Plaintiff. Instead, they both provided one combined analysis. Given this background, the court declines to separately consider the registered trade dress, because the court finds that Plaintiff can meet the higher burden for both its registered and common law trade dress.

conveys cleanliness (white); slanted ordering counter encourages traffic flow; open-ended burger wrappers effectively hold grease and drippy condiments; classic car décor promotes higher sales; a simple menu featuring combo meals at the top promotes efficiency while increasing sales margins; red awnings are functional. Some of the elements cited by Defendants are clearly much more aesthetic in nature than functional; for instance, many burger chains are successful without pictures of classic cars on the wall, and awnings need not be red to block the sun or "add dimension" to a building's exterior. But in any event, pointing to a few elements of a store's larger trade dress that could reasonably be considered functional does not constitute a significant evidentiary dispute indicating that Plaintiff has fallen short of proving the trade dress is primarily non-functional. *See Fuddruckers,* 826 F.2d at 842. Reviewing the different elements of both the registered and common law trade dress, the court finds that the vast majority of the components are non-functional in nature. Therefore, the court concludes, as a matter of law, that the alleged trade dress as a whole is primarily non-functional. So, it must also deny Defendant's cross-motion for summary judgment regarding this issue.

### 4. Likelihood of Confusion

The Lanham Act prohibits the use of "any word, term, name, symbol, or device, or any combination thereof" that "is likely to cause confusion...as to the origin, ownership, or approval of his or her goods." 15 U.S.C. § 1125(a). To prevail on the third prong of an infringement claim, Plaintiff must show that Defendants' trade dress creates a likelihood of confusion as to the origin of the goods offered by Plaintiff and Defendants. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723 (6th Cir. 2012). Both trademark and trade dress claims are subject to the same likelihood of confusion

standard. *See Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013). In determining whether a likelihood of confusion exists, the Sixth Circuit considers the following factors:

> (1) the strength of the plaintiff's mark, (2) the relatedness of the goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks.

> *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648

(6th Cir. 1982). While not every one of the *Frisch* factors will be relevant in every case, "the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Therma-Scan,* 295 F.3d at 630. Whether confusion exists "is a mixed question of fact and law," "but the ultimate determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Id.* at 630-31.

When balancing *Frisch* factors, as a general rule, the Sixth Circuit has made clear that "when the factors, . . . [are] so evenly balanced—a 4 to 3 split, with the eighth factor not at issue in th[e] case," the court should err against granting summary judgment. *Innovation Ventures,* 694 F.3d at 733. *But see Int'l IP Holdings, LLC v. Green Planet, Inc.,* No. 13-13988, 2016 WL 1242275, at *4 (E.D. Mich. Mar. 30, 2016) (Cleland, J.) (cautioning against "a strict mathematical weighing of the factors" when determining the likelihood of confusion because under "such a multi-factored test, it is sensible to place the factors on a sliding scale, such that a strong showing on one or two factors may lessen the burden on other factors").

Because a genuine factual dispute exists regarding at least three important factors, the court finds it would be inappropriate to award summary judgment to either party on the likelihood of confusion prong.

### a) Strength of the Mark

The strength of the mark factor "focuses on the distinctiveness of a mark and its recognition among the public." *Therma-Scan*, 295 F.3d at 631. The Sixth Circuit has explained that strength evaluation encompasses two separate components: "(1) 'conceptual strength,' or 'placement of the mark on the spectrum of marks,' which encapsulates the question of inherent distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition value of the mark.'" *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) (quoting McCarthy, § 11.83). A mark's distinctiveness and resulting conceptual strength "depends partly upon which of four categories it occupies: generic, descriptive, suggestive, and fanciful or arbitrary." *Therma-Scan*, 295 F.3d at 631 (internal quotation marks omitted).

Here, since the court has already found that neither Plaintiff's registered nor common law trade dresses are inherently distinctive, the combined trade dress should be considered "conceptually weak." *See Progressive Distribution Servs*, 856 F.3d at 428. "Because the strength of a trademark for purposes of the likelihood of confusion analysis depends on the interplay between conceptual and commercial strength, the existence or non-existence of distinctiveness is not the end of the inquiry." *Maker's Mark,* 679 F.3d at 419. So, Plaintiff may still ultimately show that the mark has acquired commercial strength nationally, but there is a direct factual dispute between the competing secondary meaning surveys presented by the parties that must be resolved

63

before the court can make a definitive determination on the commercial strength of the trade dress.

### b)  Relatedness of the services

Both parties sell primarily the same products, so Defendants concede this factor points in favor of a likelihood of confusion. (ECF No. 37, PageID.1906.)

### c)  Similarity of the marks

"Similarity of marks is a factor of considerable weight." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997). "In evaluating whether the mark is similar, a court should not examine the marks side by side but instead must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented." *Progressive Distribution Servs*, 856 F.3d at 432 (quotations omitted). Additionally, the Sixth Circuit recognizes the "anti-dissection rule," whereby courts "view marks in the entirety and focus on the overall impressions, not individual features." *Daddy's*, 109 F.3d at 283; *see also Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) (quoting McCarthy, § 23:15 (2d ed. 1984)) (A trademark "should not be split up into its component parts and each part then compared with parts of the conflicting mark to determine the likelihood of confusion. It is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important.").

The court views this factor to be a relatively close call in the present case, so the court reserves final judgment on the issue until the fact finder makes a determination regarding actual confusion. Preliminarily, however, the court finds this factor weighs

slightly in favor of Defendants. The two burger chains do not currently, and likely will not in the short or medium term, compete in the same market. And the court notes that as a general matter, consumers seem to be able to distinguish between Steak n' Shake, In-N-Out, Freddy's, and other burger chains with red and white interiors. Here, Doll n' Burger has a large cow logo prominently displayed on both the interior and exterior of the store, along with clear signage spelling out the name on the storefront. Viewing the copious supply of images provided by the parties, "[w]hile there are some similarities between the [restaurants], the readily apparent and numerous differences [at least somewhat] outweigh those similarities," so the court's preliminary conclusion is that the marks are not significantly similar. *See Int'l IP Holdings*, 2016 WL 1242275, at *8.

### d) Evidence of actual confusion

"Nothing shows the likelihood of confusion more than the fact of actual confusion." *Groeneveld Transp. Efficiency,* 730 F.3d at 517. As already discussed at length above, Plaintiff and Defendants have presented expert testimony and survey data that lead to dramatically different conclusions regarding the likelihood of actual consumer confusion. Given the importance the Sixth Circuit has placed on this factor in the past, the fact that it is so evenly contested in the present case weighs strongly against granting summary judgment to either party.

### e) Marketing channels

In considering this factor, courts must determine "how and to whom the respective goods or services of the parties are sold." *Leelanau Wine Cellars, Ltd.*, 502 F.3d at 519 (quoting *Gen. Motors Corp. v. Keystone Auto. Indus.*, Inc., 453 F.3d 351, 357 (6th Cir. 2006)). There is less likelihood of confusion where the goods are sold

through different avenues. *Id.* "Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion [also] decreases." *Therma-Scan*, 295 F.3d at 636. Since In-N-Out engages in at least some national marketing and has a significant social media presence, the court finds this factor points in their favor.

### f) Likely Degree of Purchaser Care

"Generally, the standard for determining whether a likelihood of confusion would arise is predicated upon an ordinary buyer exercising ordinary caution." *Progressive Distribution Servs.*, 856 F.3d at 435. However, the Sixth Circuit has previously noted that "consumers of fast-food are unlikely to employ much care during their purchases." *Daddy's Junky Music Stores*, 109 F.3d at 285 (citing *Little Caesar*, 834 F.2d at 572; *Frisch I,* 670 F.2d at 648). Likewise, the court finds that customers are unlikely to exercise a high degree of care in purchasing Defendant's products, so this factor weighs in favor of Plaintiff.

### g) Defendants' Intent

In this circuit, "[i]f a party chooses a mark with the intention of creating confusion between its products and those of another company, 'that fact alone may be sufficient to justify an inference of confusing similarity.'" *Therma-Scan*, 295 F.3d at 638 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 286). "Circumstantial evidence of copying, particularly the use of a contested mark with knowledge that the mark is protected, may be sufficient to support an inference of intentional infringement where direct evidence is not available." *Progressive Distribution Servs.*, 856 F.3d at 436.

This factor remains factually disputed, as the court has discussed with regard to secondary meaning. Plaintiff has presented substantial circumstantial evidence suggesting that Defendants' may have engaged in intentional copying of Plaintiff's trade dress. The factfinder will need to make a credibility determination when weighing this circumstantial evidence against the testimony of Defendants' employees to the contrary.

### h)  Overlap

The court preliminarily finds that future overlap of the products remains unlikely. Plaintiff has presented no testimony indicating that it actually plans to expand into the midwestern market. Affidavits from Plaintiff's employees only establish that it has not completely ruled out expansion someday in the future, but for this factor to tilt in favor of Plaintiff a more explicit showing of potential overlap is required. Defendants have testified, despite some marketing puffery to the contrary, that its future expansion is likely limited to Michigan and adjoining states. The court's ruling on this issue is preliminary, however, so the parties remain free to contest this issue at trial.

### 5.  Counterclaims

Plaintiff also contends that the court should grant summary judgment on Defendants' two counterclaims. The court agrees. Because the court has already found that Defendants failed to provide sufficient evidence to support the cancellation of Plaintiff's registered trade dress, the court must necessarily conclude that summary judgment should be granted to Plaintiff on Defendants' counterclaim seeking cancelation of In-N-Out's registered trade dress.

Defendants' second counterclaim seeks a declaration that Plaintiff's trade dress does not have secondary meaning and that there is no likelihood of confusion. This

claim is clearly a mirror image of the elements that Plaintiff must prove to show trade dress infringement and unfair competition under the Lanham Act. The Sixth Circuit has noted that the court should look at the redundancy of such "mirror image" claims when deciding if they should be dismissed. *Malibu Media, LLC v. Redacted*, 705 F. App'x 402, 406 (6th Cir. 2017) (affirming dismissal of a counterclaim in a copyright infringement suit because it was "not clear what 'useful purpose' [the defendant's] counterclaim would serve"); *see also Orleans Int'l, Inc. v. Mistica Foods, L.L.C.*, No. 15-13525, 2016 WL 3878256, at *2-3 (E.D. Mich. Jul. 18, 2016) (Cox, J.) (dismissing a declaratory judgment counterclaim under Rule 12(b)(6) because it was redundant to the plaintiff's claims and therefore did not serve a useful purpose). Since Defendants have likewise failed to articulate a useful purpose for this counterclaim, the court will grant summary judgment against it.

### 6.  Dismissal of Defendants

In their motion for summary judgment, Defendants also briefly argue that the court should dismiss two of the Defendants: Veritas Vineyard, LLC and Doll n' Burgers, LLC. (ECF No. 37, PageID.1913.) Defendants note that "Veritas performs back office administrative work, and Doll n' Burgers LLC is simply a holding company for the restaurants' intellectual property, specifically its trademarks." (*Id.*) And they contend "[t]here is no evidence that either infringed or contributed to infringement." (*Id.*) But Plaintiff points out that Defendants' Answer contained an admission that "[e]ach Defendant has a direct role in, and is at least partially responsible for, operating the [Doll n' Burger] Restaurants, including with respect to the restaurants' use of the Infringing Trade Dress." (ECF No. 21, PageID.179 ¶37; ECF No. 25, PageID.207.)

Given this admission, and the general lack of evidentiary development of Defendant's argument, the court declines to dismiss any of the Defendants at this time.

## IV. CONCLUSION

The court finds that neither of the reports produced by the opposing parties' expert witnesses are so flawed that they should not be presented to the factfinder, *see Scott Fetzer*, 381 F.3d at 488, so both motions in limine must be denied. The court also finds, as a matter of law, that Plaintiff In-N-Out's registered trade dress is valid because it is both non-functional and that it has acquired secondary meaning. But a question of fact remains as to whether either Plaintiff's registered or common law trade dress would lead to consumer confusion. And, a genuine factual dispute exists regarding whether Plaintiff's alleged common law trade dress has acquired secondary meaning in the relevant market (or nationwide). Given these findings, both parties' cross-motions for summary judgment must be denied as to all counts in Plaintiff's amended complaint. But, as explained above, summary judgment shall be entered for Plaintiff on Defendants' counterclaims. So, the court will grant in part, and deny in part, Plaintiff's motion for summary judgment, and it will deny Defendants' motion for summary judgment *in toto*. Accordingly,

IT IS ORDERED that Plaintiff In-N-Out's "Motion in Limine to Exclude Dr. Stec's Proposed Expert Testimony and Opinions" (ECF No. 31) is DENIED.

IT IS ORDERED that Defendants' joint "Motion in Limine to Exclude Report and Testimony of Dr. Isabella Cunningham" (ECF No. 38) is DENIED.

IT IS ORDERED that Plaintiff In-N-Out's motion for Summary Judgment (ECF No. 32) is GRANTED IN PART and DENIED IN PART. It is GRANTED and Summary

Judgment will be awarded to Plaintiff on Defendants' counterclaims, the acquired distinctiveness of Plaintiff's registered trade dress, and the non-functionality of both Plaintiff's common law and registered trade dresses. It is DENIED with respect to Plaintiff's request for summary judgment on its amended complaint as Plaintiff has failed to prove every required element of its claims.

IT IS ORDERED that Defendants' joint Motion for Summary Judgment (ECF No. 37) is DENIED.


s/Robert H. Cleland                              /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 14, 2022


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 14, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner                              /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C1 ORDERS\20-11911.IN-N-OUT.MSJ.AAB.2.RHC.docx